FILED
12/16/2016
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Jeanette Y. Sams

Plaintiff,

v.

City Of Chicago, et al.

Defendants.

Case No. 13-cv-07625

Honorable Judge Alonso

Honorable Magistrate Judge Gilbert

PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO MOTION FOR SUMMARY JUDGMENT

NOW COMES Plaintiff, Jeanette Y. Sams, by her attorneys LAD LAW GROUP, P.C., and for her Memorandum in Opposition to Motion for Summary Judgment states:

## I. LEGAL PRINCIPLES

### A. Summary Judgment

Summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, construing all facts and reasonable inferences in the non-movant's favor, Cracco v. Vitran Exp. Inc., 559 F.3d 625, 633 (7th Cir. 2009). At summary judgment plaintiff need only raise a material issue of fact as to the believability of the employer's justification. E.E.O.C. v. Target Corp., 460 F.3d 946, 960 (7th Cir. 2006).

### B. Prima Facie Case for Race Discrimination under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981

The Seventh Circuit has dispensed with the "direct" and "indirect" frameworks for analyzing employment discrimination claims, which had taken on a life of their own, sowing confusion and sometimes imposing a too-high burden on plaintiffs. But the prima facie framework under McDonnell Douglas of course survives (it was established by the Supreme

Court). Ortiz v. Werner Enters., Inc., — F.3d —, 2016 WL 4411434, at *5(7th Cir. Aug. 19, 2016). Under the prima facie framework, plaintiff must show that: (1) she belongs to a protected class; (2) she performed her job to the defendant's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably by the defendant. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803 (1973); Atanus v. Perry, 520 F.3d 662, 672-73 (7th Cir. 2008); Wyninger v. Venture Gear, Inc., 361 F.3d 965, 978 (7th Cir. 2004). If the plaintiff is able make a prima facie case, then the burden shifts to the defendant "to produce a legitimate, noninvidious reason for its actions." Atanus, 520 F.3d at 672. If the defendant successfully rebuts the plaintiff's prima facie case, then the burden shifts back to the plaintiff "to show that the [defendant's] reasons 'are false and only a pretext for discrimination.'" Id. (quoting Bahl v. Royal Indem. Co., 115 F.3d 1283, 1290 (7th Cir. 1997)).

## II. FACTS[1]

In her Third Amended Complaint[2], Plaintiff alleges that she was improperly placed on a personal leave by Barbara Hemmerling, the Administrator of the Chicago Police Department's ("CPD") Medical Services Section ("MSS") in March 2011. (Plaintiff's Statement of Additional Material Facts ("PSOAF") ¶17; Plaintiff's Response to Defendant's Statement of Material Facts ("RDSOF") ¶¶8, 24-26, 28-32, 34-35, 45. Plaintiff had been assigned to MSS, and Hemmerling

[1] Plaintiff hereby incorporates her responses to Defendant's Statement of Material Facts, and Plaintiff's Statement of Additional Material Facts, as stated herein. Plaintiff further states that the statements are undisputed for the purpose of responding to Defendant's Motion for Summary Judgment, only.

[2] Plaintiff makes claims in her Third Amended Complaint ("Complaint") [dkt. 36] that Defendant failed to accommodate her disability, and discriminated against her on the basis of her disability of race. Judge Shah's November 25, 2014 Order on Defendant's Motion to Dismiss Plaintiff's Complaint, dismisses Plaintiff's claim for discrimination based upon her March 2011 placement on leave in response to her request for an accommodation to work in the Medical Services Section at time, but noted Plaintiff could assert the facts as background information. The Court also dismissed Plaintiff's retaliation claim. The Court did, however, expressly state that Plaintiff could proceed on her claim that Defendant's failure to reinstate Plaintiff in March 2012 was discriminatory, and on her §1983 claim against Defendant Barbara Hemmerling. [dkt. 56] at pg. 16.

blocked Plaintiff's assignment. PSOAF ¶¶11, 12, 15, 32; RDSOF ¶¶ 29,45, 50-51, 58-59. After her placement on personal leave, which is distinct from a medical leave, Plaintiff made several attempts to find out why she was placed on personal leave, as she had not made such request, and on February 22, 2011.had been cleared by her doctor, Dr. Deborah Killingsworth to return to work as of February 28, 2011. PSOAF ¶¶10, 14, 21, 36; RDSOF ¶¶42, 56, 58. She never received a response to those inquiries. PSOAF ¶13. Plaintiff remained on personal leave, for which she was not earning any money or benefits during that time PSOAF ¶¶ 22,24.

Beginning in March 2012, Plaintiff made several efforts to request reinstatement from her March 2011 personal leave. PSOAF ¶¶ 20, 24, 26. Plaintiff followed Defendant's process of disputing the information on the PAR form placing her on leave, and by contacting HR for reinstatement, as she had in the past. PSOAF ¶¶34, 39. Ladner finally responded to Plaintiff at the behest of the Superintendent, with a phone call wherein she told Plaintiff she could not return to work due to medical reasons, and in two letters simply restating Hemmerling's false version of the March 1, 2011 meeting, and the actions Defendant took thereafter. PSOAF ¶¶23-28. Ladner had no personal knowledge of Plaintiff's medical condition at the time of her March 2011 leave, or at the time she sought reinstatement. The only information she relied on in communicating with Plaintiff was the information provided by Hemmerling regarding the happenings on March 1, 2011. PSOAF ¶¶18, 29-30, 62 While Plaintiff was blocked from working in the MSS, and was denied reinstatement, so that she could work her assignment in the MSS, employees outside of her protected classes of race and disability[3], and were not blocked by Hemmerling.

---

[3] Patricia Polick, Sieka O'Campo, and Kimberly Farret were all non-African-American, while Sieka O'Campo, and Kimberly Farret were not disabled. PSOAF ¶¶31.

## III. ARGUMENT

### A. Race and Disability Discrimination (City of Chicago)

#### 1. Protected Class: Plaintiff is African-American and had a qualified disability.

##### a. Perceived disability

It is undisputed that Plaintiff is African-American. (See Defendant's Memo in Support of Motion for Summary Judgment ("DMSJ") at page 14). It is also undisputed that Defendant perceived Plaintiff has having a qualified disability. The ADA defines "disability" as (a) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment. See 42 U.S.C. § 12102(2) (2006). The plaintiff does not need to establish an actual disability to make a claim based on ADA § 12102(2)(c). Under the 2008 ADA Amendments, an individual may be perceived as having an impairment whether or not the impairment limits or is perceived to limit a major life activity. 29 C.F.R. § 1630.2(g)(1)(iii) (―This means that the individual has been subjected to an action prohibited by the ADA as amended because of an actual or perceived impairment that is not both transitory and minor.); See, e.g., Brunker v. Schwan's Home Service, Inc., 583 F.3d 1004 (7th Cir. 2009) (reprimand for dress code violation suggests employer regarded employee as unable to care for himself).

In order to prove that the defendant regarded plaintiff as having a disability, plaintiff must demonstrate that the employer believed that the plaintiff had an impairment that substantially limited one or more major life activities. Viramontes v. U.S. Bancorp, 10-cv-761, 2011 WL 6780644 (N.D. Ill. Dec. 27, 2011). Major life activities are the basic activities that average persons can perform with little or no difficulty. These ―include, but are not limited to: Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing,

sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working. 29 C.F.R. § 1630.2(i)(1)(i). Kupstas v. City of Greenwood, 398 F.3d 609, 611 (7th Cir. 2005); Amadio v. Ford Motor Co., 238 F.3d 919, 925-27 (7th Cir. 2001).

In Defendant's Memo in support of summary judgment, on page 2, it openly admits its belief that Plaintiff "would not have been able to meet the essential duties required of all CPD police officers in 2012." On page 8 of DMSJ, Defendant runs down a list of essential functions of Plaintiff's job as a police office, which includes walking and driving, and states "Plaintiff would not have been able to perform these essential functions." Defendant goes on to argue that there were no accommodations that would allow Plaintiff to perform the essential functions of her job duties, even on limited duty[4]. Defendant's statements constitute judicial admissions that Defendant perceived Plaintiff as disabled. See Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel ..." See Medcom Holding Co. v. Baxter Travenol Laboratories, 106 F. 3d 1388, 1404 (7th Cir. 1997), citing Keller v. United States, 58 F.3d 1194, 1198 n. 8 (7th Cir.1995), and In re Lefkas Gen. Partners, 153 B.R. 804 (N.D.Ill.1993) (Binding judicial admissions are "any `deliberate, clear and unequivocal' statement, either written or oral, made in the course of judicial proceedings."). Aside from Defendant's admissions in its brief, the evidence shows that Defendant was well aware that Plaintiff had a history of strokes that at times, limited her ability to perform the essential functions of her job duties (including walking and driving) to the point she was off work for considerable periods of time. PSOAF ¶¶1-3, 6, 15, 22, 31, 44, 50. During Plaintiff's March 1,

[4] Even if Plaintiff could not perform the essential functions of a police officer, as Defendant alleges, that would not preclude her from returning to work as a Chicago Police Officer. See Jackson v. City of Chicago, 414 F. 3d 806 (7th Cir. 2005) (The court noted that the ADA "allows for the possibility" that [Plaintiff] could be given "the reasonable accommodation of reassignment to another position within [the] City where handling a firearm is not an essential function.")

2011 meeting with Hemmerling, Hemmerling told Plaintiff she was "over" Plaintiff's health issues, and that she was unfit to be a Chicago Police Officer. RDSOF ¶45. Further, when Plaintiff requested reinstatement in March 2012, Ladner told her she could not return because of "medical reasons", despite the fact that Plaintiff had been returned to work by her physician, and had no changes in her health since released. PSOAF ¶¶4, 21, 24. These facts would allow a reasonable jury to infer that Defendant regarded Plaintiff as disabled, and unable to perform her the essential functions of job duties-including walking and driving.

2. Plaintiff met Defendant's legitimate expectations

At the time of Plaintiff's personal leave in March, 2011, she had successfully completed the Police Academy, and was to begin her assignment on February 14, 2011, with no disciplinary action pending. In fact, despite Defendant's allegation that Plaintiff refused to report to work in the Alternate Response Unit, a terminable offense, Plaintiff was not terminated, and there is no evidence that she was disciplined at all. PSOAF ¶¶22, 23,33, 38; RDSOF ¶¶4, 21, 41 (and the assertions made by Defendant in ¶¶4, 21, 41). Defendant's PAR form that places Plaintiff on leave, shows that an employee can be terminated for job abandonment, yet that selection is not indicated for Plaintiff's leave. Plaintiff's physician Dr. Killingsworth released Plaintiff to work on February 21, 2011, and Plaintiff was ready, willing, and able to work. With no evidence to the contrary, a reasonable jury could determine that Plaintiff was an employee, with no disciplinary issues, and that she indeed met Defendant's legitimate expectations.

3.Defendant's refusal to reinstate Plaintiff was a discrete adverse employment action.

Defendant does not dispute that Plaintiff's request for reinstatement was an adverse employment action, but argues that it was not a "new" action, only a continuation of Plaintiff's

placement on leave in March 2011. Defendant is incorrect. As Judge Shah correctly noted in his November 25, 2014 Order, "[t]he March 2012 refusal to reinstate [Plaintiff], after her request for reinstatement, is a discrete act, separate from the March 2011 forced leave, citing Stuart v. Local 727, Int'l Bhd. of Teamsters, – F.3d –, 2014 U.S. App. LEXIS 21710, *8 (7th Cir. Nov. 14, 2014) (The existence of past acts and the employee's prior knowledge of their occurrence . . . does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.") [dkt. 56 at pg. 9].

The facts in the record are very clear that in March, 2012, Plaintiff requested reinstatement to Ladner over the phone, through letters to Ladner and to the Superintendent, and by following procedure and requesting reinstatement at CPD headquarters. PSOAF ¶¶20. Further, according to CPD's policies, practices, and procedures, to seek reinstatement, Plaintiff was to first contact HR to begin the reinstatement process. PSOAF ¶34, RDSOF ¶18. Plaintiff did just that. She called HR over and over again; she wrote letters to Ladner, the director of HR, and even showed up to state she was seeking reinstatement. PSOAF ¶20. Ladner even acknowledged Plaintiff's efforts, and admitted that Plaintiff's efforts were not only to complain about Hemmerling, but that Plaintiff was also seeking to come back to work, a distinct, discrete act. PSOAF ¶¶24,28. The mere mentioning of the past acts provide background as to why she was on leave, and as Judge Shah ruled, is permissible when discussing the adverse action of Defendant's denial of Plaintiff's reinstatement. See Sharp v. United Airlines, Inc., 236 F.3d 373 (7th Cir. 2001) (an employer's current refusal to reverse a previous discriminatory act does not revive an expired limitations period; rather, it begins a new limitation period for the discriminatory refusal).

4. Similarly Situated Individuals outside of Plaintiff's protected class were treated better than Plaintiff

a. Hemmerling blocked Plaintiff from working in MSS

Prior to Defendant placing Plaintiff on personal leave in March 2011, Plaintiff was assigned to work in the Medical Services Section ("MSS") by Chief Eugene Williams. RDSOF ¶¶28-30,31. As an initial matter, this issue is a material fact in dispute, which precludes summary judgment. Plaintiff asserts that Williams approved her assignment. Plaintiff's assignment was evidenced by the MSS unit number designation on her paycheck. She did not contact anyone to direct her paycheck to be picked up in MSS. It is important to note here, that Plaintiff did simply pick up her paycheck in MSS, but MSS was designated as the assigned unit for Plaintiff directly on the check, the same way Plaintiff's unit had always been designated on her checks. PSOAF ¶¶5-8, 15. Defendant proofers no evidence that Chief Williams did not expressly approve Plaintiff's assignment, or any evidence that refutes that the unit number assigned on Plaintiff's check of February 28, 2011, is not MSS[5]. Instead, Defendant argues that its "policy" would not allow such an action by Williams. However, it is clear from the testimony in this case, that such actions were common practice. RDSOF ¶¶8.

According to former CPD Sergeant Brenda Shed Mayo, an officer's circle of influence at the CPD can affect whether an officer is given a particular assignment or detail, and Williams had the authority and influence to reassign Plaintiff. PSOAF ¶32. Ladner testified that some

---

[5] In its Statement of Fact ¶48, Defendant attempts to insinuate that Plaintiff called the finance department on February 14, 2011 and told the finance department to direct her check to MSS. This theory however would not explain why the paycheck with the pay period ending the next day, February 15, 2011, with a pay date of February 16, 2011, did not list MSS (if Plaintiff in fact had called to make such request on the 14th) as Plaintiff's assigned unit-it listed the Academy, where Plaintiff was actually assigned at the time. PSOAF ¶¶5-8. Plaintiff's assigned unit on her paycheck with the pay period ending February 28, 2011 is the ARU. PSOAF ¶15. It also begs to question how an employee can simply call the finance department, and the finance department will change the information it prints on a paycheck, which is a different action than Defendant insinuates of Plaintiff (that she called to have her check forwarded to a unit other than her assignment." See Defendant's Statement of Facts¶48. Plaintiff expressly disputes these insinuations, as she never made such call to the finance department. PSOAF ¶7.

CPD assignments and details were made by HR. RDSOF ¶8. Further, CPD employee Chanete Wooley, in her affidavit provided by Defendant in support of its Motion for Summary Judgment, attests moved from ARU to MSS simply by sending in her resume and interviewing with the Commanding officer. RDSOF ¶8. These common practices, showing a deviation from Defendant's "stated" policy evidence Defendant's actual practice of allowing persons other than the highest person in the bureau to grant a request such as Plaintiff's. See Adickes v. SH Kress & Co., 398 US 144, 168-169 (1970) ("Deeply embedded traditional ways of carrying out state policy, such as those of which petitioner complains, are often tougher and truer law than the dead words of the written text" (internal citations omitted)). A reasonable jury could determine that because of Plaintiff's express approval from Chief Williams, the unit assignment on Plaintiff's paycheck, Plaintiff was indeed assigned to MSS.

b. Employees Patricia Polick, Sieka O'Campo, and Kimberly Farret began working in MSS after Plaintiff was blocked by Hemmerling

Plaintiff asserts that she was treated less favorably than employees Patricia Polick, Sieka O'Campo, and Kimberly Farret. These employees were all non-African-American, and at the time of Plaintiff's request for reinstatement, were not disabled[6]. At the time Plaintiff requested reinstatement, these individuals were not working in the medical unit, and had not been previously assigned to work there before Plaintiff's personal March 2011 personal leave. PSOAF ¶31. The fact this was Plaintiff's assigned unit, and she was not allowed to return to work there while other non-African-American, non-disabled employees were allowed to begin working there, evidences differential treatment.

[6] Plaintiff alleges only Polick was disabled. O'Campo and Farrett were not disabled.

Defendant argues that Hemmerling was not a decision maker, and therefore could not have blocked Plaintiff's assignment to MSS, because she lacked "authority" to do so. The evidence is uncontroverted that all decisions made regarding Plaintiff's leave were based on Hemmerling's version of the facts. PSOAF ¶¶ 19, 23, 25; RDSOF ¶58 (and the assertions made by Defendant in ¶58). Hemmerling admits to receiving a phone call about Plaintiff being assigned to the MSS, and making to a unilateral unauthorized[7] decision to report that there was no work for Plaintiff in the MSS. RDSOF ¶50 (and the assertions made by Defendant in ¶50). Neither Ladner nor Lt. Looney had any independent information regarding Plaintiff, and acted based off on Hemmerling's representation of the events of March 1, 2011. Ladner's supervisor, even states that he met with Hemmerling before recommending Plaintiff be placed on personal leave, based on events as relayed by Hemmerling's email, and Ladner concurred. RDSOF ¶58 (and the assertions made by Defendant in ¶58). The evidence is clear that at the March 1, 2011 meeting between Plaintiff and Hemmerling, Plaintiff was requesting to come back to work. PSOAF ¶17. Hemmerling, however, represented that Plaintiff was attempting to take more time off, but she had none available. She went on to state Plaintiff "refused" to sign a PAR form, and to take accommodation paperwork[8]. Ladner and Lt. Looney had no independent information regarding this alleged "refusal", and Ladner simply "rubber-stamped" Hemmerling's representation of the facts. Hemmerling in effect acted as the "Cat's Paw" to cause adverse action against Plaintiff. "In employment discrimination law, the 'cat's paw' metaphor refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor (or other decision-maker) who himself has no discriminatory motive, but who has

[7] According to Defendant in its Statement of Facts ¶50, Hemmerling was not authorized to make such a decision.

[8] It is important to note that Hemmerling claims not to have viewed Plaintiff's February 21, 1011 letter from Dr. Killingsworth as a reasonable accommodation request, but insists she gave Plaintiff reasonable accommodation paperwork. (See facts asserted in Defendant's statement of facts ¶¶45-46, 50).

been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action. See Staub v. Proctor Hospital, 562 U.S. 647 (March 1, 2011). See also Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir.1990) ("If the [formal decision-makers] acted as the conduit of the [subordinate's] prejudice—his cat's-paw—the innocence of [the decision-makers] would not spare the company from liability.") Here, Hemmerlings's action need only be a "causal factor" of the ultimate employment action, and is at fault because its agent acted on discriminatory animus, intending to cause, and causing, an adverse employment decision. See Staub, supra. See also Darchak v. City of Chicago Bd. of Educ., 580 F.3d 622 (7th Cir. 2009).

Plaintiff made several complaints to Defendant, to refute Hemmerling's version of the events. However, no one- Hemmerling, Lt. Looney, or Ladner-had any conversations with anyone at CPD about it. PSOAF ¶¶19, 23, 25. No one got back to Plaintiff until March 2012. The decision disallowing Plaintiff to work in MSS and to place Plaintiff on persona leave was made solely based on Hemmerling's contrived story, to accomplish her efforts of blocking Plaintiff's assignment to the MSS, and placing her on leave, causing her to lose money, benefits, and other damage incurred from being out of work and receiving no income.

5. Pretext

Defendant argues that Plaintiff cannot show pretext in her reinstatement request denial claim, because she cannot show that Ladner's 2012 response to Plaintiff's letters was pretext. However, Ladner's 2012 letters are devoid of any reason Plaintiff was unable to return to work. Ladner's letters do not even cite a reason that Defendant would not allow Plaintiff to be reinstated. PSOAF ¶26-27, and attachments referenced therein. None of the language in the letters addresses Plaintiff's 2012 request for reinstatement, despite the fact that the letter itself

claims to be a response to Plaintiff's March 6, 2012 request for reinstatement to Superintendent McCarty. Id. The first letter recaps Plaintiff's medical history and states the current status of the matters-that Plaintiff has been placed on a personal leave. It states Plaintiff was "unable to return to work due to your treating physician's assessment that you needed one-on-one interactions, and that working in large settings with multiple officers interacting with clients caused you psychological distraction and anxiety" PSOAF ¶25. This was not true, as Plaintiff's physician had returned her to work, Defendants' own system evidenced she was set to return to work on February 28, 2011, and there is no evidence stating that she could not work.

The second letter, dated November 16, 2012, fares no better: it only tells Plaintiff that Ladner can no longer talk to her about the matter. With no non-discriminatory reason articulated for its action, Defendant's poorly defined grounds for not allowing Plaintiff to return to work demonstrates pretext. See Gordon v. United Airlines, Inc., 246 F.3d 878 (7th Cir. 2001). (Pretext exits where the employer's grounds for its adverse action are poorly defined, and the grounds are inconsistently applied).

Because Ladner's 2012 letters fail to articulate a reason for refusing to allow Plaintiff to return to work, the Court, along with Plaintiff, are left to speculate. In areas of its Statement of Facts, Defendant purports to assert other reasons why Plaintiff was not allowed to return to work. These reasons, however, are also untrue, and evidence pretext. For example, in Paragraph 40 of its statement of facts, Defendant asserts that Plaintiff was required to report to the gun range before she returned to work. This is not true. Plaintiff had passed her range qualifications test when reinstated in January 2011. She was only out for a headache for two weeks, and when she returned, was not required to complete the gun range qualification again. RDSOF ¶35, 40. This position also conflicts with Defendant's purported reason that Plaintiff was placed on leave-

because she was out of medical role time. Defendant asserts in Paragraph 45 of its statement of facts, that "Hemmerling explained to Plaintiff that she was out of medical roll time and thus, pursuant to CPD's rules and orders, would either need to report to her unit of detail, the ARU, after she qualified at the gun range". Why would Hemmerling tell Plaintiff that she would need to qualify at the gun range and report to ARU, if Plaintiff was out of medical role time? It must be that Defendant's reason for not allowing Plaintiff to return to work is a lie. Proof that the defendant's asserted reason is untrue permits a finding of discrimination. Reeves v. Sanderson Plumbing Prods, Inc., 530 U.S. 133 (2000); Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1123 (7th Cir. 1994).

It also appears that Defendant attempts to purport that Plaintiff was placed on leave (and therefore not allowed to work in the MSS) because she was out of medical role time[9]. This again is illogical, as, at the time Plaintiff was placed on leave in March 2011, and even when she sought reinstatement in March 2012, it is clear she was seeking to return to work, therefore whatever medical time she did or did not have is irrelevant.

Also, Defendant claims that Plaintiff refused to report to her unit of detail, and refused to fill out reasonable accommodation paperwork, presumably as a purported reason for not allowing Plaintiff to return to work. Ladner and Lt. Looney testified that they have no idea whether Plaintiff actually refused anything. PSOAF ¶¶19,2 5. Further, they testified that the word "refused" on the PAR form simply met the person was not there to sign the form. PSOAF ¶19. This alleged "refusal" was clearly no refusal at all, and no legitimate reason to disallow Plaintiff from working. Further, Ladner, Looney, and Williams were very clear that refusal to report to a detail was grounds for termination-yet Plaintiff was not terminated. This too raises

[9] This purported explanation for Defendants' actions was also stated in Ladner's March 2012 letter

suspicion as to Defendant's reasons alleged for its actions, wherein a jury could determine that it is a lie to cover up discrimination.

In addition, Ladner's November 2012 letter appears to suggest that Plaintiff's alleged failure exercise her option to go on a leave of absence, as the reason for its adverse action, however this is nonsensical. Plaintiff was already on a leave of absence, and was seeking reinstatement when placed on leave. This could not be the true reason for Defendant failing to allow Plaintiff to return to work. The same letter also cites Plaintiff's failure to request a reasonable accommodation under the ADA. This is also unworthy of credence, as Plaintiff was requesting reinstatement, and there is absolutely no evidence that she needed, or was requesting an accommodation in March, 2012. Plaintiff had been cleared to return to work, and had no new medical restrictions at the time. No information was ever provided to Defendant that Plaintiff could not work. Further, according to Hemmerling and Lander, Plaintiff was placed on personal leave because she refused to report to her assigned unit. This is not a medical reason, and would not require Plaintiff to get clearance from a physician or request a reasonable accommodation in order to return to work. PSOAF ¶36. In fact, Plaintiff had no documented restrictions in 2012 when she requested to return to work; she did not request a reasonable accommodation to return, only to be reinstated. She was told she could not due to "medical reasons", suggesting a discriminatory motive.

Plaintiff has provided evidence where a reasonable jury could infer that Defendant's stated reasons for terminating Plaintiff were not the true reasons. If the employer's stated reason is not the true reason, the case cannot be decided on summary judgment. Forrester v. Rauland-Borg Corp, 453 F.3d 416 (7th Cir. 2006).

B. §1981 Race Discrimination[10]

Section 1981 discrimination claims are analyzed in the same manner as claims brought pursuant to Title VII of the Civil Rights Act. Montgomery v. Am. Airlines, Inc., 626 F.3d 382, 389 (7th Cir. 2010). Accordingly, in order to prevail on a sec. 1981 claim, a plaintiff establishes a prima facie case of discrimination under the indirect method by showing that (1) she was part of a protected class; (2) she was either qualified for the position for which she was applying or she was performing well enough to meet her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably. Naik v. Boehringer Ingelheim Phamaceuticals, Inc., 627 F.3d 596, at 599-600. (7th Cir. 2010).

The evidence in the record supports Plaintiff's prima facie case. As argued herein, Plaintiff is African-American, and qualifies as disabled under the ADA. She performed her job duties satisfactorily, as she had successfully completed the police academy, and was prepared to begin work on February 14, 2011, and had no disciplinary action pending against her at the time. Similarly-situated non-African-American, non-disabled employees were treated better than Plaintiff, as they were allowed to work in the MSS and Plaintiff was not.

Plaintiff experienced an adverse employment action when Hemmerling told Plaintiff she was "over" her medical issues, and refused to allow Plaintiff to work in the MSS by placing her on personal leave. Defendant argues that this alleged adverse action could not be attributed to Hemmerling because she did not have authority to make assignments. However, the record is

[10] Defendant argues that Plaintiff's 1981 claim against Hemmerling is time barred. Defendant is incorrect. This issue has already been adjudicated by Judge Shah in his November 25, 2014 Order on Defendant's Motion to Dismiss, wherein he rules that Plaintiff's 1981 claim against Hemmerling individually, as a state actor, is subject to the four year statue of limitations [dkt. 56] at pp.12-14.

replete with evidence wherein a reasonable jury could find that Hemmerling directly caused Plaintiff's improper placement on leave, by stating that there was on position for Plaintiff in MSS over the phone, and by providing the false the information used to effect Plaintiff's March 2011 personal leave. This information is a lie, as Plaintiff made no request to go on medical role, or take any type of leave at the time she was placed on personal leave. She did not refuse anything. These facts were concocted by Hemmerling in order to discriminate aginst Plaintiff and block her assignment to MSS, while other non-African-American, non-disabled employees were allowed to work in MSS.

## IV. CONCLUSION

For the reasons set forth herein, Defendant's Motion for Summary Judgment must be denied, and the issues of whether Defendant unlawfully discriminated against Plaintiff on the basis of her race and perceived disability, must be heard by a trier of fact for determination.

WHEREFORE, Plaintiff, Jeanette Sams, respectfully request that this Court deny Defendant's Motion for Summary Judgment in all parts, set this matter for trial, and for all other relief that this Court finds just and proper.

Respectfully submitted,

/s/Jemelle Cunningham
Attorney for Plaintiff

LAD Law Group, P.C.
203 N. LaSalle St., Suite 2100
Chicago, IL 60601
(312) 252-3085

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JEANETTE Y. SAMS,

      Plaintiff,

v.

CITY OF CHICAGO and
BARBARA HEMMERLING,

      Defendants.

No. 13 CV 7625

District Judge Jorge Alonso
Magistrate Judge Jeffrey T. Gilbert

PLAINTIFF'S RESPONSE TO DEFENDANT'S LOCAL RULE 56.1(B)(3)
STATEMENT OF UNDISPUTED MATERIAL FACTS

Now Comes Plaintiff, JEANETTE Y. SAMS, by and through her attorneys, and for her Local

Rule 56.1(b)(3) response to Defendant's Statement of Undisputed Material Facts, states as follows:

PARTIES, JURISDICTION, AND VENUE

1.     Jeanette Sams ("Plaintiff"), an African American, is an inactive police officer with the

Chicago Police Department ("CPD"). (Third Am. Complaint ("Compl."), ¶¶ 2, 4, 5 at Docket

("R.") 36, Compl. attached as Exhibit ("Exh."), A; Plaintiff Jeanette Sams Deposition ("Pl.

Dep."), 19:17-20, 365:23-24; Pl. Dep. attached as Exh., B; Tracey Ladner Deposition

("Ladner Dep."), 11:2-10, Ladner Dep. attached as Exh., C). Defendant City is a

governmental entity. (Compl., ¶ 3, Exh., A). Defendant Hemmerling formerly worked as the

Medical Administrator in the Medical Services Section ("MSS") for CPD during the relevant

time period. (Barbara Hemmerling Deposition ("Hemmerling Dep."), 6:1-19, Hemmerling

Dep. attached as Exh., D; William Looney Deposition ("Looney Dep."), 17:20-18:2, Looney

Dep. attached as Exh., E).

Response: UNDISPUTED[1]

2. The Court has jurisdiction of this matter pursuant to the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1981 and § 1983. (Compl., ¶ 9, Exh., A; J. Shah Order dated 11/25/14, Dkt. No. 56). Venue is proper because Plaintiff resides in the Northern District of Illinois and the alleged acts giving rise to her claims occurred in this District. (Compl., ¶ 2, Exh., A).

Response: UNDISPUTED

CHICAGO POLICE DEPARTMENT

3. CPD is charged with the responsibility of serving and protecting those within its jurisdiction by enforcing the law. (Ladner Affidavit ("Ladner Aff.") at ¶ 3, Ladner Aff. attached as Exh., F). CPD is organized as a paramilitary operation where there is a clear chain of command. (Pl. Dep., 312:3-4, Exh., B; Eugene Williams Deposition ("Williams Dep."), 8:7-9:4, 23:11-24:13, 34:14-18, Williams Dep. attached as Exh., G). CPD is organized into two main branches: Operations and Administration. (Williams Dep., 24:7-20, Exh., G; Ladner Aff., ¶ 7, Exh., F).

Response: UNDISPUTED

4. CPD rules and regulations and details and assignments are memorialized in writing. (Flores Aff., ¶¶ 4, 6__, Exh., M; Brenda Shead Mayo Deposition ("Shead Dep.") 33:10-34:1, Shed Dep. attached as Exh., H). CPD officers, including Plaintiff, are obligated to be familiar with the rules and orders of CPD and may be subject to discipline, up to and including termination, for failing to comply with rules and orders of CPD. (Pl. Dep.,138:4-8, 376:15-18,

[1] As used herein, Plaintiff qualifies facts as undisputed solely for the purpose of responding to Defendant's motion for summary judgment.

Exh., B; Ladner Aff., ¶ 5, Exh., F).

Response: UNDISPUTED

5.      Tracey Ladner ("Ladner"), an African American female, worked as the director of the Human Resources Department ("HR") for CPD from May 2008 through April 2014 and was generally responsible for all human resources functions for CPD employees. (Ladner Dep., 7:15-21, 8:5-15, 116:7-8, Exh., C).  The HR department falls under the Bureau of Administration.  (Ladner Aff., ¶ 7, Exh., F).

Response: UNDISPUTED

6.      Chief Eugene Williams ("Chief Williams"), an African American, worked as the Chief of Patrol for the Chicago Police Department between November 2008 and July 2012. (Williams Dep., 8:2-16, 9:18-19, Exh., G).  The Bureau of Patrol falls within the Bureau of Operation. (Ladner Aff., ¶ 7, Exh., 3 to Ladner Aff.,  Exh., F).

Response: UNDISPUTED

7.      As a Chief of Patrol in 2011, Chief Williams was not the highest ranking officer in the Bureau of Patrol, rather, he reported directly to Ernest Brown ("Brown"), an African American, who was the Deputy Superintendent ("DS") of Patrol until late 2011. (Williams Dep., 30:6-18, Exh., G)  The Deputy Superintendent is the highest position within a Bureau but that title changed to "Chief" in August 2011 and Brown held the title of Chief of Patrol until he retired in December 2011.  (Williams Dep., 30:22-31:4, Exh., G).  Thereafter, Williams became the highest ranking member of Patrol and held the title of Chief from December 2011 to July 2012.  (Williams Dep., 31:5-31:23, Exh., G).

Response: UNDISPUTED

8. The Chief of Patrol's duties included providing manpower to each of the 25 CPD districts, 5 areas, special function unit(s) and CAPS unit(s) in Patrol. (Williams Dep., 11:15-23, Exh., G). However, DS Brown had the final say with respect to assignments and details. (Williams Dep., 32:15-33:2, Exh., G). Patrol may assign or detail an officer to the Bureau of Administration, but once in the Bureau of Administration, moving an officer within the Bureau would be handled internally through the chain of command of the Bureau of Administration. (Williams Dep., 33:24-34:18, Exh., G).

Response: DISPUTED as to the allegation that DS Brown had the final say with respect to assignments and details. Assignments and details were usually made at the bureau level, however if it was a routine assignment, it was made by HR. Deposition of Tracy Ladner, Defendant's Exhibit C[2] ("Ladner Dep.") at 115:1-6. An officer can also be assigned to a unit at the commander's discretion. Ladner Dep. 29:17-21. For example, Chanete Wooley, in her affidavit provided by Defendant in support of its Motion for Summary Judgment, attests that she "switched from the [ARU] to the MSS because they had an open position." She was contacted by a Sergeant in the MSS about the opening, and obtained the job by sending in her resume and interviewing with the Commanding officer. Affidavit of Chanete Wooley, Defendant's Exhibit I at ¶ 8. In further dispute, as Chief of Patrol, Eugene Williams, had the authority to approve or allow someone to be detailed or assigned to a unit. Deposition of Eugene Williams, Defendant's Exhibit G ("Williams Dep.") at 18:9-20. Further DISPUTED as to the allegation that Williams could only assign or detail an officer to the Bureau of Administration. Williams had the authority to assign and detail offers to a variety of different units. Deposition of Brenda Shed-Mayo,

[2] For the sake of brevity of the record, Plaintiff will not reproduce depositions previously produce by Defendant in its Appendix, and referenced in its Rule 56.1 Statement of Material Undisputed Facts. Plaintiff will reference those previously produced depositions herein, in a manner consistent with Defendant's references in its Rule 51.1 Statement of Material Undisputed Facts.

Defendant's Exhibit H ("Shead Dep.") at 75:6-24; Williams Dep. 18:17-18; 19:2-7. Pl. Dep. 73:18-21.

9. Commander William Looney ("Looney") served as the commanding officer in the MSS between 2009 and June 2011 while he was a lieutenant for CPD. (Looney Dep., 8:5-13, 10:17-23, Exh., E; Hemmerling Dep., 37:11-18, Exh., D). As the commanding officer of the MSS, Looney oversaw the day to day operations of the unit and supervised the civilian employees and police officers working in the unit. (Looney Dep., 11:9-11, 13:2-6 18:15-23, Exh., E). Both Hemmerling and Looney reported to Ladner, the director of HR. (Ladner Dep., 30:21-31:4, Exh., C; Looney Dep., 11:1-5, Exh., E).

Response: UNDISPUTED

10. Brenda Shead-Mayo ("Shead"), an African American, is a former Sergeant with CPD who retired in April 2005. (Shead Dep., 9:1-8, Exh., H). Shead worked in the Alternate Response Unit ("ARU") from 2004-2005, during the same time that Plaintiff worked in the ARU prior to Plaintiff's first stroke. (Shead Dep., 10:5-20, 21:5-16, Exh., H).

Response: UNDISPUTED

11. Detective Chandra Wooley ("Wooley"), an African American, worked with Plaintiff in the ARU until Plaintiff took a leave of absence, and in November 2007, Wooley transferred to work in the MSS where she worked until she made detective in April 2013. (Chanete Wooley Affidavit ("Wooley Aff.")., ¶¶ 1, 12, 14, Wooley Aff. attached as Exh., I).

Response: UNDISPUTED

THE ALTERNATE RESPONSE UNIT ("ARU")

12. In 2005, Plaintiff worked in the ARU in a light duty position. (Pl. Dep., 91:20-92:14,

Exh., B). The ARU, also referred to as "call-back," fell under the Bureau of Administration and is located at 2111 W. Lexington. (Pl. Dep., 67:11-13, 96:17-24, Exh., B; Williams Dep., 24:17-20, Exh., G; Shead Dep., 10:22-11:5, Exh., H; Wooley Aff., ¶ 5, Exh., I).

Response: UNDISPUTED

13. Police officers working in the ARU take police reports over the phone in response to 311 calls. (Ladner Dep., 40:21-41:9, Exh., C). The call takers sat at their individual consoles in a large open room talking to clients on the phone. (Pl., Dep., 93:13-95:12, Exh., B; Shead Dep., 14:6-18, Exh., H). There was not heavy foot traffic in the ARU. (Shead Dep., 20:20-21:1, Exh., H; Wooley Aff., ¶¶ 5, 9, Exh., I). The ARU had many sedentary positions available and CPD's manpower needs to operate the ARU were high and thus a large number of light duty officers were assigned to the ARU. (Shead Dep., 11:15-12:8, 65:20-23, Exh.,___; Ladner Aff., ¶ 8, Exh., F).

Response: DISPUTED as the "there was not, heavy foot traffic in the ARU." Officer Shead testifies that, in addition to 30 plus call takers, anyone could and often did walk through the door of the ARU such as vendors, people (officers as well as civilians) assigned to that particular building who had entrance and egress to the ARU unit, other officers, inspectors, family members bearing things like flower deliveries, partners or ex-partners of people detailed to the ARU, as well as members of the general public. Shead Dep. 18:7-18, 19:8-16, 19:24-20:3, 20:17-19.

14. While working in the ARU, Plaintiff had a number of different job assignments, but was primarily assigned to the Victim Information Notice Room ("VIN Room") sending out victim information notices. (Pl. Dep., 90:23-91:12, Exh., B; Wooley Aff., ¶ 13, Exh., I). The VIN room

was a quiet room separated from the larger office area where all the other police officers and civilians in the unit worked. (Pl. Dep., 91:13-92:5, 93:7-12, 107:7-9, 119:20-21, Exh., B; Shead Dep., 12:19-23, 79:23-80:9, Exh., H). Plaintiff's hours in ARU varied, but she worked the day shift, and it only took her approximately 20 minutes to get to the ARU from her home. (Pl. Dep., 98:20-99:9, 100:14-20, Exh., B).

Response: DISPUTED that the VIN room was a "quiet room" separated from the larger office area. Officer Shead, who worked in the VIN room of the ARU until she retired in 2005, testifies that the VIN room was in close proximity to where the call takers were located, and at least 30 counselors worked in that large open room taking reports over the phone, and that if there was a door to the VIN room, it was always ajar. Shead Dep. 11:13-16, 13:9-14:16.

PLAINTIFF GOES ON DISABILITY

15. In July 2005, Plaintiff suffered a stroke while off duty and took medical roll time. (Pl. Dep., 168:7-17, 176:16-20, Exh., B). While on medical roll, Plaintiff suffered a second stroke. (Pl. Dep., 176:16-22, Exh., B). Plaintiff remained on the medical roll until she exhausted her allowed medical roll time in 2006. (Pl. Dep., 173:19-174:3, Exh., B). Officers are given 365 days of medical time in a two-year period. (Looney Dep., 21:2-7, Exh., E; Pl. Dep., 175:11-13, Exh., B; Ladner Aff., ¶ 29, Exh., F). When an officer runs out of medical time they are placed on a personal leave, at which point they may apply for disability benefits. (Ladner Dep., 67:14-68:4, Exh., C; Looney Dep., 21:8-16, Exh., E; Shead Dep., 29:4-10, Exh., H). After Plaintiff exhausted her medical time, she was placed on a personal leave of absence[3], to apply for disability benefits. (Barbara Hemmerling Affidavit ("Hemmerling Aff.") ¶¶ 7-8, Hemmerling Aff., attached as Exh., J).

[3] Plaintiff incorrectly refers to her personal leave to apply for disability pension as a "medical leave."

Response: UNDISPUTED

16. To receive disability pension benefits, Plaintiff submitted documentation from her primary care physician, Dr. Deborah Killingsworth ("Dr. Killingsworth"), from the Christian Community Health Center, confirming her inability to meet the minimum requirements of the police officer position. (Dr. Deborah Killingsworth Deposition ("Killingsworth Dep."), 11:17-20, 17:23-18:23, 20:2-16, 40:2-7, Killingsworth Dep. attached as Exh., K; ). The minimum requirements of a police officer included being able to safely handle a weapon and walking without external ambulatory support such as with a cane or walker. (Pl. Dep., 274:23-275:13, Exh., B; Ladner Aff., ¶ 13, Exh., F).

Response: UNDISPUTED

17. Pursuant to CPD's collective bargaining agreement ("CBA"), police officers are entitled to 1 year of disability for every 4 years worked, for a maximum of 5 years, if they suffer from an injury that was not sustained on duty. (Ladner Dep., 20:20-21:5, Exh., C; Hemmerling Dep., 15:13-21, Exh., D). Plaintiff was awarded disability benefits from July 24, 2006 through May 23, 2010. (Hemmerling Aff., ¶ 9, Exh., J; Pl. Dep., 69:4-18, Exh., B). After an officer has exhausted disability time and benefits, they may seek reinstatement or they may retire. (Hemmerling Dep., 15:19-16:3, Exh., D; Ladner Dep., 67:14-68:4, Exh., C; Looney Dep., 21:8-16, Exh., E; Shead Dep., 29:4-10, Exh., H).

Response: UNDISPUTED

## THE REINSTATEMENT PROCESS

18. An officer seeking reinstatement from a leave of absence must contact HR and complete the reinstatement process, which includes drug testing, a medical examination, shooting qualification, a background check, and once cleared for duty, the officer attends the CPD

academy for retraining. (Ladner Dep., 34:12-35:5, Exh., C; Looney Dep., 23:11-20, Exh., E). At the academy, the officer is brought up to date on any changes in procedures or policies that were put in place while on a leave. (Ladner Dep., 35:12:15, Exh., C).

Response: DISPUTED as to the implication[4] that all officers seeking to return to work are required to complete weapon training upon returning from any type of leave of absence. The required testes depend on the nature and length of the leave. Deposition of Lt. William Looney, Defendant's Exhibit E ("Looney Dep." 26:4-24, 29:5-21). An officer returning from medical leave would be sent to the academy for shooting if they've been on leave for more than 30 days. Ladner Dep. 34:14-35:18. Brief absences do not require weapon training, but an officer who is out for a month due to a concussion would likely be sent to the academy for weapon training. Looney Dep. 29:5-21; Deposition of Tracy Ladner, Defendant's Exhibit C ("Ladner Dep.") Further DISPUTED as to the implication that all officers are subject to a background check when returning from any sort of leave. Ladner testified that an employee might be subject to a background check, depending upon the length of leave. Ladner Dep. 34:22-35:3.

19. On July 28, 2010, HR sent Plaintiff a notification that her leave of absence had recently expired on May 23, 2010, and she would need to either seek reinstatement or resign. (Ladner Aff., ¶ 11, Exh., F). Plaintiff believed she only had to work six months to receive her pension benefits and therefore, she decided to seek reinstatement in 2010. (Pl. Dep., 322:4-10, 322:16-323:10, Exh., B) As a result, in May 2010, Plaintiff contacted CPD to begin the reinstatement process. (Pl. Dep., 71:6-17, 177:23-178:2, 257:10-24 Exh., B; Hemmerling Dep., 20:2-7, 21:4-13, Exh., D; Hemmerling Aff., ¶10, Exh., J).

---

[4] By omitting relevant related facts, Defendant's proposed statement makes incorrect, disputed factual implications. Where this issue occurs throughout Defendant's Proposed Statement of Facts, Plaintiff disputes the implications made by Defendant, and responds thereto.

Response: DISPUTED as to the phrase "therefore, she decided" to the extent that it implies that

Plaintiff's purpose in seeking reinstatement was to work six months and take her pension, as this

implication is not supported by the portion of the record cited by Defendant.

20.     As part of the reinstatement process, Plaintiff provided a note from her primary care

physician, Dr. Killingsworth, attesting to the fact that she could meet the minimum qualifications

of the police position.  (Killingsworth Dep., 75:10-80:20, Exh., K; Hemmerling Aff., ¶ 13, Exh.,

J).  Namely, Dr. Killingsworth confirmed that Plaintiff could ambulate without the assistance of

external ambulatory support and could safely physically and mentally handle a weapon.

(Killingsworth Dep., 75:5-76:20, Exh., K). Dr. Killingsworth also noted that Plaintiff could work

in a full time sedentary position if returned to work.  (Killingsworth Dep., 91:9-92:2, Exh., K).

The ability to both safely carry a weapon and walk without external ambulatory support were the

minimum requirements for a police officer seeking reinstatement on limited duty status in 2010

and 2011. (Ladner Dep., 96:15-97:13, Exh., C; Hemmerling Aff., ¶12, Exh., J).  Plaintiff was

eventually cleared for Convalescent Duty and reinstated on January 14, 2011.  (Pl. Dep., 71:6-17,

177:23-178:2, 256:21-257:3 Exh., B; Hemmerling Dep., 20:2-7, 21:4-13, Exh., D; Hemmerling

Aff., ¶14, Exh., J).

Response: UNDISPUTED

21.     In 2011, CPD designated light duty positions that were expected to last six months or less

as "Convalescent Duty" and light duty positions expected to last longer than six months as

"Limited Duty." (Ladner Dep., 39:18-40:4, 43:9-11, Exh. C; Hemmerling Dep., 49:11-24, Exh.,

D; Pl. Dep., 272:7-13, 273:19-24, Exh., B).  Light duty officers are placed in positions that meet

their medical restrictions.   (Ladner Dep., 43:24-44:7, Exh., C). However, an officer was not

placed on Convalescent Duty or Limited Duty if they could not meet the minimum requirements

of the police officer position. (Ladner Aff., ¶¶ 13-14, Exh., F; Hemmerling Aff., ¶ 11, Exh., J).

Response: UNDISPUTED

22. Pursuant to CPD reinstatement policy, once Plaintiff was reinstated, she was assigned to the academy for retraining. (Ladner Aff., ¶ 16, Exh., F). Plaintiff attended the academy from January 14, 2011 through February 11, 2011. (Pl. Dep., 71:13-21, Exh., B; Hemmerling Dep., 69:12-20, Exh., D). While in the academy, Plaintiff testified that she was typically in classes with 25 to 30 people, which did not cause her anxiety or medical problems. (Pl. Dep., 166:12-22, Exh., B). Plaintiff also admits that she did not have any problem driving the 25-40 minutes it took to arrive at the academy each day for four weeks. (Pl. Dep., 167:3-168:6, Exh., B).

Response: DISPUTED as to the allegation that Plaintiff "admits that she did not have any problem driving the 25-40 minutes it took to arrive at the academy each day for four weeks." The citation Defendant proffers does not support this asserted fact. See Pl. Dep., 167:3-168:6. In Defendant's citation, Plaintiff is not asked whether or not she had any problem driving the 25-40 minutes; rather, in the portion of Plaintiff's deposition cited for this proposition, Plaintiff is simply describing her means of commuting. Pl. Dep., 167:3-168:6.

ASSIGNMENTS

23. On February 11, 2011, Plaintiff was notified that she was assigned to the 3rd District and detailed to the ARU on the third watch, which is the afternoon watch.[5] (Pl. Dep., 281:15-17, Exh., B; Ladner Aff., ¶ 11, Exh., F; Hemmerling Aff., ¶15; Exh., J). An "assignment" is a police officer's "home unit" and a "detail" means the officer works someplace other than their home unit. (Lander Dep., 45:2-11, Exh., C). Police officers are assigned based upon their

[5] Afternoon start times vary and can either run from 2pm to 10pm, 3pm to 11pm, or 4pm to 12am. (Hemmerling Dep., 72:24-73:3, Exh., D).

rights contained within the collective bargaining agreement, management decisions based upon operational need, and for an officer on light duty, the detail is based upon their medical restrictions. (Williams Dep., 16:5-17, 17:10-19, Exh., G; Ladner Aff., ¶ 19, Exh., F). A limited duty officer may not bid or pick their unit of assignment or detail. (Shead Dep., 40:18-21, Exh., H; Pl. Dep., 288:23-289:2, Exh., B).

Response: DISPUTED as to the allegation that a limited duty officer may not bid or pick their unit of assignment or detail. Shead testified that she has no personal knowledge as to how duty and assignments are made, nor does she have personal knowledge of how the convalescent duty assignments and details are made. Shead Dep. 40:12-17.

24.    Officers are not allowed to refuse an assignment or detail; however, if they believe that an assignment is in violation of their collective bargaining rights or that it does not comport with their medical restrictions, an officer may file a grievance. (Williams Dep., 19:16-21:2, Exh., G; Ladner Aff., ¶20, Exh., F). Failure to report to an assigned unit may result in termination. (Shead Dep., 32:10-14, Exh., H; Ladner Aff., ¶ 21, Exh., F). After the 1980s, assignments and details were always memorialized in a written order, and CPD did not make verbal assignments or details. (Shead Dep., 33:10-19, Exh., H). Assignments and Orders were also noted in the CPD clear system. (Ladner Aff., ¶ 22, Exh., F).

Response: DISPUTED as to the allegation that, since the 1980s, CPD has made verbal assignments or details, as well as to the allegation that each and every verbal assignment or detail made within the CPD since the 1980s has been memorialized in a written order. In the citation provided by Defendant to support these proposed facts (Shead Dep. 33:10-19), Shead stated that "usually" or "generally" is "something" in writing that makes an assignment or detail official. Furthermore, Williams verbally approved Plaintiff's assignment to the MSS, and Plaintiff's

assignment to the MSS was memorialized by the MSS's Unit number, "231", appearing on her paycheck for the pay period ending February 28, 2011. Pl. Dep. 112:8-113:7, 114:20-23; Declaration of Plaintiff' Jeanette Y. Sams ("Pl. Dec."), Plaintiff's Exhibit A, attached herewith at ¶¶60-61, 17-23).

PLAINTIFF FAILED TO REPORT TO THE ARU AND GOES ON MEDICAL ROLL

25.     Although Plaintiff was notified to report to the ARU on February 14, 2011, she refused. (Pl. Dep., 364:7-16, Exh., B). Plaintiff did not want to work in the ARU because she felt the unit was under media scrutiny, ill managed and chaotic. (Pl. Dep., 283:1-5, 285:14-286:23, 325:2-6, Exh., B). Plaintiff testified that she felt the ARU was a "zoo," "it was out of control," "it was not well supervised," and there were personnel that screamed across the room" and "personnel that had loud discussions." (Pl. Dep., 283:4-5, 286:4-287:10, Exh., B).

Response: DISPUTED as to the implication that the reason Plaintiff did not report to the ARU on February 14, 2011, truncated in Defendant's asserted facts in ¶25, represents a complete picture of why Plaintiff did not report to the ARU on February 14, 2011. Plaintiff did not report to the ARU on February 14, 2011 because on that day, Plaintiff was out on leave due to a slip and fall on ice on February 11, 2011. Pl. Dep., 189:10-15, 294:3-9; Killingsworth Dep. Tr. 141:10-12. Upon her return, Plaintiff did not report to the ARU because Williams had approved her request to transfer to MSS. Pl. Dep. 114:20-23; Pl. Dec. ¶¶73-74. Further, the reason (s) Plaintiff did not want to work in the ARU was because it contained loud officers taking police reports over the phone. Pl. Dep. 104:12-23, 107:1-6. Up to 100 officers could be in the room at any particular time, it was not uncommon for officers to forget to use their "inside voices," and she would often be required to interact with multiple individuals simultaneously at any given time during the loud noise. Pl. Dep. 95:3-7, 97:12-15, 98:6-11; 117:24-118:4. The ARU was a

"zoo" because ARU officers had been indicted for committing crimes and the unit was out of control: officers would scream across the room, use constant vulgarities, engage in extremely loud combative conversations with citizens over the phone, with officers, and with each other. Plaintiff's post stroke status caused her difficulty in working in stressful environments. Killingsworth Dep. 26:13-19. Plaintiff did not want to in ARU for any reason(s) other than to improve her health. Pl. Dep. 117:13-20, 324:3-9; See also Pl. Dec. ¶¶39-41.

26. Instead of reporting to the ARU, on February 14, 2011, Plaintiff called the MSS claiming she could not work because she had a headache, and also advised she would provide medical documentation to MSS to support her injury. (Pl. Dep., 296:5-23, Exh., B; Hemmerling Dep., 22:12-18, Exh., D; Hemmerling Aff., ¶¶ 16-17, Exh., J). Further, Plaintiff notified her unit of detail – the ARU, that she was taking medical roll time. (Hemmerling Aff., ¶ 17, Exh., J). Plaintiff put herself on the medical roll on February 14, 2011 for the headache and continued to call in sick to the ARU and MSS. (Hemmerling Dep., 23:2-13, Exh., D). Plaintiff's headache was the result of a fall suffered on February 11, 2011 near her home. (Pl. Dep., 189:10-15, 294:3-9, Exh., B).

Response: DISPUTED as to Plaintiff's call to MSS was made "instead of reporting to the ARU, on February 14, 2011", to the extent it implies that Plaintiff made this call so that she would not have to report to the ARU on February 14, 2011. Plaintiff did not report to the ARU on February 14, 2011 because on that day, Plaintiff was out on leave due to a slip and fall on ice on February 11, 2011. Pl. Dep., 189:10-15, 294:3-9; Killingsworth Dep. Tr. 141:10-12. Upon her return, Plaintiff did not report to the ARU because Williams had approved her request to transfer to MSS. Pl. Dep. 114:20-23.

MEDICAL SERVICES SECTION ("MSS")

27. The MSS is a non-bid unit. (Ladner Dep., 29:22-24, Exh., C). Generally, the responsibilities of the MSS include processing officers who are injured on duty, authorizing medical care, managing officers' medical time off for injuries, and processing medical clearances for new hires and officers seeking reinstatement. (Hemmerling Dep., 9:17-10:7, 11:16-12:1, Exh., D; Ladner Aff., ¶ 31, Exh., F). The MSS is a very busy unit: the phones ring all day long, there are 80 to 150 officers walking in and out each day for assistance, there is a lot of talking and interacting between staff and officers, and there are no private offices for the clerical staff who work at cubicles in a large open area. (Hemmerling Dep., 56:15-57:3, Exh., D). It took Plaintiff 20 to 25 minutes to get to the MSS from her home. (Pl. Dep., 121:14-16, Exh., B).

Response: DISPUTED as to the allegation that the "MSS is a very busy unit." The MSS was more of an office setting-it was not as loud or as busy as the ARU because the ARU contained loud officers taking police reports over the phone, Pl. Dep. 104:5-15, 107:1-6, whereas the job duties in MSS included a lot of one-on-one talking with officers and pulling files, Pl. Dep. 105:4-19, 106:13-23, 109:7-22.

PLAINTIFF WANTS TO WORK IN THE MSS

28. Shortly after receiving her assignment to the ARU, Plaintiff decided that she wanted to work in the MSS because she had not worked in the MSS before and she believed it was not loud. (Pl. Dep., 104:2-15, Exh., B). CPD records indicate that Plaintiff was never assigned to the MSS. (Hemmerling Aff., ¶15, Exh., J; Ladner Aff., ¶ 18, Exh., F).

Response: DISPUTED that Defendant's cited facts represent the reason Plaintiff wanted to work in MSS. Plaintiff sought to transfer to the Medical Services Section to accommodate her status as post-stroke; she knew the MSS was not as loud or as busy as the ARU because MSS was more of an office setting, whereas ARU contained loud officers taking police reports over

the phone. Pl. Dep. 104:12-23, 107:1-6. Up to 100 officers could be in the room at any particular time, it was not uncommon for officers to forget to use their "inside voices," and she would often be required to interact with multiple individuals simultaneously at any given time during the loud noise. Pl. Dep. 95:3-7, 97:12-15, 98:6-11; 117:24-118:4. The ARU was a "zoo" because ARU officers had been indicted for committing crimes and the unit was out of control: officers would scream across the room, use constant vulgarities, engage in extremely loud combative conversations with citizens over the phone, with officers, and with each other. Pl. Dep. 285:14-287:10. Plaintiff often visited the MSS, spoke with MSS employees, and was familiar with the job duties, and knew she could do a good job within her post-stroke limitations because the job duties included a lot of one-on-one talking with officers and pulling files. Pl. Dep. 105:4-19, 106:13-23, 109:7-22. Plaintiff often visited the MSS, spoke with MSS employees, and was familiar with the job duties, and knew she could do a good job within her post-stroke limitations because the job duties included a lot of one-on-one talking with officers and pulling files. Pl. Dep. 105:4-19, 106:13-23, 109:7-22. Further DISPUTED as to CPD records indicated Plaintiff was never assigned to MSS: Plaintiff's assignment to the MSS was memorialized by the MSS's Unit number, "231", appearing on her paycheck for the pay period ending February 28, 2011. Pl. Dec. ¶¶60-61, 17-23.

29.     Plaintiff testified that after receiving her assignment to the ARU, she contacted the Chief of Patrol, Eugene Williams, from her home phone, to request that she be reassigned to the MSS. (Pl. Dep., 73:18-74:11, 292:1-6, 319:2-320:1, Exh., B.)   Plaintiff claims that Williams informed her that he "didn't see a problem with [reassignment]" but that she needed to obtain paperwork from her doctor to justify the reassignment.  (Pl. Dep.,112:19-113:7,  Exh.,  B). However, Plaintiff's phone records indicate  that  she never placed a call to phone number (312) 745-6210,

Chief William's number. (Pl. Dep.,73:18-74:11, 292:1-6, 319:2-320:1, Exh., B; AT&T Affidavit ("AT&T Aff.") and relevant phone records attached as Exh., N).

Response: DISPUTED as to the allegation that (312)745-6210 is Chief Williams's phone number Plaintiff dialed to speak to Chief Williams. There is no citation to the record to support that (312)745-6210 is Chief Williams's phone number, or that (312)745-6210 was the number Plaintiff dialed to speak to Chief Williams. Further disputing, Plaintiff called Chief Williams on his cell phone, as he was out of town in Las Vegas on February 14, 2011. (312)745-6210 is not Williams's cell phone number. Pl. Dec. ¶¶25-26.

30. Chief Williams has no recollection of Officer Sams or of any police officer asking to be transferred from the ARU to the MSS. (Williams Dep., 21:15-20, 22:7-12, Exh., G). Further, Williams testified that reassignment within the Bureau of Administration, i.e., from the ARU to the MSS, would have been handled internally by the Bureau of Administration, not Patrol. (Williams Dep., 33:24-34:24, Exh., G). Williams testified that if he had received a call requesting this type of reassignment, he would have directed the police officer to submit the appropriate paperwork through their chain of command. (Williams Dep., 23:5-13, 33:24-34:18, Exh., G). Neither the MSS nor the ARU fall within Bureau of Patrol's chain of command. (Williams Dep., 24:4-25:4, Exh., G).

Response: DISPUTED as to the implication that, as Chief of Patrol , Eugene Williams did not have the authority to approve or allow someone to be detailed or assigned to a unit; as Chief of Patrol, Eugene Williams had the ability to allow someone to be detailed or reassigned from, i.e., the ARU to the MSS, and signing similar transfer orders was part of Eugene Williams' responsibilities as Chief of Patrol. Williams Dep. 18:9-20; 19:2-10; Shead Dep. 35:7-36:22; 75:6-24; Pl. Dep. 72:12-22, 73:18-21, 124:5-11, 324:3-9.

PLAINTIFF SEEKS A DOCTOR'S NOTE

31. On February 14, 2011, instead of reporting to the ARU, Plaintiff contacted her doctor's office and requested a note to work day time hours and to work in an environment where there were only a few employees. (Killingsworth Dep., 116:14-21, Exh., K). On February 19, 2011, Plaintiff spoke to Dr. Killingsworth and advised her that she "does well with one on one interactions," but "becomes distracted and anxious in situations where she is in a large room with many officers at desks[s] talking to clients and request[ed] a smaller work[] environment." (Killingsworth Dep., 117:12-118:3, Exh., K). Plaintiff also informed Dr. Killingsworth that driving long distances in rush hour causes her fatigue at work. (Killingsworth Dep., 118:4-7, Exh., K). However, Plaintiff never told Dr. Killingsworth that she was unable to work without these restrictions. (Killingsworth Dep., 125:19-21, Exh., K).

Response: DISPUTED as to the implication that Plaintiff's call to her doctor was made "instead of reporting to the ARU, on February 14, 2011", to the extent it implies that Plaintiff made this call so that she would not have to report to the ARU on February 14, 2011. Plaintiff did not report to the ARU on February 14, 2011 because on that day, Plaintiff was out on leave due to a slip and fall on ice that occurred on February 11, 2011. Pl. Dep., 189:10-15, 294:3-9; Killingsworth Dep. Tr. 141:10-12; Pl. Dec. ¶¶12, 73. Upon her return, Plaintiff did not report to the ARU because Williams had approved her request to transfer to MSS, and she had to meet with Hemmerling before she was to start. Pl. Dep. 114:20-23; Pl. Dec. ¶74.

32. On February 21, 2011, after speaking with Plaintiff, but before examining her, Dr. Killingsworth wrote a note thanking CPD for allowing Plaintiff to return to work and noted the following:

> "Ms. Sams continues to do well with one on one interactions with clients. However, when placed in large settings with multiple officers interacting with clients, this results in psychological distraction and anxiety for Ms. Sams. I would like to ask that she be allowed to work in smaller settings providing more one on one interactions . . . To date, Ms. Sams has also had to drive relatively long distances in rush hour traffic which results in significant fatigue when she arrives at the assigned site to report to work. . . A work site assignment closer to her home would definitely decrease stressors related to her commute."

(Killingsworth Dep., 120:4-18, Exh., K; Pl. Dep., 115:7-18, 117:13-20, Exh., B).

Response: DISPUTED as to the implication that Dr. Killingsworth had yet to examine Plaintiff at the time Dr. Killingsworth wrote the letter dated February 21, 2011. Dr. Killingsworth had been examining, treating, and monitoring Plaintiff for symptoms related to Plaintiff's post-stroke status on a regular basis for at least the previous five years. Killingsworth Dep. 19:7-18. Killingsworth was aware that as a result of multiple strokes experienced between 2005-2008, Plaintiff suffered from significant physical, cognitive, and speech deficits. Killingsworth Dep. 30:6-9. Plaintiff's ability to perform duties even in a sedentary light-duty position had been limited, as her physical cognitive speech deficits caused great anxiety in stressful environments. Killingsworth Dep. 26:13-19.

33. Dr. Killingsworth explained at her deposition that "relatively long distances" meant 30 or 45 minutes or longer. (Killingsworth Dep., 132:8-23, Exh., K). Dr. Killingsworth also testified that based upon Plaintiff's request, she believed Plaintiff had been working in the environment she described in her letter dated February 21, 2011, i.e., in a large setting with multiple officers and which required her to drive relatively long distances from home, and was looking to change this environment. (Killingsworth Dep., 123:2-18, Exh., K).

Response: UNDISPUTED

34. Dr. Killingsworth further stated that the requests for Plaintiff's work environment

contained within her February 21, 2011 letter were not medically necessary, but rather, "preferable for improved performance," and "just basically [Plaintiff's] request." (Killingsworth Dep., 128:22- 129:17, 133:10-19, Exh., K).

Response: DISPUTED. Dr. Killingsworth testified that the requests for Plaintiff's work environment contained within her February 21, 2011 letter were medically necessary, and that they would be "helpful," and "preferable for improved performance," Killingsworth Dep. 90:23-91:22, 117:21-118:7, 120:9-18, 124:7-125:20, 128:18-21, 129:16-17, 179:11-180:1.

35.     In her deposition, Plaintiff testified that the requests found in Dr. Killingsworth's February 21, 20111 [sic] letter were not medically necessary [emphasis in original] and were just Plaintiff's preferences.  (Pl. Dep., 290:24-291:19, Exh., B).

Response: DISPUTED. Nowhere in the portion of the transcript cited by Defendant are the words "medically necessary" or "preference". Plaintiff testifies, in in the portion of the transcript cited by Defendant, that at the time she was cleared to go back to work by her doctor, she was capable of performing her job duties. Pl. Dep. 290:24-291:19. Further answering, the requests in Dr. Killingsworth's February 21, 2011 letter based on Plaintiff's need to be in setting she could work in and do a good job, especially after returning from strokes. Pl. Dep. 104:5-23.

36.     Plaintiff requested the letter from Dr. Killingsworth after she completed the training academy, but before she ever reported to her new detail in the ARU.   (Killingsworth Dep., 116:14-120:12, Exh., K; Pl. Dep., 103:3-9, 104:2-15, Exh., B).

Response: DISPUTED. This proposed fact is not supported by the proposed citations. The portion of Plaintiff's deposition cited (Pl. Dep. 103:3-9, 104:2-15) discusses Plaintiff not knowing what the job duties would have been in ARU in 2011, and some reasons why Plaintiff

was seeking to work in MSS.

37. Plaintiff never reported to work in the ARU. (Pl. Dep., 103:3-9, 364:7-16, Exh., B) Plaintiff had no personal knowledge of how the ARU operated in 2011 and her information about the unit was based upon limited conversations with employees who allegedly worked in the ARU, but whose names she could not recall. (Pl. Dep., 281:22-24, Exh., B).

Response: DISPUTED as to the proposition that Plaintiff never reported to work in the ARU; the portion of Plaintiff's deposition cited for this proposition indicates that, at the time her deposition was taken, Plaintiff could not recall specifically what her new duties in ARU would be. Further DISPUTED as to the remaining proposition, as Plaintiff's testimony located at Pl. Dep. 281:22-24 simply states that, at the time she learned she was going to be returning to her pre-stroke position post stroke at ARU, she had not been to the ARU since taking leave in 2005. See also Pl. Dep. 281:18-21.

PLAINTIFF IS CLEARED TO RETURN TO WORK

38. Dr. Killingsworth examined Plaintiff on February 22, 2011 and noted that Plaintiff's physical condition was unchanged between December 2010 when Plaintiff was cleared for duty and the February 22, 2011 exam, except that she now recommended Plaintiff use a cane to ambulate. (Killingsworth Dep., 139:22-140:9, Exh., K; Pl. Dep., 211:23-212:8, Exh., B). Dr. Killingsworth also wrote Plaintiff a note clearing her to return to work as of February 28, 2011, "with the restrictions as previously recommended [in the February 21, 2011 correspondence]." (Killingsworth Dep., 142:8-144:12, Exh., K).

Response: UNDISPUTED

39. Plaintiff provided the MSS with the return to work note dated February 22, 2011.

(Hemmerling Aff., ¶19, Exh., J). The Doctor assigned to the MSS, Susan Arjmand, noted in the CPD computer system that she reviewed Plaintiff's return to work note and authorized Plaintiff to return to work as of February 28, 2011. (Hemmerling Aff., ¶ 20, Exh., J).

Response: UNDISPUTED

40. Although Plaintiff was cleared to return to work as of February 28, 2011, she was required to report to the gun range for weapon qualification because of her head injury. (Hemmerling Dep., 46:22-47:2, 51:20-52:9, 72:3-14, Exh., D). However, Plaintiff never reported to the gun range. (Pl. Dep., 275:16-278:3, Exh., B).

Response: DISPUTED as to the phrase "head injury." Plaintiff's physician did not diagnose Plaintiff with a "head injury" but stated that Plaintiff had "headaches" resulting from a fall. Pl. Dec. ¶13 and attached Exhibit 5. FURTHER DISPUTED as to the allegation that Plaintiff "was required to report to the gun range for weapon qualification because of her head injury". Plaintiff was out due to slipping on ice for less than two weeks, and was not required to report to the gun range to return for headaches after two weeks: weapons qualifications are only required for leave of absences lasting at least 30 days. Killingsworth Dep. 144:13-145:3; Pl. Dep. 292:15-22; Ladner Dep. 34:21-23. Further DISPUTED as to alleged fact that Plaintiff never reported to the gun range. Plaintiff had completed her weapon qualification by February 11, 2011. DSOF ¶18, 20, 22 and responses thereto supra. Further, Plaintiff never received an appointment to go to the gun range in February 2011. Pl. Dep. 276:7-16, 277:1-14. Further, there is no provision in Defendant's proposed citation, to support the alleged fact that Plaintiff never reported to the gun range, as the question was not even posed. See Pl. Dep. 275:16-278:2.

PLAINTIFF EXHAUSTED HER MEDICAL ROLL TIME

41. Plaintiff did not have any accrued medical roll time when she placed herself on the

medical roll on February 15, 2011. (Hemmerling Aff., ¶ 26, Exh., J) Plaintiff improperly stayed on the medical roll without available medical time for approximately two weeks before MSS realized that Plaintiff did not have any medical time to use. (Hemmerling Dep., 25:16-26:2, Exh., D).

Response: DISPUTED. Plaintiff did not place herself on medical role on February 15, 2011. Pl. Dec. ¶33-35. Further disputed as to Plaintiff was improperly on medical role until "MSS realized Plaintiff did not have any medical time to use." When an employee's medical time is running out, the employee is notified in a letter in advance. Ladner Dep. 15:11-14, 76:15-77:18. If an officer is ordered to return to work, and does not return to work within a reasonable amount of time, the officer is considered to have abandoned his/her job, which is also grounds for termination. Ladner Dep. 33:22, 34:3-6, 38:20-39:9; Williams Dep. 19:17-18, 20-21, 21:10-14; Shead Dep. 29:4-15, 32:10-17. In further dispute, Plaintiff was supposed to received advanced notice if she had in fact been out of medical time, or some notice that she was out with no medical time available, and she received no such notice. Pl. Dec. ¶¶ 4-6, 63.

MARCH 1, 2011 MEETING WITH HEMMERLING

42. Plaintiff gave the February 21, 2011 letter to a nurse in the MSS, Erika Jenkins, sometime between February 22, 2011 and March 1, 2011. (Pl. Dep., 135:14-18, Exh., B).

Response: UNDISPUTED

43. The letter does not advise that Plaintiff cannot work in the ARU or that she should work in the MSS. (Pl. Dep., 134:4-10, Exh., B).

Response: UNDISPUTED

44. Hemmerling, the MSS medical administrator, reviewed Plaintiff's February 21, 2011

letter on or about March 1, 2011 and called Plaintiff to request that she report to the MSS. (Hemmerling Aff., ¶ 27, Exh., J). Plaintiff reported to the MSS later that same day. (Hemmerling Aff., ¶ 28, Exh., J). Neither Hemmerling nor Lt. Looney viewed the February 21, 2011 letter as an accommodation request, but rather a note from the Plaintiff's doctor who was trying to get Plaintiff a different job detail at Plaintiff's request. (Hemmerling Dep., 54:1-19, Exh., D; Looney Dep., 41:5-15, Exh., E). Looney noted that he too would "like to work closer to home…avoid rush hour traffic" but whether a request is an "accommodation request" depends on its medical necessity. (Looney Dep., 41:17-42:4, Exh., E).

Response: DISPUTED as to the proposition that Lt. Looney did not view the February 21, 2011 letter as an accommodation request. Lt. Looney testifies that he does not know whether Dr. Killingsworth's February 21, 2011 letter seeking workplace accommodations on behalf of the Plaintiff was actually received by the medical services department—the department to which the letter was addressed and sent. Looney Dep. 40:8-12. Looney admits that, had the medical services section received a document of "this type", a nurse or her caseworker would have let the "medical administrator know that [they] received a note of this type; and in order to process this note, the medical administrator would bring it up to the director of personnel to say that we **received a request for different accommodations for a patient, for an officer**." Looney Dep Tr. 40:20-41:4. [emphasis added]. UNDISPUTED as to Looney's desire to work closer to home and avoid rush hour traffic, but DISPUTED as to the implication that Plaintiff's return to work full-time, despite her post-stroke status, was not medically necessary; indeed, Plaintiff's primary care physician believed working up to full-time was necessary for Plaintiff's health and recovery. Killingsworth Dep. 104:16-105:9.

45. During their in person meeting, Hemmerling explained to Plaintiff that she was out of

medical roll time and thus, pursuant to CPD's rules and orders, would either need to report to her unit of detail, the ARU, after she qualified at the gun range, complete accommodation paperwork, or take a leave of absence. (Hemmerling Aff., ¶ 28, Exh., J).

Response: DISPUTED in its entirety. Hemmerling told Plaintiff none of these things. Pl. Dec. ¶37, 63. Hemmerling never told Plaintiff that she could take a leave if she could not work in the ARU, nor did Hemmerling—or anyone else at CPD—provide Plaintiff with a reasonable accommodation packet or form. No one at CPD told Plaintiff to fill out any accommodation form, or in any way supplement the letter from Dr. Killingsworth dated February 21, 2011 indicating that Plaintiff was more aptly suited for an office position outside of the ARU. Pl. Dep. 132:18-24, 133:1-3, 136:8-12, 138:15-139:7. During the in person meeting, Hemmerling told Plaintiff that she was "over" Plaintiff's health issues, that she did not want Plaintiff working in MSS, that she was going upstairs to make sure Plaintiff is not assigned to MSS, that she would speak to Ladner to ensure Plaintiff did not go to MSS, and that if Plaintiff did not go back to ARU, Hemmerling will complete paperwork stating Plaintiff was unfit for work. Pl. Dep. 124:16-17, 126:10-127:1, 128:1-16, 142:1-6; Pl. Dec. ¶32.

46. Hemmerling offered Plaintiff a reasonable accommodation packet, but Plaintiff refused to take the accommodation request paperwork. (Hemmerling Dep., 71:15-72:2, Exh., D). Hemmerling also offered Plaintiff a Personal Action Request Form ("PAR Form") to request a leave of absence, but Plaintiff also refused to sign or take the PAR form. (Hemmerling Aff., ¶ 32, Exh., J).

Response: DISPUTED. Hemmerling never offered Plaintiff a reasonable accommodation packet, nor did Hemmerling offer Plaintiff a Personal Action Request Form. Pl. Dec. ¶38, 63. The first time Plaintiff saw the PAR form for her leave was in August 2012. Pl. Dec. ¶38, 64.

Hemmerling never told Plaintiff that she could take a leave if she could not work in the ARU, nor did Hemmerling—or anyone else at CPD—provide Plaintiff with a reasonable accommodation packet or form. No one at CPD told Plaintiff to fill out any accommodation form, or in any way supplement the letter from Dr. Killingsworth dated February 21, 2011 indicating that Plaintiff was more aptly suited for an office position outside of the ARU. Pl. Dep. 132:18-24, 133:1-3, 136:8-12, 138:15-139:7.

47. Plaintiff testified that she refused to report to the ARU simply because she "chose not to work there." (Pl. Dep., 364:7-11, Exh., B; Ladner Dep., 38:20-22, Exh., C).

Response: DISPUTED. Plaintiff testifies that she did not want to go to the ARU because she wanted to work in the unit in which she was told she could work by the chief of patrol, after explaining to him her medical concerns . Pl. Dep. 364:7-11. Further DISPUTED as to to the term "simply" and its exclusion of the real reason Plaintiff did not want to work in the ARU: Plaintiff had past experience in ARU prior to her strokes, and as a result of her complications post stroke, was seeking reassignment to MSS. Pl. Dep. 103:3-9, 364:7-16; see also DSOF ¶¶27-28 and responses thereto supra.

48. Plaintiff now claims that she was actually assigned to the MSS because she picked up her paycheck from the MSS and it indicated the unit number 231 on the check, which is the designation of the MSS. (Pl. Dep., 143:13-144:19, 340:2-342:5, 344:11-346:6, Exh., B). Though, paychecks are generated by CPD's finance department, CPD finance does not have the authority to make an assignment or detail. (Yasmine Ali-Kelley Affidavit ("Kelley Aff.") ¶¶ 4-5, Kelley Aff. attached as Exh., L). Indeed, Ms. Kelley, head of the CPD finance department in 2011, testified that while officers' checks typically went to their unit of assignment for logistical purposes, the designation on the check did not unequivocally indicate that an officer was

assigned or detailed to that unit. (Kelley Aff., ¶ 6-7, Exh., L). In fact, officers could call and request that CPD finance forward their check to a division other than their unit of assignment. (Kelley Aff., ¶¶ 8-9, Exh., L). Plaintiff's phone records indicate that she called CPD's finance department on February 14, 2011 at phone number (312)745-5670. (Kelley Aff., ¶ 10, Exh., L, AT&T Aff. and relevant records, Bates No. DEF005014, Exh., N).

Response: DISPUTED as to "checks typically went to their unit of assignment for logistical purposes, the designation on the check did not unequivocally indicate that an officer was assigned or detailed to that unit" and as to "officers could call and request that CPD finance forward their check to a division other than their unit of assignment." Paychecks always indicate the unit detail on the check. Pl. Dec. ¶22. Further DISPUTED as to the implication that Plaintiff called the finance department to have her check forwarded to a unit other than her unit of assignment on February 14, 2011—Plaintiff called the Finance on February 14, 2011 to inquire as to the location of her check. Pl. Dec. ¶¶14-24, 60-61.

49. Plaintiff believes that Hemmerling did not want her to work in the MSS based on the fact that Hemmerling advised Plaintiff that if she chose not to return to the ARU, then MSS would complete paperwork and documents recommending Plaintiff for a leave of absence. (Pl. Dep., 126:9-20, Exh., B).

Response: UNDISPUTED

50. After reviewing Plaintiff's February 21, 2011 letter, Hemmerling recalls receiving a telephone call inquiring whether the MSS had a position that met Plaintiff's preferences articulated in the letter, but that she explained there were no positions in the MSS which would allow Plaintiff to work in a quiet one-on-one environment because the MSS did not have this type of position – it was a unit with constant heavy foot traffic and the officers sat in cubicles in

a large open area.  (Hemmerling Dep., 35:21-36:21, Exh., D; Hemmerling Aff., ¶ 33, Exh., J).

Response: DISPUTED as to "there were no positions in the MSS which would allow Plaintiff to work in a quiet one-on-one environment because the MSS did not have this type of position – it was a unit with constant heavy foot traffic and the officers sat in cubicles in a large open area." Plaintiff often visited the MSS, spoke with MSS employees, and was familiar with the job duties, and knew she could do a good job within her post-stroke limitations because the job duties included a lot of one-on-one talking with officers and pulling files. Pl. Dep. 105:4-19, 106:13-23, 109:7-21.

51.    Hemmerling did not have the authority to assign an officer to the MSS, and she did not have the ability to block assignments into the MSS. (Ladner Dep., 114:6-23, Exh., C; Hemmerling Aff., ¶ 40, Exh., J).  Further, Hemmerling did not have the authority to unilaterally place an officer on leave.  (Hemmerling Aff., ¶ 39, Exh., J; Ladner Aff., ¶ 35, Exh., F).  The MSS could recommend a leave if an officer had exhausted his/her medical roll time, but all leaves are ultimately decided by HR and/or the superintendent's office. (Ladner Dep., 115:11-19, Exh., C).

Response: DISPUTED as to the allegation that Hemmerling did not have the ability to block assignments to the MSS. Hemmerling told Plaintiff that she would use her power to ensure Plaintiff was not placed in the MSS. Pl. Dep. 124:16-17, 126:10-127:1, 128:1-16, 142:1-6.  Also, as Defendant articulates in ¶50, Hemmerling unilaterally relayed that "there were no positions in the MSS which would allow Plaintiff to work…" which blocked Plaintiff's assignment to the MSS. Further DISPUTED as to "Hemmerling did not have the authority to unilaterally place an officer on leave." It was Hemmerling alone, who provided the false information that Plaintiff

was refusing to go to her assigned unit, and that she refused to sign reasonable accommodation forms that resulted in Plaintiff's placement on leave, and not in the MSS as Williams had approved. Affidavit of Barbara Hemmerling, Defendant's Exhibit J, at Exhibit 16, attached thereto. Further DISPUTED as to all leaves are ultimately decided by HR and/or the superintendent's office. Leaves are ultimately decided by the records provided to HR and/or the superintendent's office. According to Ladner, these records indicate which indicate Plaintiff had been given reasonable accommodation paperwork that she never turned, and the PAR form that shows she refused to sign her leave of absence form. Ladner Dep. 85:19-86:5. Besides having been the only person to meet with Plaintiff and the only person having directly reported the information Ladner testifies were CPD's records regarding Plaintiff's March 2011 leave, Hemmerling had the overall responsibility for maintaining medical records. Ladner Dep. 115:22-116:6.

52. Plaintiff admits that she has no personal knowledge that Hemmerling was involved in the decision not to assign Plaintiff to the MSS, and admits that Hemmerling was only the messenger delivering the decision. (Pl. Dep., 349:16-350:1, Exh., B).

Response: DISPUTED. Plaintiff testifies that she was told by Barbara Hemmerling she would not work in MSS, and did not know the identity of the ultimate decision maker. Pl. Dep. 349:16-350:1.

CPD'S ACCOMMODATION PROCESS

53. CPD's accommodation process is memorialized by CPD order. (Hemmerling Aff., ¶ 29, Exh., J). To request an accommodation, the employee completes the accommodation request form, then the department and the employee engage in the interactive process to determine whether or not an accommodation is possible. (Ladner Dep., 25:18-26:10, Exh., C). The final

decision to accomoodate [sic] an employee is handled by the City's Department of Human Resources, if there is no suitable position within CPD. (Ladner Dep., 26:11-28:6, Exh., C).

Response: DISPUTED as there is no time frame of reference provided in Paragraph 53. According to Ladner, the original process was that the department used to make accommodations and just report out to whether or not the accommodation was going to be approved. Ladner Dep. 102:13-17. The accommodations policy claimed to be in effect by Defendant was not given to Plaintiff before she went on leave in 2006, nor when she returned from that leave in 2011. 137:18-20, Pl. Dep. 138:12-14, 375:5-13, 16-17. Further disputing, Defendant's alleged accommodations policy states the first step to be taken by a Department member is to contact their immediate supervisor, or Human Resources to start a request. See Defendant's Exhibit J, Hemmerling Affidavit, at Exhibit 14-page 1.

54.     Employees can obtain an accommodation request form from their supervisor, the MSS, or HR. (Ladner Aff., ¶ 25, Exh., F).  If employees indicate that they cannot perform their job, they may be offered an accommodation form by the MSS or HR.  (Ladner Dep.,28:7-22, Exh., C). The accommodation request form advised the employee that completion of the form would assist CPD in the interactive process. (Hemmerling Aff., ¶29, Exh., J; Ladner Aff., ¶ 26, Exh., F). The form further advised  that  if  an accommodation could not be provided that would enable an officer to perform the essential functions of the position, alternative employment within a vacant position in the City may be sought. (Hemmerling Aff., ¶ 29, Exh., J; Ladner Aff., ¶ 27, Exh., F).

Response: UNDISPUTED

55.     The accommodation form advised the employee to call Virginia Garcia at (312) 745-5310 if they had additional questions about the accommodation process. (Hemmerling Aff., ¶29, Exh., J; Ladner Aff., ¶ 28, Exh., F).

Response: DISPUTED as to Hemmerling' s assertion in Paragraph 29, cited by Defendant, that Hemmerling offered this form to Plaintiff. Pl. Dec. ¶37-38, 64.

56. Plaintiff' s phone records indicate that she called Virginia Garcia's number and had a conversation lasting 18:39 minutes on March 3, 2011. (AT&T Aff. and relevant phone records, Bates Nos. DEF005033, Exh., N).

Response: DISPUTED. Plaintiff did not call Virginia Garcia's number on March 3, 2011. Plaintiff called the Human Resources division at (312) 745-5310 on March 3, 2011, to try and resolve her improper March 1, 2011 placement on leave. Pl. Dec.¶¶ 75-76. (312) 745-5310 is the main number for CPD Human Resources division, and is indicted as the number to reach multiple individuals in HR, which Plaintiff attempted to do in order to get answers as to why she was placed on leave Pl. Dec.¶¶ 75-76, and Exhibits 3, 11, and 15 listing (312) 745-5310 as a contact number for HR attached thereto; See Affidavit of Tracy Ladner, Defendant' s Exhibit F at Exhibit 14 listing (312) 745-5310 as a contact number for HR;

PLAINTIFF IS PLACED ON LEAVE

57. It was the MSS's duty to complete a PAR Form recommending the removal of an officer from active duty status after the officer had exhausted all available medical roll time. (Hemmerling Aff., ¶ 34, Exh., J). The process of the MSS filling out a PAR form on behalf of a police officer who is out of medical roll time, does not retire, and is not at work, is purely administrative and in accordance with CPD General Orders because CPD cannot have an officer who is not in a payroll category such as active, or inactive status. (Looney Dep., 34:16-35:14, 38:9-13. Exh., E; Hemmerling Dep., 64:15-65:7, Exh., D).

Response: UNDISPUTED

58. On March 3, 2011, Hemmerling emailed the commanding officer in MSS, Lt. Looney,

and the Sergeant in HR, Barbara West, a black female, about her meeting with Plaintiff on March 1, 2011, asking for advice and direction on how to handle the situation. (Hemmerling Aff., ¶ 35, Exh., J; Ladner Aff., ¶ 32, Exh., F). Hemmerling's request was forwarded to Ladner for direction and Ladner, in turn, forwarded the request to her direct boss, Marvin Shear, the Deputy Chief of the Bureau of Administration. (Pl. Dep., 128:1-16, Exh., B; Hemmerling Aff., ¶ 7, Exh., J; Ladner Aff., ¶ 32, Exh., F). Deputy Chief Shear reviewed Plaintiff's medical file and met with Hemmerling and Lt. Looney and told them to complete paperwork placing Plaintiff on a leave of absence. (Hemmerling Aff., ¶ 36, Exh., J).

Response: DISPUTED as to "the situation" as presented by Hemmerling in her March 3, 2011 email, wherein Hemmerling represented that Plaintiff's note from her physician "precluded her from returning to Duty." This was not "the situation." Plaintiff's physician's note released her to duty, which was indicated by Jenkins's authorization, and entry into the CLEAR system returning Plaintiff to work on February 28, 2011 Pl. Dec.¶30; CLEAR System Entry, attached herewith as Plaintiff's Exhibit B. Hemmerling further represented in her email, that Plaintiff refused to sign the PAR form for LOA and refused to take the ADA form to apply for an accommodation. This also was not "the situation." Plaintiff never refused to sign the PAR form or refused to apply for an accommodation . Pl. Dec. ¶¶33-38, 63.

59.   Later that day, clerk Ramona Bodoy from the MSS typed the PAR Form recommending Plaintiff be placed on a leave of absence and Lt. Looney signed the PAR Form which notified all relevant units that Plaintiff had exhausted her medical roll time as of March 1, 2011 and, because she refused to return to work, the MSS completed paperwork that recommended she be placed on a personal leave of absence. (Looney Dep., 32:3-35:2, Exh., E; Hemmerling Dep., 26:7-27:3, 58:11-16, 69:3-7, Exh., D).

Response: DISPUTED. No citation provided by Defendant supports the allegation that "Ramona Bodoy from the MSS typed the PAR Form recommending Plaintiff be placed on a leave of absence." In the citation to Hemmerling's deposition provided by Defendant , Hemmerling testifies that she does not know who realized Plaintiff was out of medical time, or whether anyone called Plaintiff to let her know she was out of medical time (Hemmerling Dep. 26:7-27:3). She goes on to testify that it was "probably filled out by [her] or…either Lt. Looney or [she] probably told the clerical staff what to type." Hemmerling Dep. 28:10-23. Loony testified that he did not know who filled out the PAR Form. Looney Dep. 35:15-36.1.

60. Hemmerling did not draft or sign the PAR Form placing Plaintiff on a leave; rather, she was simply the messenger and informed Plaintiff that the MSS would take these steps because Plaintiff was out of medical roll time. (Hemmerling Aff., ¶¶ 37-38, Exh., J; Looney Dep., 32:3-34:15, 36:15-38:24, Exh., E).

Response: DISPUTED. Hemmerling testified that she likely filled out the PAR form, or either told the staff what to put on the form. Hemmerling Dep. 28:10-23. Further DISPUTED as to Hemmerling was just a "messenger" regarding the steps MSS would take, when in fact Hemmerling provided Shear, Lander, and Looney with the information that led to the decision that Plaintiff would be placed on leave. Babarba Hemmerling Affidavit, Defendant's Exhibit J at Exhibit 16). It was Hemmerling who met with Plaintiff, and who had knowledge of the alleged facts on the PAR form. (cite). Further disputing, Hemmerling never told Plaintiff she was out of medical roll time; rather, Hemmerling told Plaintiff that Hemmerling did not want Plaintiff working in MSS, that Hemmerling was going upstairs to make sure Plaintiff is not assigned to MSS, that Hemmerling would speak to Ladner to ensure Plaintiff did not go to MSS, and that if Plaintiff did not go back to ARU, Hemmerling will complete paperwork stating Plaintiff was

unfit for work. Pl. Dep. 124:16-17, 126:10-127:1, 128:1-16, 142:1-6.

61. Once on a personal leave of absence, the MSS no longer monitors a police officer, and it is the officer's responsibility to ensure they are in the proper status. (Ladner Dep., 75:15-18, Exh., C). If an officer disagrees with the information that is generated by MSS regarding a PAR Form for a leave, then that officer would need to discuss his/her dispute with HR, who would double check to see if the officer had more time available before being placed on leave. (Ladner Dep., 24:1-24, Exh., C; Hemmerling Dep., 67:11-19,68:8-16, Exh., D).

Response: DISPUTED. On past leaves, it was the MSS that notified Plaintiff that her leave expired, or was about to expire, and that she needed to take action to request additional leave. Pl. Dec. ¶¶ 4-6.

62. Ladner testified that Plaintiff was appropriately placed on leave because Plaintiff was out of medical roll time and refused to return to her unit of assignment or complete accommodation paperwork. (Ladner Aff., ¶ 34, Exh., F). Ladner reviewed and approved the PAR Form placing Plaintiff on a leave of absence and determined that MSS acted appropriately. (Ladner Aff., ¶ 33, Exh., F). Ladner denies any racial animus towards Plaintiff and does not believe that any action by CPD related to Sams' assignment, detail or leave of absence was racially motivated. (Ladner Aff., ¶ 47, Exh., F).

Response: DISPUTED to the extent this fact purports that Ladner's statements of what was "appropriate" was her own, independent determination, and unrelated to Hemmerling's representations. Ladner testified that based on her review of the records, Hemmerling followed the procedures for processing people or who have used up all their medical time and generating the paperwork from MSS. Ladner Dep. 116:18-22. According to Ladner, these records include that Plaintiff had been given reasonable accommodation paperwork that she never returned, and

the PAR form that shows she (Plaintiff) refused to sign her leave of absence form. Ladner Dep. 85:19-86:5.

ESSENTIAL FUNCTIONS OF A CPD POLICE OFFICER

63. In 2011, the minimum requirements of a police officer included being able to safely handle a weapon and the ability to walk without external ambulatory support such as with a cane or walker. (Pl. Dep., 274:23-275:13, Exh., B; Ladner Aff., ¶ 13, Exh., F; Hemmerling Aff., ¶ 12, Exh, J).

Response: UNDISPUTED

64. Plaintiff testified that her health changed after her fall in February 2011. (Pl. Dep., 188:8-21, Exh., B).

Response: UNDISPUTED as to the fact as cited in Paragraph 64, DISPUTED as to the implication that Plaintiff's health changes constituted anything more than a temporary headache. Pl. Dep. Tr. 189:13-15.

65. She never walked without cane assistance any further than from her home to her car after February 2011, which was a distance of only approximately 30 feet. (Pl. Dep., 205:4-7, 231:6-15, 243:22-24, Exh. B).

Response: DISPUTED as to the implication that simply because Plaintiff did not walk more than approximately 30 feet without a cane, doesn't mean she could not walk more than 30 feet without a cane. Pl. Dep. 196:17-197:2.

66. A PACE ADA Paratransit application is for people with disabilities which prevent them from using public transportation such as the CTA and Pace Fixed Routes. (Pl. Dep.,206:1-207:6, Exh., 6 to Pl. Dep., Exh., B). On February 19, 2011, Plaintiff applied for PACE transportation services and attested to the fact that she could not walk without ambulatory

support. (Pl. Dep., 81:11-17, 83:1-8., 206:1-19, Exh., B). In the application, Plaintiff indicated that she sometimes needed assistance while traveling, that noise distracted and confused her, that she could never stand for ten minutes if there was no place to sit, that on her best day she could walk no farther than a ½ block, and that driving could be hard sometimes and she required a nap after driving. (Pl. Dep., 206:1-207:6, 222:5-223:24, 321:6-20, Exh., 6 to Pl. Dep., Exh., B). Plaintiff completed the application attesting that the information provided was true and correct and that falsification of information could result in penalty under law. (Pl. Dep., 206:1-207:6, Exh., 6 to Pl. Dep., Exh., B). Plaintiff further agreed to notify PACE if she no longer needed to use the ADA Paratransit Services, but Plaintiff has used its service continually since 2011. (Pl. Dep., 206:1-207:6, Exh., 6 to Pl. Dep., Exh., B).

Response: DISPUTED as to "Plaintiff further agreed to notify PACE if she no longer needed to use the ADA Paratransit Services, but Plaintiff has used its service continually since 2011. (Pl. Dep., 206:1-207:6, Exh., 6 to Pl. Dep., Exh., B)", as it is unsupported by the citation provided by Defendant.

67.     Dr. Killingsworth was of the opinion that, after Plaintiff's fall in February 2011, it was in Plaintiff's best interest to always ambulate with a cane. (Killingsworth Dep., 148:16-149:1, 180:17-21, Exh., K). Indeed, Dr. Killingsworth advised Plaintiff to use a cane each time she saw her. (Pl. Dep., 212:1-8, Exh., B).

Response: UNDISPUTED

68.     Further, Dr. Killingsworth opined that someone who felt anxious in a large room with people should not be operating a gun. (Killingsworth Dep., 175:24-176:24, 180:2-16, Exh., K).

Response: DISPUTED. Defendants cited support for this paragraph (Killingsworth Dep.

175:24-176:24) bears no reference to anyone, hypothetical or real, operating a gun. In Killingsworth Dep. 180:2-16, Dr. Killingsworth is asked whether Plaintiff, with her difficulty in being in a large room with multiple officers, shouldn't be handling a weapon; Dr. Killingsworth answers affirmatively, but not because of Plaintiff's issues with noise and distraction, but because Plaintiff had been out of work on medical leave for so long she would need to become acclimated to her surroundings before Dr. Killingsworth was confident in her ability to operate a firearm. Killingsworth Dep. 180:2-16. Further disputed as to the implication, by the use of the word "Further," that the facts contained in ¶68 have any temporal relation to ¶67; such an implication is unsupported by the citations provided.

69.     In 2012, CPD revised the essential functions of the police officer position and the minimum requirements necessary for a police officer to return to work on Limited Duty Status. (Lander Dep., 223:20-113:1, Exh., C; Hemmerling Aff., ¶ 43, Exh., J).     In addition to being medically cleared to safely operate a gun and ambulate without a cane or walker, the police officer seeking to return to work, even in a Limited Duty capacity, was also required to prove they were able to effectuate an arrest at the resister level, and was able to drive.   (Ladner Dep., 113:2-9, Exh., C; Hemmerling Aff., ¶ 43, Exh., J; Ladner Aff., ¶¶ 38-39, Exh., F).

Response: UNDISPUTED

70.     Plaintiff admitted she was unable to state that she could either carry and handle a gun or effectuate an arrest in 2012. (Pl. Dep., 238:12-23, Exh, B).  Dr. Killingsworth testified that in her opinion, Plaintiff did not have the physical, emotional and psychological ability to safely effectuate an arrest in 2012.  (Killingsworth Dep., 175:2-10,175:19-23, Exh., K).

Response: DISPUTED. Dr. Killingsworth could not make a definitive determination as to whether Plaintiff would be unable to perform any work absent the requested accommodations

without receiving feedback from the Police Department regarding Ms. Sams' performance upon her return to work, which never came. Killingsworth Dep. 128:22-129:9, 126:1-127:19. The City of Chicago Police Department never responded to Dr. Killingsworth's communications regarding Plaintiff's requested accommodations, nor Dr. Killingsworth's communications regarding Plaintiff's return to work. Killingsworth Dep. 126:1-127:19. Dr. Killingsworth testified that, as of March 28, 2012, had Plaintiff been given the opportunity to gradually come back into her previous working environment, she would have been able to perform her job as well as anyone else, despite her disabilities. Killingsworth Dep. 179:11-180:1.

PLAINTIFF'S ACTIONS IN 2012

71. In 2012, Plaintiff sent letters and made calls to CPD members and City officials complaining about being placed on leave. (Pl. Dep., 361:13-362:13, Exh., B). Plaintiff also claims to have tried to call the MSS in 2012, but asserts that no one returned her call and that she never spoke to Hemmerling in 2012. (Pl. Dep., 361:3-14, Exh., B).

Response: UNDISPUTED

72. Ladner recalls that in 2012, the superintendent of CPD forwarded Plaintiff's letter to her attention for response, and also recalls talking to Plaintiff on the phone. (Ladner Aff., ¶¶ 40-41, Exh., F; and letters attached to Ladner Aff. as Exh., 16-17) Ladner recalls that during the course of the phone conversation, Plaintiff advised that she was interested in returning to work because she was close to having enough time to retire but that she was a little short on time, and so Ladner informed Plaintiff of the steps she needed to take to return to work; however, Plaintiff never took those steps or completed the necessary paperwork. (Ladner Dep., 52:20-53:2, 57:22-58:17, Exh., C).

Response: DISPUTED that Plaintiff never "took those steps or completed the necessary paperwork". The citation provided by Defendant (Ladner Dep., 52:20-53:2, 57:22-58:17) does not support this alleged fact. Lander never talked to Plaintiff about completing any paperwork. Pl. Dec. ¶45.

73.     Specifically, to return to duty from inactive status, Plaintiff needed to obtain a medical release from her doctor, which indicated she could meet the minimum qualifications of a police officer as delineated by general order, and start the reinstatement process with HR. (Ladner Dep., 53:3-8, Exh., C). Plaintiff initially responded that she would send the documentation in for reinstatement, but she never did. (Ladner Dep., 53:9-13, Exh., C). Alternatively, Ladner advised that if Plaintiff wanted to be placed in a non-police position, she could fill out the accommodation paperwork. (Ladner Aff., ¶ 44, Exh., F).

Response: DISPUTED. Hemmerling never gave Plaintiff a reasonable accommodation form, and no one ever requested Plaintiff fill out any type of a reasonable accommodation form. Pl. Dep. 136:8-12. Plaintiff did not need a medical release to return to work, as her doctor had released her to return to work in February 2011, and there was no medical documentation to the contrary thereafter. From February 28, 2011 through the time she sought reinstatement in March, 2012, Plaintiff had no new medical restrictions. Pl. Dep. 189:16-18, 238:3-8; Killingsworth Dep. 141:10-12, 151:22-152:6; 162:4-163:1, 163:16-165:16. No one ever asked Plaintiff to send in the documentation in for reinstatement, or requested that she fill out reasonable accommodation form. The only communication Plaintiff received from Ladner regarding accommodation paperwork was Ladner's 2012 letters to Plaintiff stating Plaintiff refused to fill out the reasonable accommodation paperwork. Pl. Dec. ¶¶42-45; Ladner Dep. 108:21-24.

74.     Plaintiff never filled out a reasonable accommodation packet. (Pl. Dep., 136:8-11,

362:21-363:2, Exh., B). Plaintiff's failure to complete the reasonable accommodation form was discussed by Lander and Plaintiff through the 2012 correspondence and a telephone conversation in 2012. (Ladner Dep., 50:1-9, Exh., C; Ladner Aff.,¶¶ 40-44, and Letters at Exh., 16-17 to Ladner Aff., Exh., F).

Response: DISPUTED. Hemmerling never gave Plaintiff a reasonable accommodation form, and no one ever requested Plaintiff fill out any type of a reasonable accommodation form. Pl. Dep. 136:8-12. Further DISPUTED that the reasonable accommodation form was "discussed by Lander and Plaintiff." The only communication Plaintiff received from Ladner regarding accommodation paperwork was Ladner's 2012 letters to Plaintiff stating Plaintiff refused to fill out the reasonable accommodation paperwork. Pl. Dec. ¶¶42-45; Ladner Dep. 108:21-24.

SIMILARLY SITUATED EMPLOYEES

75. Plaintiff alleges that there were 3 Caucasian officers, Patricia Pawlak, Kim Farrett, and Sieko O'Campo, who were assigned to MSS after she requested to work in the unit. (Pl. Dep., 305:21-307:22, 350:2-13, Exh., B). However, O'Campo self identifies as Hispanic. (Sergeant Robert Flores Affidavit ("Flores Aff."), ¶ 7, Exh., M). Further, between January 2011 and March 2012 the racial breakdown in the MSS included the following: 21 Caucasian employees, 22 African American Employees, 7 Hispanic employees, and 1 Asian employee. (Flores Aff., ¶ 7, Exh., M). Plaintiff admits that there were a number of other African Americans who were assigned to the MSS. (Pl. Dep., 351:9-352:15, Exh., B). Further, there were a number of police officers assigned to the MSS in a Limited Duty position due to medical reasons. (Hemmerling Aff., ¶ 41, Exh., J).

Response: UNDISPUTED

76. Plaintiff admits that the sole basis for her belief that the City and Hemmerling

discriminated against her is because she believes Hemmerling did not have authority to complete paperwork placing her on a personal leave of absence and believes that the information in the PAR form was a "lie." (Pl. Dep., 353:16-354:16, Exh., B).

Response: DISPUTED. Plaintiff lists numerous bases for her belief that the City and Hemmerling discriminated against her. Pl. Dep. 352:16-356:11; amongst those reasons are that Plaintiff was not only qualified but also cleared for duty and not seeking leave at the time Hemmerling claimed Plaintiff was seeking leave because she was not cleared for duty. Pl. Dep. 352:16-356:11. In addition to those reasons, Plaintiff believes the CPD has engaged in a pattern and practice of violating the rights of disabled police officers, and also believes that Hemmerling did not want Plaintiff to work in MSS because Plaintiff is black. Pl. Dep. 352:16-356:11. 353:6-15,. Furthermore, Plaintiff believed Hemmerling was not treating Plaintiff fairly, at least in part because Hemmerling was "over" Plaintiff and her medical issues. Pl. Dec. ¶32; Killingsworth Dep. 184:1-7, 18-19.

77. Plaintiff believes that the City was trying to save money; and therefore, it discriminated against her based upon her race and disability when it placed her on a leave of absence. (Pl. Dep., 358:8-360:19, Exh., B).

Response: UNDISPUTED

PLAINTIFF'S ADMINISTRATIVE CHARGES AND ALLEGATIONS

78. Plaintiff admits that she never heard Hemmerling make any discriminatory comments about African-Americans or disabled persons. (Pl. Dep., 347:4-10, 356:16-19, Exh., B). Plaintiff's belief that African-Americans and disabled people were denied the right to work in the MSS is based solely on the fact that she and one other African American officer were not personally assigned to work in the MSS. (Pl. Dep., 347:8-15, Exh., B).

Response: UNDISPUTED.

79. At her deposition, Plaintiff denied that she requested a reasonable accommodation and asserts she only ever requested a unit reassignment. (Pl. Dep., 377:2-7, 378:1-6, Exh., B).

Response: DISPUTED. Plaintiff asked to be reassigned because MSS was not as loud as ARU, and therefore had an environment more conducive to Plaintiff's post-stroke status. Pl. Dep. 104:12-15, 18-24. Further, Plaintiff testified she did not understand the word "reasonable accommodation" because it was not a police word. Pl. Dep. 380:16-23. In an objection to a question posed to Ladner during her deposition, Defendant also acknowledges that "reasonable accommodation" is a legal term. See Ladner Dep. 25:18-24.

80. At her deposition Plaintiff claimed her EEOC charge alleging she had requested and was denied an accommodation was incorrect. (Pl. Dep., 377:2-7, 378:1-6, Exh., B).

Response: DISPUTED. Plaintiff asked to be reassigned because MSS was not as loud as ARU, and therefore had an environment more conducive to Plaintiff's post-stroke status. Pl. Dep. 104:12-15, 18-24. Further, Plaintiff did not understand the word "reasonable accommodation" because it was not a police word. Pl. Dep. 380:16-23. In an objection to a question posed to Ladner during her deposition, Defendant also acknowledges that "reasonable accommodation" is a legal term. See Ladner Dep. 25:18-24.

Respectfully Submitted:

By: /s/ Jemelle D. Cunningham
One of Plaintiff's Attorneys

Jemelle D. Cunningham
LAD LAW GROUP, P.C.
203 N. LaSalle St.
Suite 2100
Chicago, IL 60601
(312)252-3085

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JEANETTE Y. SAMS,

Plaintiff,

v.

CITY OF CHICAGO and
BARBARA HEMMERLING,

Defendants.

No. 13 CV 7625

District Judge Jorge Alonso
Magistrate Judge Jeffrey T. Gilbert

PLAINTIFF'S LOCAL RULE 56.1
STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

Plaintiff, Jeanette Y. Sams, by and through her attorneys, Lad Law Group, P.C., hereby submits her Local Rule 56.1(b)(3)(c) Statement of Additional Undisputed Material Facts as follows:

Plaintiff's Employment, Medical Leave, and Return to Work

1. After experiencing a series of strokes between 2005 to 2008, Plaintiff suffered from significant physical, cognitive, and speech deficits, and was on medical leave between the years 2006 and 2010, with a reinstatement date of January 14, 2011. Pl. Dep., 71:6-17, 177:23-178:2, 256:21-257:3; Deposition of Barbara Hemmerling[1] ("Hemmerling Dep.") Defendant's Exhibit D, at 20:2-7, 21:4-13; Deposition of Deborah Killingsworth ("Killingsworth Dep."), Defendant's Exhibit K, at 19:7-18, 30:6-9. Plaintiff experienced significant improvement with therapy, and was extremely motivated to return to work, Killingsworth Dep. 27:12-17.

[1] For the sake of brevity of the record, Plaintiff will not reproduce duplicate deposition transcripts previously provided by Defendant in support of its Local Rule 56.1 Statement of Material Facts, but will reference them accordingly herein.

2. In June of 2006, Plaintiff was notified by the MSS that her medical time would be exhausted on July 13, 2006, and that she would need to request a leave Disability benefits to continue to be off. Declaration of Plaintiff Jeanette Y. Sams "Pl. Dec.", Plaintiff's Exhibit A at ¶4.She signed a personnel action request ("PAR") form, reflecting her request. Pl. Dec. ¶4. In June of 2009, Plaintiff requested an extension of that leave, and signed a PAR form reflecting that request. Pl. Dec. ¶5.

3. In July of 2010, Plaintiff received a letter from CPD's Human Resources Director, Tracy Ladner, stating that her Leave of Absence had expired more than 2 months prior, and that if she wished to return to active duty, she would be required to report to CPD's Human Resources Division to begin the reinstatement process, which Plaintiff did, after jer doctor, Deborah Killingsworth released her back to work with the restriction that Plaintiff work in a sedentary position, with intermittent standing. Pl. Dec. ¶6-9.

4. On February 11, 2011, Plaintiff, slipped on some ice and fell backwards, resulting in a bump on her head, and a headache, which was treated with an increase in pain medication. Deposition of Plaintiff Jeanette Sams ("Pl. Dep."), Defendant's Exhibit B at 33:17-21, 35:16-36:7. Plaintiff's health change after that time did not constitute anything more than a temporary headache. Pl. Dep. 189:13-15; Pl. Dec. ¶12.

5. On February 14, 2011, Officer Adrina Ridley, who had finished at the Academy with Plaintiff three days prior, and who was also assigned to the ARU, called and informed Plaintiff that her paycheck for the pay date ending February15, 2011, to be paid on February 16, 2011, would not be available for pickup at the ARU on February 16, 2011, and suggested Plaintiff verify the whereabouts of her February 16, 2011 paycheck as

well. Pl. Dec. ¶¶10, 14-15. Plaintiff then called CPD's finance department to ask where her check would be located on the upcoming payday. Pl. Dec. ¶16.

6. A representative at the finance department told Plaintiff that her check would be sent to the academy for pick up, which Riley retrieved from the Academy and brought to Plaintiff on or about February 16, 2011. Pl. Dec. ¶¶16-17.

7. Plaintiff did not contact the finance department and tell anyone to change her assignment or detail designated on her check. She only contacted the finance department to inquire as to the location of her check, so that Riley could retrieve it and bring it to her while she was out. Pl. Dec. ¶24.

8. The unit detail listed on Plaintiff's February 16, 2011 check is "045", as indicated on the top left hand side of the check, third line down, and the second set of numbers from the right. Code "045" on Plaintiff's paycheck indicates the Police Academy as Plaintiff's detail unit. Pl. Dec. ¶¶17-22.

9. Once the bump from Plaintiff's February 11, 2011 fall cleared and Plaintiff's headaches subsided, Dr. Killingsworth released her back to work on February 22, 2011, with the same restrictions she had previously in the July 2010 recommendation. Pl. Dec. ¶¶13,27. At that time, Plaintiff had no disciplinary actions pending against her. Pl. Dec. ¶65.

10. On or about February 23, 2011, Plaintiff went to the MSS to submit two letters from Dr. Killingsworth-one was a release to return to work from her fall, dated February 22, 2011, and the other was to support her reassignment to the MSS, as requested by Chief Williams, dated February 21, 2011. She gave both letters to Erica Jenkins, the nurse she was assigned to in the MSS. Pl. Dec. ¶¶28-29.

11. Dr. Killingsworth's February 21, 2011 note was based on Plaintiff's reports of "the problems that she was having" upon returning to work from a years-long disability leave, as well as Dr. Killingsworth's belief, based on Plaintiff's treatment history, that placing Plaintiff in a "smaller" working environment would prevent "psychological distraction and anxiety" and improve Plaintiff's ability to focus on her job responsibilities. Killingsworth Dep. 120:9-18, 124:7, 124:7-20, 124:24-125:20; Pl. Dec. ¶28, and Group Exhibit 8, attached thereto.

12. The second note, dated February 22, 2011, thanked the CPD for allowing Plaintiff to return to the MSS instead of the ARU, explained that Plaintiff's post-stroke status renders her more effective in smaller working environments that are conducive to "more one on one interactions", that Plaintiff would benefit from an occupational therapy evaluation with therapeutic training to reduce the need for this limitation, and that—because extended drives in heavy rush hour traffic can cause Plaintiff significant fatigue—a work assignment closer to Plaintiff's home would "definitely decrease stressors". Killingsworth Dep. 117:23-118:11; Pl. Dec. ¶28, and Group Exhibit 8, attached thereto.

13. While Plaintiff was out due to her fall, she received no communication from the MSS or from CPD Human Resources. Pl. Dec. ¶28. No one ever responded to Dr. Killingsworth's communications regarding Plaintiff's February 21, 2011 requested accommodations, nor Dr. Killingsworth's communications regarding Plaintiff's February 22, 2011 return to work. Killingsworth Dep. 126:1-127:19. No one from the Chicago Police Department ever communicated with Dr. Killingsworth, nor did they ever respond to her communications regarding Plaintiff. Killingsworth Dep. 165:20-22, 126:1-127:19.

14. On or about February 23, 2011, MSS nurse Erica Jenkins gave Plaintiff an authorization to return to work on February 28, 2011. Pl. Dec. ¶30, and Clear System Entry, Plaintiff's Exhibit B.

15. Plaintiff's paycheck for the pay period ending February 28, 2011, with a pay date of March 1, 2011, indicates she was detailed to the MSS Pl. Dep. 143:13-24; Pl. Dec. ¶¶60-61. She was on active duty at that time, and picked up her check at MSS because that is where she was assigned, as she had been picking up her checks in the unit where she was assigned to work throughout her entire time working at the CPD. 144:4-16, 148:12-14, 341:15-342:5. Pl. Dec. ¶¶14-23.

16. Lt. Looney, Commander in the MSS, called Plaintiff and told her that there was a problem with her reassignment to MSS, and that she would have to speak with Hemmerling. Pl. Dep. 114:1-19.

17. Over Plaintiff's objections, Hemmerling placed Plaintiff on personal leave in lieu of effectuating Plaintiff's assignment to the MSS. Pl. Dep. 140:14-141:11. Plaintiff did not request to be placed on medical roll, or request a leave. She was requesting to come back to work. Pl. Dec. ¶¶31, 33-36. She was never provided a PAR form to sign, prior to leave, nor was she given reasonable accommodations papers. The first time Plaintiff saw the PAR form was when it was mailed to her home, already filled out, in August 2012. Pl. Dec. ¶¶38,55,64-65. Also in August 2012, Plaintiff received a letter dated March 15, 2011, stating her request for leave was approved, although she made no such request. Pl. Dec. ¶¶56.

18. The remarks section of the form reads "Officer Sams exhausted available medical days on 13 Jul 06. The Officer went on an LOA for Disability Benefits effective 14 Jul 06.

Member was re-instated to the Payroll on 14 Jan 11. The Officer has no available medical time; therefore the new LOA date is effective 01 Mar 11." March 1, 2011 PAR Form, Plaintiff's Exhibit C, attached herewith.

19. Looney signed Plaintiff's PAR Form, and wrote the word "refused" where Plaintiff was supposed to sign her name because he generally cannot sign a PAR Form without the officer's signature. Looney Dep. 33:2-4, 37:9-22, Ex. 1. Writing the term "refused" was Looney's own, as well as the department's general practice of indicating that "the officer wasn't available at the time and the form had to be processed." Looney Dep. 37:10-12, 17-18; Ladner Dep. 66:4-9; 120:10-19. Looney does not recall the circumstances surrounding his signing Plaintiff's PAR Form, but knows that he was "told or there was a reason why the [Plaintiff] refused" to sign the PAR Form. Looney Dep. 37:15, 37:23-24, He could not recall ever having "any kind of conversation" with "anyone" as to why the Plaintiff "refuse[d] to sign the document." Looney Dep. 38:1-8, 39:6-9.

<u>Plaintiff's 2012 Requests for Reinstatement</u>

20. In 2012, Plaintiff took a number of steps towards returning to work: she went to the CPD's 35th Street office, spoke with the superintendent, left messages with the MSS intake person for Hemmerling, went to City Hall and notified the City council that CPD was refusing to allow her to return to work, went to the CPD's 35th St. office again to inform Superintendent McCarthy's office that the CPD was refusing to allow Plaintiff to be reinstated, filed a grievance with the FOP, wrote letters to the superintendent, made a number of phone calls including phone calls to the chief of patrol, human resources, and several different active CPD chiefs, filed a complaint with the EEOC, and filed the

present lawsuit. Pl. Dep. 360:20-362:17, 366:16-18, 369:24-370:1, 371:8-372:17, Pl. Dec. ¶¶42-54, 58-59; 66.

21. From February 28, 2011 through the time she sought reinstatement in March, 2012, Plaintiff had no new medical restrictions. Pl. Dep. 189:16-18, 238:3-8; Killingsworth Dep. 151:22-152:6; 162:4-163:1, 163:16-165:16. As of March 28, 2012, had Plaintiff been given the opportunity to gradually come back into her previous working environment, she would have been able to perform her job as well as anyone else. Killingsworth Dep. 179:11-180:1.

22. Ladner knew Plaintiff suffered from strokes during her employment with the CPD. Ladner Dep. 55:6-16. According to Ladner, Plaintiff did not come back because she had some type of medical condition. She believes Plaintiff injured herself. Ladner Dep. 52:2-12; 54:3-5. As of March 2012, Lander understood Plaintiff was out there as an employee in some capacity, but she had not resigned, she had not retired, and she had not been terminated. Ladner Dep. 50:14-24.

23. Lander did not know Plaintiff, and everything she knew about her was based on CPD's records, which indicate Plaintiff had been given reasonable accommodation paperwork that she never turned in, and the PAR form that shows she refused to sign her leave of absence form. Ladner Dep. 85:16-86:5. Ladner did not know whether Plaintiff in fact refused to provide reasonable accommodation paperwork, but did understand that Plaintiff refused to go on a leave of absence. Lander Dep. 50:1-4, 57:1-4, 86:16-19.

24. Ladner spoke to Plaintiff in 2012, and knew Plaintiff wanted to come back to work from speaking to her, and from Plaintiff's letters to the superintendent saying she wanted to

come back to work. Ladner Dep. 52:24-53:2, 55:7-10, 82:6-7 84:13-14. Ladner told

Plaintiff she could not come back because of "medical reasons"). Pl. Dec. ¶45.

25. Ladner does not know if Plaintiff was able to work when she went on leave after her

reinstatement in January 2011. She believed Plaintiff stated she could not work, that she

had injured herself, and that's what started the March 2011 leave-that she had injured

herself. Ladner Dep. 56:1-14. However, Ladner did not talk to Plaintiff when she went on

leave. It was over a year later that she talked to her. She does not know what Plaintiff was

doing when she first went on her March 2011 leave, and did not know what type of leave

Plaintiff was on. Ladner Dep. 54:22-55:3, 56:17-22. Other that talking to Plaintiff,

Lander did not talk to anyone about Plaintiff's leave, about the letters Plaintiff wrote to

her, or about Plaintiff's 2012 request for reinstatement. Ladner Dep. 57:15-23, 59:14-18,

91:24-92:5.

26. In 2012, the superintendent's office required Ladner to follow up on Plaintiff's inquiries,

and in response, Ladner wrote Plaintiff two letters, and spoke with Plaintiff over the

phone regarding Plaintiff's attempts to return to work. Ladner Dep. Tr. 57:21-59:13,

108:21-2; Pl. Dec. ¶57. Plaintiff responded to those letters received in November 2012.

Pl. Dec. ¶58.

27. Ladner's letter dated March 2012 to Plaintiff stated that Plaintiff was "unable to return to

work due to your treating physician's assessment that you needed one-on-one

interactions, and that working in large settings with multiple officers interacting with

clients caused you psychological distraction and anxiety" Pl. Dec. ¶57.

28. Lander understood Plaintiff's letters to be complaints about being placed on leave, about

Barbara Hammering, and about not being able to work and not receiving money. Ladner

Dep. 90:8-22. Ladner did not talk to Hemmerling about Plaintiff other than to request Plaintiff's file Ladner Dep. 103:16-18. She never talked to her boss Mark Sheer about the letters Plaintiff wrote her Ladner Dep. 109:1-3

29. Hemmerling was responsible for administering the rules for all medical programs and sending out notices when people ran out of time, and basically had the overall responsibility for maintaining medical records. Ladner Dep. 115:22-116:6.

30. Ladner testified that based on her review of the records, Hemmerling followed the procedures for processing people or who have used up all their medical time and generating the paperwork from MSS. Ladner Dep. 116:18-22. According to Ladner, these records indicate Plaintiff had been given reasonable accommodation paperwork that she never turned, and the PAR form that shows she refused to sign her leave of absence form. Ladner Dep. 85:19-86:5.

31. CPD employees Patricia Polick, Sieka O'Campo, and Kimberly Farret are all non-African-American, and Sieka O'Campo, and Kimberly Farret were not disabled. Pl. Dec. ¶¶67-68. These individuals began working in MSS after Plaintiff was placed on leave on March 1, 2011. Pl. Dec. ¶¶69-72.

<u>CPD Policies, Practices and Procedures</u>

32. An officer's circle of influence at the CPD can affect whether an officer is given a particular assignment or detail, and Williams had the authority and influence to reassign Plaintiff. Williams Dep. 19:2-4, 7, 9-10. Deposition of Brenda Shead-Mayo ("Shed Dep."), Defendant's Exhibit H at 39:13-23, 40:5-6.

33. When an employee's medical time is running out, the employee is notified in a letter in advance. Ladner Dep. 15:11-14, 76:15-77:18. If an officer is ordered to return to work,

and does not return to work within a reasonable amount of time, the officer is considered to have abandoned his/her job, which is also grounds for termination. Ladner Dep. 33:22, 34:3-6, 38:20-39:9; Williams Dep. 19:17-18, 20-21, 21:10-14; Shead Dep. 29:4-15, 32:10-17.

34. If an employee wants to return from work on their own, they would report to human resources to get processed by the staff, who processes and coordinates the reinstatement. Ladner Dep. 34:12-14, 39:10-13.

35. In general, officers who are returning from medical leave or some other leave of absence, or who have been terminated by the department, must apply for reinstatement, and may be required take certain types of physical or psychological exam designed to determine whether the officer was still qualified to serve. Looney Dep Tr. 23:11-24:18. The required tests depend on the nature and length of the leave. Looney Dep Tr. 26:4-24, 29:5-21. A hand injury, for example, would necessitate proof of the returning officer's ability to handle his or her firearm. Looney Dep Tr. 26:5-9. A brief absence for something like stitches to the head would probably not require any sort of "qualification" testing, but a month-long absence for a concussion might necessitate qualification testing. Looney Dep Tr. 29:5-21.

36. If an employee had used all of their medical time, they would use a personal leave if they were not able to come back to work Ladner Dep. 11:17-19. A personal leave is a leave of absence from the payroll for personal reasons Ladner Dep. 11:4-6. People who have exhausted their medical time and can't come back to work are usually put on medical leave. Ladner Dep. 22:13-21. The only difference between a medical leave and a personal leave is the reason they are on leave. Ladner Dep. 22:10-12

37. A leave of absence could be terminated by a superintendent, by HR, or the employee could request to come back to work. Ladner Dep. 32:16-19. HR could terminate a leave of absence by notifying an employee who had used up all of their medical time the that they have to come to work because their leave of absence had expired. Ladner Dep. 32:24-33:5; Pl. Dec. ¶62.

38. CPD employees do not get to refuse assignments. It's not allowed. Ladner Dep. 38:20-24. If a CPD employee is ordered to report somewhere and they do not report, they have disobeyed an order, and they will likely get stripped of their police powers and be discharged. Ladner Dep. 38:2-7.

39. If an employee is placed on medical leave and has exhausted their medical time, and MSS generates a PAR form and they disagree with the information, the employee would dispute it by either coming to human resources, or they could go to MSS to say whatever they thought was wrong. Ladner Dep. 24:1-12. Human Resources would look into it by investigation what the employee said. Ladner Dep. 24:13-20.

40. The MSS involvement with range qualification was that once a person had passed medical clearance, then either HR of MSS would notify the range that the person was coming over Ladner Dep. 100:16-22

Respectfully Submitted:

By:  /s/ Jemelle D. Cunningham
     One of Plaintiff's Attorneys

Jemelle D. Cunningham
LAD LAW GROUP, P.C.
203 N. LaSalle St. Suite 2100
Chicago, IL 60601
(312)252-3085

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JEANETTE Y. SAMS,

     Plaintiff,

v.

CITY OF CHICAGO and
BARBARA HEMMERLING,

     Defendants.

No. 13 CV 7625

District Judge Jorge Alonso
Magistrate Judge Jeffrey T. Gilbert

PLAINTIFF'S APPENDIX IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, by and through her attorney, LAD LAW GROUP, P.C., certifies that the following documents represent true and correct copies of the exhibits and submitted in the above referenced matter:

| Exhibit # | Description |
|---|---|
| A | Declaration of Jeanette Y. Sams |
| 1. | June 2006 PAR form |
| 2. | June 2009 PAR form |
| 3. | July 2010 letter from Tracy Ladner |
| 4. | Killingsworth July 2010 recommendation |
| 5. | Killingsworth's February 28, 2011 Release to Return to Work |
| 6. | Check picked up by Adrina Riley on February 16, 2011 |
| 7. | Check for pay period ending January 15, 2011 |
| 8. | Reassignment support letter dated February 21, 2011 |
| 9. | Preauthorization for Plaintiff to return to work on CD status |
| 10. | Copies of letters Plaintiff submitted in support of her return to work efforts |
| 11. | Letter dated March 15, 2011 received by Plaintiff in August, 2012 |
| 12. | Letters from Tracy Ladner received in November, 2012 |
| 13. | Plaintiff's letter to Ladner dated November 28, 2012 |
| 14. | Plaintiff's Paycheck for pay period ending February 28, 2011 |
| 15. | Notifications of Plaintiff's expiring medical leave |
| 16. | CPD's Medical Section Assignment sheets for February 2011 and March 2011 |
| B | CPD's CLEAR System Releasing Plaintiff for Duty as of February 28, 2011 |
| C | March 2011 PAR form |

       /s/ Jemelle D. Cunningham
      Attorney for Plaintiff

LAD LAW GROUP, P.C.
203 N. LaSalle St. Suite 2100
Chicago, IL 60601
312-252-3085

**Declaration of Jeanette Y. Sams**

Pursuant to 28 USC § 1746, I hereby declare as follows:

1. I, Jeanette Y. Sams, state that I am over the age of 18, and competently able to testify as to the matters herein.
2. The following statements are based on my personal, firsthand knowledge.
3. I am Plaintiff in the matter of Jeanette Y. Sams v. City of Chicago, et al., Case No. 13–cv–07625 in the United States District Court for the Northern District of Illinois.
4. In June of 2006, I was notified by the MSS that my medical days would be exhausted on July 13, 2006, and that I would need to request a leave Disability benefits to continue to be off. I signed a personnel action request ("PAR") form, reflecting my request. A true and correct copy of the June 2006 PAR form is attached hereto as Exhibit 1.
5. In June of 2009, I requested an extension of that leave, and signed a PAR form reflecting my request. A true and correct copy of the June 2009 PAR form is attached hereto as Exhibit 2.
6. In July of 2010, I received a letter from CPD's Human Resources Director, Tracy Ladner, stating that my Leave of Absence had expired more than 2 months prior, and that if I wished to return to active duty, I would be required to report to CPD's Human Resources Division to begin the reinstatement process. A true and correct copy of the July 2010 letter is attached hereto as Exhibit 3.
7. In July 2010, my doctor, Deborah Killingsworth released me back to work with the restriction that I work in a sedentary position, with intermittent standing. A true and correct copy of her recommendation is attached hereto as Exhibit 4.

EXHIBIT A

8. I tendered this document (Exhibit 4) to the Medical Services Section ("MSS") for the Chicago Police Department ("CPD") during the reinstatement process, which began with me contacting Human Resources to state that I wanted to return to work.

9. I also underwent an independent medical examination by the City of Chicago's chosen physician, and was medically cleared to return to work.

10. I finished my retraining in the Police Academy on February 11, 2011, and on that day, received an assignment to the Alternate Response Unit ("ARU").

11. Officer Adrina Riley, who I had just completed the Academy with, also received an assignment to ARU.

12. After falling on February 11, 2011, I had a bump on the back of my head from the fall, and I had a headache.

13. My doctor Deborah Killingsworth recommended I take off from work, and released me to return to work on February 28, 2011. A true and correct copy of the release returning me to work is attached hereto as Exhibit 5.

14. While I was out from my fall, on February 14, 2011, Officer Riley called me and stated that her (Riley's) check for the pay date ending February 15, 2011 was scheduled to be picked on the upcoming payday (February 16, 2011) at the academy, and not at the ARU where she was assigned.

15. Riley advised me to call and find out where my check would be, because I had asked her to pick up my paycheck and bring it to me while I was out.

16. On February 14, 2011, I called CPD's finance department to ask where my check would be located on the upcoming payday. A representative at the finance department told me

that my check would be sent to the academy for pick up. I communicated this information to Riley, so that she could pick up my check from the Academy.

17. On or about February 16, 2011, Adrina Riley picked up my check from the Academy, and brought it to me at my home. A true and correct copy of that check is attached hereto as Exhibit 6.

18. The pay period for the check ended on February 15, 2011, and the pay date is listed as February 16, 2011.

19. My unit detail listed on Exhibit 6 is "045", and is indicated on the top left hand side of the check, third line down, and the second set of numbers from the right.

20. Code "045" on my check represents the Police Academy as my detail unit.

21. Code "045" was also listed as my unit detail on my check for the pay period ending January 15, 2011. A true and correct copy of the check for the pay period ending January 15, 2011 is attached hereto as Exhibit 7.

22. I was detailed to the Police Academy, and was training there on January 15, 2011.

23. Since I have worked at CPD, my paychecks have always indicated the unit where I was detailed and worked during the relevant pay period on the check, on the top left hand side of the check, third line down, and the second set of numbers from the right.

24. On or about February 14, 2011, I did not contact the finance department and tell anyone to change my assignment or detail designated on my check. I only contacted the finance department to inquire as to the location of my check, so that Riley could retrieve it and bring it to me because I was out from my fall.

25. On February 14, 2011, I called Eugene Williams, who was Chief of Patrol at the time on his cellular phone. I have his cell phone number because he is a member of the NOBLE

police organization, and I was a member of the Guardian's police organization, and the members often communicated via personal cell phones. His cell phone number is not (312)745-6210.

26. When I spoke to Chief Williams on February 14, 2011, he was out of town, in Las Vegas.

27. Once the bump cleared and my headache subsided, on February 22, 2011, Dr. Killingsworth released me back to work on February 28, 2011 with the same restrictions she had previously in the July 2010 recommendation. (See Exhibit 5).

28. On or about February 23, 2011, I went to the MSS to submit two letters from Dr. Killingsworth-one was a release to return to work from my fall, dated February 22, 2011, and the other was to support my reassignment to the MSS, as requested by Chief Williams, dated February 21, 2011. A true and correct copy of the support letter is attached hereto as Exhibit 8.

29. I gave both letters to Erica Jenkins, the nurse I was assigned to in the MSS. Other than this communication I initiated with Jenkins, I received no other communication from MSS or HR while I was on leave from approximately February 14, 2011 until February 28, 2011.

30. In return Erica Jenkins gave me an authorization to return to work on February 28, 2011 indicating that I should be released to return to work in CPD's "CLEAR" system, to work status "CD" which stands for convalescent duty. A true and correct copy of that pre-authorization is attached hereto as Exhibit 9.

31. On or about February 28, 2011 or March 1, 2011, I met with Barbara Hemmerling, the Medical Administrator of the MSS regarding my return to work from falling on ice on February 11, 2011, and my assignment to the MSS.

32. At that meeting, Hemmerling indicated that she took issue with the time I had taken off, and, referring to me, stated "I am over you and your medical issues."

33. I did not place myself or request to be placed on medical roll on February 28, 2011, or in March 2011.

34. I did not place myself on personal leave or request a personal leave on February 28, 2011, or in March 2011.

35. I never told anyone at CPD that I did not want to work on February 28, 2011, or in March 2011.

36. When I met with Hemmerling, I told her that I was I was trying to come back to work.

37. At this meeting, Hemmerling did not tell me that I would either need to report to my unit of detail, the ARU, after I qualified at the gun range, complete accommodation paperwork, or take a leave of absence.

38. I was not asked to sign a PAR form prior to being placed on leave, nor was I given reasonable accommodations papers. The first time I saw the PAR form was when it was mailed to my home, already filled out, in August 2012.

39. I never told CPD officer Chantelle Wooley that I did not want to go back to the ARU in March of 2011, because I did not like Lt. Weisskopf.

40. In March of 2011, I did not know where Lt. Weisskopf. was assigned, or what shift he was assigned to.

41. In 2005, I told Chantelle Wooley that I was upset that I was transferred out of ARU based on false accusations, and that I was upset that the false accusations and transfer occurred while I was out on medical leave from suffering a stroke, and that no one investigated the matter by talking to me and asking me what happened prior to the transfer.

42. After March 2011, I wrote several letters to the CPD superintendent, and to HR Director Tracy Lander, complaining that Barbara Hemmerling had improperly placed me on personal leave, and expressing my desire to return to work.

43. After March 2011, I called the HR Division and left several messages stating that I wanted to be reinstated to work. No one returned my calls. I specifically left multiple messages for Tracy Ladner, stating that I was looking to be reinstated after Barbara Hemmerling caused me to be improperly placed on personal leave.

44. Ladner did not respond to those calls until March 2012.

45. In our single phone conversation in March 2012, I told her that Barbara Hemmerling had lied to her, and that I was requesting reinstatement. Ladner told me I could not return to work because of "medical reasons." She did not tell me to fill out any paperwork, or what I needed to do for reinstatement. The only communication Plaintiff received from Ladner regarding accommodation paperwork was Ladner's 2012 letters to me stating I refused to fill out the reasonable accommodation paperwork.

46. In March 2012, I went to the CPD headquarters to two occasions to seek reinstatement.

47. On approximately March 11, or 12, 2012, I went to CPD headquarters to the Human Resources Division. I told a female seated at the front desk that "I am Sams, and I'm here for reinstatement."

48. The female at the front desk went and got Police Officer Deborah Cooney. Cooney told me that I had to see Tracy Lander about reinstatement.

49. Approximately March 12 or 13, 2012, I went to CPD headquarters to speak to the Superintendent about reinstatement.

50. At that time, I told the Superintendent's administrative Sargent that I had called the MSS and Ladner in the HR Division several times to be reinstated and come back to work, and I received no response to my calls.

51. I also told him that I had written several letters to Ladner, to the Superintendent, and to others where I copied the Superintendent, and received no response. I gave him copies of the letters, and told him that I wanted to be reinstated back to work, and I was there to see the Superintendent. A true and correct copy of those letters are attached hereto as Group Exhibit 10.

52. The administrative sergeant walked into an office for approximately 7 to 8 minutes, and took my documentation with him.

53. When he came back he told me that I had was on medical leave, and that because it was a medical situation, I would need to talk to Barbara Hemmerling to be reinstated, and he escorted me out of the building.

54. Around the same time, or shortly thereafter, in March of 2012, Ladner contacted me by phone. At that time, I requested to be reinstated as a police officer, in which Ladner replied that I could not return due to "medical reasons."

55. In August 2012, I received a PAR form stating that I was on leave, dated March 1, 2011. Prior to August 2012, I had never seen this PAR form.

56. Also in August 2012, I received a letter dated March 15, 2011, stating that my request for personal leave was approved, although I had made no such request. A true and correct copy of the contents of that letter is attached hereto as Exhibit 11.

57. In November 2012, I received two letters from HR Director Tracy Ladner. One was dated March 16, 2012, and the other was dated November 16, 2012. A true and correct copy of those letters are attached hereto as Group Exhibit 12.

58. I responded to Ladner's November letters in a letter dated November 28, 2012. A true and correct copy of that letter is attached hereto as Exhibit 13.

59. When I requested to be reinstated in March 2012, I did not request a reasonable accommodation. My only request was to return back to work.

60. My paycheck for the pay period ending February 28, 2011 lists my unit detail as "231", and is indicated on the top left hand side of the check, third line down, and the second set of numbers from the right. A true and correct copy of the check for the pay period ending February 28, 2011 attached hereto as Exhibit 14.

61. Code "231" on my check represents the Medical Services Section.

62. Prior to the expiration of medically related leaves of absences I had taken in 2007, 2008, and 2009, I received letters from CPD's Human Resources Division notifying me of my expiring leave, and requesting I submit a PAR form. A true and correct copy of those letters are attached hereto as Group Exhibit 15.

63. When I was placed on personal leave in March of 2011, I did not receive any paperwork from the Human Resources Division, MSS, or any other person or division of CPD prior to. While I was out due to my fall on ice in February 2011, I did not receive any paperwork from the Human Resources Division, MSS, or any other person or division of CPD prior to.

64. The first documentation I received regarding my March 2011 placement on personal leave was the PAR form I received in August 2012. It did not have a cover letter; only the single document inside an envelope.

65. At the time of my completion of retraining in the Police Academy in February 2011, I had no disciplinary action pending against me.

66. I contacted the Fraternal Order of Police ("FOP"), Collective Bargaining Unit for Plaintiff as a Chicago Police Officer, and filed a grievance due to CPD's failure to reinstate me as a police officer.

67. I am familiar with employees Patricia Polick, Sieka O'Campo, and Kimberly Farret, as I have personally met, and spoken to these employees before. I know from meeting these employees, that they were all non-African-American, and Sieka O'Campo, and Kimberly Farret were not disabled.

68. While seeking reinstatement beginning in 2010, and again in March 2012, I made several trips to the MSS, and became familiar with the employees who worked in the MSS.

69. I visited the MSS several times from July 2010 to February 2011, when I was seeking reinstatement, and shortly after I was reinstated in January 2011, and Sieka O'Campo and Kimberly Farret were not working in the MSS.

70. I also reviewed CPD's Medical Section Assignment sheets for February 2011 and March 2011, produced by Defendant in this litigation, and attached hereto as Exhibit 16, which shows each employee by name who was working in Unit 231, the MSS.

71. Patricia Polick, Sieka O'Campo, and Kimberly Farret were not working in the MSS in February or March 2011.

72. By March 2012, I learned from speaking to Patricia Polick, Sieka O'Campo, and Kimberly Farret when calling the MSS to speak to Hemmerling, that they worked in MSS.

73. I did not report to the ARU on February 14, 2011 because on that day, I was out on leave due to a slip and fall on ice that occurred on February 11, 2011.

74. Upon return after my fall, I did not report to the ARU because Chief Williams had approved my request to transfer to MSS, and because Hemmerling told me to meet with her before I was to begin working in the MSS.

75. I did not call to speak to Virginia Garcia's number on March 3, 2011 at (312) 745-5310 to discuss a reasonable accommodation. (312) 745-5310 is a main number for CPD Human Resources division, and is indicted as the number to reach multiple individuals in HR. An employee can call and speak to anyone in HR at that number.

76. On March 3, 2011, Barbara Hemmerling called me to confirm that I had been placed on leave, and it was approved by the Human Resources Division. In response, on March 3, 2011 I called the Human Resources Division to try and resolve my improper March 1, 2011 placement on leave. I was placed on hold several times, and spoke to multiple people in trying to get answers.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 21 Dec 2016

Jeanette Y. Sams

**PERSONNEL ACTION REQUEST**
**CHICAGO POLICE DEPARTMENT**

| MEMBER TO BE AFFECTED (LAST NAME - FIRST - M.I.) | STAR / BADGE NO. | TODAY'S DATE | |
|---|---|---|---|
| | | 15 Jun 06 | |
| | | EMPLOYEE NO. | UNIT ASSIGNED |
| SAMS, Jeanette Y. | 7523 | 30860 | 003/166 |

| EFFECTIVE DATE | JOB TITLE | SOCIAL SECURITY NO. |
|---|---|---|
| 14 Jul 06 | Police Officer | [redacted] |

**TYPE OF ACTION**

| CHECK TYPE OF ACTION HERE (DO NOT CHECK MORE THAN ONE) | | INFORMATION REQUIRED (ENTER INFORMATION IN "REMARKS SECTION" BELOW) | SIGNATURES REQUIRED |
|---|---|---|---|
| EXCUSED WITHOUT PAY - DISCIPLINARY | | GIVE EFFECTIVE DATE, CIRCUMSTANCES & C.R. NO. | UNIT C.O. |
| EXCUSED WITHOUT PAY - NON-DISCIPLINARY | | GIVE EFFECTIVE DATE & CIRCUMSTANCES. | UNIT C.O. |
| ABSENCE WITHOUT PAY - AWOP | | GIVE EFFECTIVE DATE & CIRCUMSTANCES. STATE WHETHER OR NOT MEMBER NOTIFIED SUPERVISOR. | UNIT C.O. |
| TERMINATION - JOB ABANDONMENT | | GIVE EFFECTIVE DATE: F.O.P. - ACTION TAKEN AFTER 4 CONSECUTIVE WORKDAYS AWOP; AFSCME & UNIT II - ACTION TAKEN AFTER 5 CONSECUTIVE WORKDAYS AWOP | UNIT C.O., AREA CHIEF OR DIVISION C.O. |
| LEAVE, DISABILITY PENSION - SWORN ONLY | XX | ATTACH MEDICAL REPORTS, COMPLETE REVERSE SIDE. | MEMBER, MEDICAL DIRECTOR |
| LEAVE, MILITARY (PAID ENCAMPMT.-14 DAYS MAX.) | | GIVE DATES, ATTACH COPY OF OFFICIAL ORDER, COMPLETE REVERSE SIDE. | MEMBER, UNIT C.O., AREA CHIEF OR DIVISION C.O. |
| LEAVE, MILITARY - WITHOUT PAY | | GIVE DATES, ATTACH COPY OF OFFICIAL ORDERS, COMPLETE REVERSE SIDE. IF OVER 29 DAYS, ALSO ATTACH PER-73 (CITY REQUEST FOR LEAVE) AND PER-78 (EXIT INTERVIEW REPORT). | MEMBER, UNIT C.O., AREA CHIEF OR DIVISION C.O. |
| UNPAID ABSENCE (29 DAYS AND UNDER) - NO INSURANCE BENEFITS | | GIVE REASON & RETURN DATE, COMPLETE AND SIGN REVERSE SIDE. | MEMBER, UNIT C.O., AREA CHIEF OR DIVISION C.O. |
| LEAVE, OTHER (30 DAYS AND OVER) | | GIVE REASON & LENGTH OF LEAVE REQUESTED, COMPLETE REVERSE SIDE. ATTACH PER-73, (CITY REQUEST FOR LEAVE) AND PER-78 (EXIT INTERVIEW REPORT). | MEMBER, UNIT C.O., AREA CHIEF OR DIVISION C.O., DEP. SUPT., B.A.S. |
| LEAVE, EXTENSION OF | | GIVE DATES & REASON, COMPLETE REVERSE SIDE. ATTACH PER-73 (CITY REQUEST FOR LEAVE). | MEMBER |
| MARRIAGE LEAVE | | GIVE DATES REQUESTED FOR LEAVE, DATE OF CEREMONY & SPOUSE'S NAME | MEMBER, UNIT C.O. |
| NAME CHANGE | | GIVE NEW NAME. IF OTHER THAN BY MARRIAGE, ATTACH VERIFICATION / EXPLANATION | MEMBER, UNIT C.O. |
| RETIREMENT | | GIVE EFFECTIVE DATE — ATTACH PER-78 (EXIT INTERVIEW REPORT). AS SOON AS RESIGNATION IS ACTED ON BY THE COMMANDING OFFICER, THE COMMANDING OFFICER WILL NOTIFY THE INTERNAL AFFAIRS DIVISION AND THE PAYROLL / FINANCE DIVISION BY PAX TELEPHONE | MEMBER, UNIT C.O., AREA CHIEF OR DIVISION C.O. |
| RESIGNATION | | GIVE EFFECTIVE DATE & REASON | MEMBER, UNIT C.O., AREA CHIEF OR DIVISION C.O. |
| SEPARATION TO ACCEPT OTHER CITY POSITION / TITLE | | GIVE EFFECTIVE DATE, NEW JOB TITLE & NAME OF NEW CITY DEPARTMENT | MEMBER, UNIT C.O., AREA CHIEF OR DIVISION C.O. |
| DEATH IN FAMILY | | GIVE DATES & RELATIONSHIP TO DECEASED | UNIT C.O. |
| TRANSFER REQUEST | | COMPLETE PERSONNEL TRANSFER & ASSIGNMENT SECTION BELOW | MEMBER, UNIT C.O., AREA CHIEF OR DIVISION C.O., DEP. SUPT. |
| RECOGNIZED OPENING BID (FOP) | | COMPLETE PERSONNEL TRANSFER & ASSIGNMENT SECTION BELOW | MEMBER |
| RECOGNIZED VACANCY BID (FOP) | | COMPLETE PERSONNEL TRANSFER & ASSIGNMENT SECTION BELOW | MEMBER |

(Stamp: LEAVE ENTERED)

**PERSONNEL TRANSFER & ASSIGNMENT SECTION**

| UNIT OF ASSIGNMENT REQUESTED | HOME ADDRESS | | HOME TELEPHONE NO. | SENIORITY DATE | TITLE CODE | GRADE |
|---|---|---|---|---|---|---|
| DATE ASSIGNED TO PRESENT UNIT | DATE OF BIRTH | ☐ UNIT NOTICE OF RECOGNIZED OPENING NO.: ☐ RECOGNIZED VACANCY LISTING ADMINISTRATIVE MESSAGE FACSIMILE NETWORK NO.: | | POSITION REQUESTED | | |
| DATE SUBMITTED | TIME SUBMITTED | COMMANDING OFFICER / WATCH COMMANDER'S SIGNATURE | | See Attached | STAR NO. | |

**REMARKS SECTION**

15 Jun 06: Officer Sams will exhaust available medical days on 13 Jul 06. A Leave of Absence to apply for Disability Benefits will be effective 14 Jul 06. The Officer has been directed to submit CPD equipment to the Personnel Division. A copy of this PAR has been forwarded to the Unit and Finance/Payroll.

Notifications: IAD 15 Jun 06 1148 P.O. JoTzuTos #7604 Finance 15 Jun 06 1156 Rita Douglas MY Unit 15 Jun 06 12 Alice Bell

**SIGNATURES**

| SIGNATURE OF MEMBER (IF REQUIRED) | ☐ RECOMMEND APPROVAL ☐ DISAPPROVAL | SIGNATURE & TITLE |
|---|---|---|
| [signature] | | |
| ☑ RECOMMEND APPROVAL ☐ DISAPPROVAL — SIGNATURE & TITLE (UNIT C.O.) [signature] 737 | ☐ RECOMMEND APPROVAL ☐ DISAPPROVAL | SIGNATURE & TITLE |

**FOR PERSONNEL DIVISION / BUREAU OF ADMINISTRATIVE SERVICES USE ONLY**

| ☐ RECOMMEND APPROVAL ☐ DISAPPROVAL — SIGNATURE | ☐ APPROVED ☐ DISAPPROVED | SIGNATURE |
|---|---|---|

COMMENTS | I.A.D. CLEARANCE AS OF:

CONFIDENTIAL

**PERSONNEL ACTION REQUEST**
**CHICAGO POLICE DEPARTMENT**

| MEMBER TO BE AFFECTED (LAST NAME - FIRST - M.I.) | STAR / BADGE NO. | TODAY'S DATE |
|---|---|---|
| SAMS JEANETTE Y. | | 15 JUNE 2009 |

| EMPLOYEE NO. | UNIT ASSIGNED |
|---|---|
| 30860 | LOA |

| EFFECTIVE DATE | JOB TITLE | SOCIAL SECURITY NO. |
|---|---|---|
| 14 JULY 2009 | POLICE OFFICER | |

**TYPE OF ACTION**

| CHECK TYPE OF ACTION HERE (DO NOT CHECK MORE THAN ONE) | | INFORMATION REQUIRED (ENTER INFORMATION IN "REMARKS SECTION" BELOW) | SIGNATURES REQUIRED |
|---|---|---|---|
| EXCUSED WITHOUT PAY - DISCIPLINARY | | GIVE EFFECTIVE DATE, CIRCUMSTANCES & C.R. NO. | UNIT C.O. |
| EXCUSED WITHOUT PAY - NON-DISCIPLINARY | | GIVE EFFECTIVE DATE & CIRCUMSTANCES | UNIT C.O. |
| ABSENCE WITHOUT PAY - AWOP | | GIVE EFFECTIVE DATE & CIRCUMSTANCES. STATE WHETHER OR NOT MEMBER NOTIFIED SUPERVISOR | UNIT C.O. |
| TERMINATION - JOB ABANDONMENT | | GIVE EFFECTIVE DATE: F.O.P. - ACTION TAKEN AFTER 4 CONSECUTIVE WORKDAYS AWOP; AFSCME & UNIT II - ACTION TAKEN AFTER 5 CONSECUTIVE WORKDAYS AWOP | UNIT C.O., AREA CHIEF OR DIVISION C.O. |
| LEAVE, DISABILITY PENSION - SWORN ONLY | | ATTACH MEDICAL REPORTS, COMPLETE REVERSE SIDE. | MEMBER, MEDICAL DIRECTOR |
| LEAVE, MILITARY (PAID ENCAMPMT.-14 DAYS MAX.) | | GIVE DATES, ATTACH COPY OF OFFICIAL ORDER, COMPLETE REVERSE SIDE | MEMBER, UNIT C.O., AREA CHIEF OR DIVISION C.O. |
| LEAVE, MILITARY - WITHOUT PAY | | GIVE DATES, ATTACH COPY OF OFFICIAL ORDERS, COMPLETE REVERSE SIDE. IF OVER 29 DAYS, ALSO ATTACH PER-73 (CITY REQUEST FOR LEAVE) AND PER-78 (EXIT INTERVIEW REPORT). | MEMBER, UNIT C.O., AREA CHIEF OR DIVISION C.O. |
| UNPAID ABSENCE (29 DAYS AND UNDER) - NO INSURANCE BENEFITS | | GIVE REASON & RETURN DATE, COMPLETE AND SIGN REVERSE SIDE. | MEMBER, UNIT C.O., AREA CHIEF OR DIVISION C.O. |
| LEAVE, OTHER (30 DAYS AND OVER) | | GIVE REASON & LENGTH OF LEAVE REQUESTED. COMPLETE REVERSE SIDE. ATTACH PER-73, (CITY REQUEST FOR LEAVE) AND PER-78 (EXIT INTERVIEW REPORT). | MEMBER, UNIT C.O., AREA CHIEF OR DIVISION C.O., DEP. SUPT., B.A.S. |
| LEAVE, EXTENSION OF | X | GIVE DATES & REASON, COMPLETE REVERSE SIDE. ATTACH PER-73 (CITY REQUEST FOR LEAVE). | MEMBER |
| MARRIAGE LEAVE | | GIVE DATES REQUESTED FOR LEAVE, DATE OF CEREMONY & SPOUSE'S NAME | MEMBER, UNIT C.O. |
| NAME CHANGE | | GIVE NEW NAME. IF OTHER THAN BY MARRIAGE, ATTACH VERIFICATION / EXPLANATION | MEMBER, UNIT C.O. |
| RETIREMENT | | GIVE EFFECTIVE DATE — ATTACH PER-78 (EXIT INTERVIEW REPORT). AS SOON AS RESIGNATION IS ACTED ON BY THE COMMANDING OFFICER, THE COMMANDING OFFICER WILL NOTIFY THE INTERNAL AFFAIRS DIVISION AND THE PAYROLL / FINANCE DIVISION BY PAX TELEPHONE | MEMBER, UNIT C.O., AREA CHIEF OR DIVISION C.O. |
| RESIGNATION | | GIVE EFFECTIVE DATE & REASON | MEMBER, UNIT C.O., AREA CHIEF OR DIVISION C.O. |
| SEPARATION TO ACCEPT OTHER CITY POSITION / TITLE | | GIVE EFFECTIVE DATE, NEW JOB TITLE & NAME OF NEW CITY DEPARTMENT | MEMBER, UNIT C.O., AREA CHIEF OR DIVISION C.O. |
| DEATH IN FAMILY | | GIVE DATES & RELATIONSHIP TO DECEASED | UNIT C.O. |
| TRANSFER REQUEST | | COMPLETE PERSONNEL TRANSFER & ASSIGNMENT SECTION BELOW | MEMBER, UNIT C.O., AREA CHIEF OR DIVISION C.O., DEP. SUPT. |
| RECOGNIZED OPENING BID (FOP) | | COMPLETE PERSONNEL TRANSFER & ASSIGNMENT SECTION BELOW | MEMBER |
| RECOGNIZED VACANCY BID (FOP) | | COMPLETE PERSONNEL TRANSFER & ASSIGNMENT SECTION BELOW | MEMBER |

HUMAN RESOURCES DIVISION
JUL 08 2009 1 10 03

**PERSONNEL TRANSFER & ASSIGNMENT SECTION**

| UNIT OF ASSIGNMENT REQUESTED | HOME ADDRESS | HOME TELEPHONE NO. | SENIORITY DATE | TITLE CODE | GRADE |
|---|---|---|---|---|---|
| | | | | | |

| DATE ASSIGNED TO PRESENT UNIT | DATE OF BIRTH | ☐ UNIT NOTICE OF RECOGNIZED OPENING NO.: ☐ RECOGNIZED VACANCY LISTING ADMINISTRATIVE MESSAGE FACSIMILE NETWORK NO.: | POSITION REQUESTED |
|---|---|---|---|
| | | | |

| DATE SUBMITTED | TIME SUBMITTED | COMMANDING OFFICER / WATCH COMMANDER'S SIGNATURE | STAR NO. |
|---|---|---|---|
| | | | |

**REMARKS SECTION**

12 MONTHS EXTENSION FOR DISABILITY PENSION PURPOSES

**SIGNATURES**

SIGNATURE OF MEMBER (IF REQUIRED) Jeanette Y. Sams

☐ RECOMMEND APPROVAL ☐ DISAPPROVAL — SIGNATURE & TITLE (UNIT C.O.)

☐ RECOMMEND APPROVAL ☐ DISAPPROVAL — SIGNATURE & TITLE

☒ RECOMMEND APPROVAL ☐ DISAPPROVAL — SIGNATURE & TITLE [signature]

**FOR PERSONNEL DIVISION / BUREAU OF ADMINISTRATIVE SERVICES USE ONLY**

☐ RECOMMEND APPROVAL ☐ DISAPPROVAL — SIGNATURE

☐ APPROVED ☐ DISAPPROVED — SIGNATURE

COMMENTS

I.A.D. CLEARANCE AS OF:

CONFIDENTIAL

DEF000449

Pl. Dec. Ex. 2



**Richard M. Daley**
Mayor

**Department of Police • City of Chicago**
3510 S. Michigan Avenue • Chicago, Illinois 60653

**Jody P. Weis**
Superintendent of Police

28 July 2010

Jeanette Y. Sams
[redacted]
Chicago, IL [redacted]

Dear Ms. Sams:

Your Leave of Absence from your position with the Chicago Police Department expired on the 23 May 2010. At this time you must take action concerning your status with this department.

If you wish to return to active duty as a Police Officer you will be required to report to the Human Resources Division at Police Headquarters at 3510 S. Michigan to begin the reinstatement process.

If you are not interested in returning to active duty as a Police Officer at this time, you should complete the enclosed resignation form and check the box 'Resignation' in order to leave the Department in good standing. Simply sign your name at the bottom left side where indicated and remove the green copy for your records. Also enclosed is a "Notice to City Employees of City Ethics Rule" which should also be signed on page 2. Return both forms to the Human Resources Division in the envelope provided. You should then contact the police pension office at (312) 744-3891 to apply for a refund of your contributions.

For any questions regarding this notice, please call Annette Steptore at (312) 745-5310. Failure to respond to this notice, by 02 August 2010 will result in your resignation from this Department under terms of the signed leave of absence agreement.

Respectfully,
Tracey R Ladner
Tracey R. Ladner
Director
Human Resources Division

TRL:as
Sent Certified & Reg. Mail

**Emergency and TTY:** 9-1-1 • **Non Emergency and TTY:** (within City limits) 3-1-1 • **Non-Emergency and TTY:** (outside City limits) (312) 746-6000
**E-mail:** police@cityofchicago.org • **Website:** www.cityofchicago.org/police

CONFIDENTIAL

DEF000441

Pl. Dec. Ex. 3





**Chicago Police Department**
Medical Services Section
3510 S. Michigan Avenue
Chicago, IL, 60653
Attn Nurse: Beverly Holowach
Contact Number: 312 745-5114
Fax Number: 312-745-6707

Date: 7/23/10

Dear Doctor,

The below listed Chicago Police Officer is currently under your care for a sickness or injury.

| Officer JEANETTE SAMS. | Employee# |
|---|---|

The Chicago Police Department promotes a timely return to duty and can accommodate an Officer with certain medical limitations. A Chicago Police Officer can return to work when the Officer can meet both of the following criteria:

- The Officer can safely carry, handle and use his/her Department approved prescribed firearm (pending a successful completion of a Department qualification course, if applicable).
- Maintain an independent and stable gait without the assistance of external ambulatory support devices (e.g., crutches, canes, walkers, wheelchairs etc.). Subject to evaluation by the MSS an officer wearing prosthesis or other orthopedic devices (braces, open toe walking shoe etc.) may be granted an assignment as appropriate.

**Based on your current evaluation of the Officer**

- This Officer meets the above criteria and return to full duty. ___ Yes ___ No
- This Officer meets the above criteria but has medical limitations. X Yes ___ No

Projected duration of medical limitation(s) ________
Please list the medical limitation(s) that may require this Officer to work in a limited duty capacity:

Sedentary position appropriate with intermittent standing walking as needed. Officer is able to maintain steady gait without cane assistance and is able to maintain full time position

This Officer cannot meet the above criteria at this time and cannot return to any type of duty. ___ Yes ___ No

Projected duration of this No-Work status ________
Please list the reason(s) the Officer cannot return to duty at this time:

CHRISTIAN COMMUNITY
HEALTH CENTER
9718 South Halsted Street
Chicago, IL 60628
~~773-233-4100~~
773-233-8542 Fax
~~Deborah Killingsworth, M.D.~~

M.D. Signature: Deborah Killingsworth MD
Deborah Killingsworth, M.D.

Date: 7/23/10

CONFIDENTIAL DEF001057

Pl. Dec. Ex. 4

Date: 2/22/11

## CERTIFICATE TO RETURN TO WORK/SCHOOL

Name: Jeanette Sams

_____ Was seen in my office on 2/22/11

_____ Was under my care from __________ to __________

Will be able to return to work/school on 2/28/11

_____ Restrictions _____ Light Work

Comments At may return to work c̄ restrictions as previously recommended

Diagnosis: Headaches s/p fall injury

Follow-Up Visit Date: 4 weeks Time: per scheduling

Dr. KILLINGSWORTH Signature: Deborah Killingsworth MD

CHRISTIAN COMMUNITY HEALTH CENTER
9718 South Halsted Street
Chicago, IL 60628
773-233-4100
773-233-8542 Fax
Deborah Killingsworth, M.D.

9718 South Halsted Street, Chicago, IL 60628 Phone (773)233-4100 Fax (773)233-8542
www.cchc-online.org

Rev. 12/03
Document1

CONFIDENTIAL DEF001012

Pl. Dec. Ex. 5

41892808

SEQ NO. 11500984

PAY01-057-1180-00-045-0000

**City of Chicago** **Department of Finance**

Check Number 1150098
Check Date 16-FEB-201

| Employee ID | Employee Name | | Period End | Check Date | Check Amount |
|---|---|---|---|---|---|
| 30860 | JEANETTE Y. SAMS 1 Single 1 | 9161 | 15-FEB-2011 | 16-FEB-2011 | $2,718.5 |

| Description | Rate | Hours | Earnings | YTD |
|---|---|---|---|---|
| Regular Salary | | 88.00 | 3,453.25 | 6,783.50 |
| Time Entry Wages | | | | 444.04 |
| UNIFORM ALLOWANCE | | | 600.00 | 600.00 |

| Before Tax Deductions | Current | YTD |
|---|---|---|
| HEALTH INS | 43.03 | 43.0 |
| POLIC PENSION | 310.79 | 650.4 |

| After Tax Deductions | Current | YTD |
|---|---|---|
| Federal Tax | 702.98 | 1,339.7 |
| IL State Tax | 180.80 | 348.3 |
| Medicare | 58.15 | 112.8 |
| POLICE INSURANCE | 1.25 | 3.7 |
| TERM LIFE INSURANC | 16.49 | 49.4 |
| UNION DUES | 21.25 | 42.5 |

| Net Amount Distribution Type | Amount |
|---|---|
| Checking Account | |
| Savings Account | |
| Check Amount | 2,718.51 |
| Total | $2,718.51 |

| Totals | Current | YTD |
|---|---|---|
| Gross | 4,053.25 | 7,827.5 |
| Less Before-Tax Deductions | 353.82 | 693.5 |
| Taxable Gross | 3699.43 | 7134.0 |
| Less After-Tax Deductions | 980.92 | 1896.7 |
| Net Amount | $2,718.51 | $5,237.3 |

DEF001228

Pl. Dec. Ex. 6

41885744

SEQ NO. 11495104

PAY01-057-1180-00-045-0000

Boost your inco[illegible] through the Earned Income Tax Credit (EITC). Call 311 to learn more about the Federal Earned Income Tax Credit!

**City of Chicago** **Department of Finance**

Check Number 11495104

Check Date 01-FEB-2011

| Employee ID | Employee Name | | Period End | Check Date | Check Amount |
|---|---|---|---|---|---|
| 30860 | JEANETTE Y. SAMS 1 Single 1 | 9161 | 15-JAN-2011 | 01-FEB-2011 | $2,518.81 |

| Description | Rate | Hours | Earnings | YTD |
|---|---|---|---|---|
| Regular Salary | | 88.00 | 3,330.25 | 3,330.25 |
| Time Entry Wages | | 16.00 | 444.04 | 444.04 |

| Before Tax Deductions | Current | YTD |
|---|---|---|
| POLIC PENSION | 339.68 | 339.68 |

| After Tax Deductions | Current | YTD |
|---|---|---|
| Federal Tax | 636.78 | 636.78 |
| IL State Tax | 167.56 | 167.56 |
| Medicare | 54.73 | 54.73 |
| POLICE INSURANCE | 2.50 | 2.50 |
| TERM LIFE INSURANC | 32.98 | 32.98 |
| UNION DUES | 21.25 | 21.25 |

| Net Amount Distribution | |
|---|---|
| Type | Amount |
| Checking Account | |
| Savings Account | |
| Check Amount | 2,518.81 |
| Total | $2,518.81 |

| Totals | Current | YTD |
|---|---|---|
| Gross | 3,774.29 | 3,774.29 |
| Less Before-Tax Deductions | 339.68 | 339.68 |
| Taxable Gross | 3434.61 | 3434.61 |
| Less After-Tax Deductions | 915.80 | 915.80 |
| Net Amount | $2,518.81 | $2,518.81 |

DEF001227

Pl. Dec. Ex. 7

 

Christian
Community
Health
Center

*Roseland Christian Health Ministries*

February 21, 2011

Chicago Police Department
Medical Services Section
3510 South Michigan Avenue
Chicago, IL 60653

To Whom It May Concern:

Re: Jeanette Sams (DOB [redacted])

I would like to thank the Chicago Police Department for accommodating Ms. Sams in her return to work after significant debilitating illness. To date Ms. Sams has been doing well in her transition back to work.

Ms. Sams continues to do well with one on one interactions with clients. However, when placed in large settings with multiple officers interacting with clients, this results in psychological distraction and anxiety for Ms. Sams. I would like to ask that she be allowed to work in smaller settings providing more one on one interactions. I have also requested an occupational therapy evaluation requesting therapeutic training for her in this area.

To date Ms. Sams has also had to drive relatively long distances in rush hour traffic which results in significant fatigue when she arrives at the assigned site to report to work. She is currently obtaining information regarding transportation services as an option for travel back and forth to work. A work site assignment closer to her home would definitely decrease stressors related to her commute to work. Again, your support and thoughtful efforts in accommodating Ms. Sams is greatly appreciated.

Thank you,

Deborah Killingsworth MD

Deborah Killingsworth, MD, FAAFP

*9718 South Halsted Street, Chicago, IL 60628* *Voice (773) 233-4100 Fax (708) 841-7803*

SATURDAY, SUNDAY AND HOLIDAY

**THE FOLLOWING MEMBER MUST BE RELEASED IN CLEAR AT THE FRONT DESK:**

**PRE RELEASE FROM MEDICAL**

**NAME:** Sams, Jeanette

**EMP:** 30860

**RTD DATE:** 28FEB11

**WATCH:** 3

**WORK STATUS:** FULL (CD) LD

**Signature:** [signature]

**Date:** 23FEB11

09 August 2011

Mayor Rahm Emmanuel

121 North LaSalle Ave

Chicago, IL 60602

I am writing to you for help. My name is Jeanette Sams, a 3 time stroke survivor and Chicago Police Officer, that is for the next few weeks. I hope that you can help me return to my job as an officer. In January of 2011, I returned back to work, after some very intense therapy, faith in God and very good medical team.

I completed all requirements to return, qualified with my firearm, completed re-training and looked forward to fulfilling my require time to retire from the Chicago Police Department. On the 11 February 2011. I fell in the rear alley of my residence and hit the back of my head, causing a large lump, and some intense headaches and returned to work after two weeks. On 01 March 201, Barbara Hemmerling informed me she found a problem, with a letter that was written by doctor. recommending a good environment which would allow me to work to the best of my ability. I informed Barbara Hemmerling that this letter was strictly for the person who requested that I have one so that my detailed assignment could be changed. I was working in that unit when I suffered my first stroke. This unit is the Police Department non-emergency section, it is very busy, noisy ,loud and can be stressful. I worked in this unit when it relocated from 11th and state in 1996, up to 2005. I am quite knowledgeable about the unit and with that in mind I also know my medical condition very well and knew I was placing myself in danger medically .

All this information I told to Barbara Hemmerling, who stated to me that if I could not work in that unit that she felt I should not be the Police. and that I needed to try and apply for a different position. I do not understand how it is that I can not work in another unit. that have medical officers in them. If there was a problem with letter. why not ask for my Medical doctor for a more acceptable letter. Barbara Hemmerling told me that she needed to check some things out. therefore contact my unit and use personal time until I heard from her. On 03 March 2011, Barbara Hemmerling a RN. called my residence and told me I was on medical leave, I told Barbara Hemmerling that I could not be on leave, I used all my leave time during my recuperation from my strokes. I have tried contacting the Chicago Police Department. and no one contacted.

Mayor Emmanuel, this situation is very wrong, when a RN. is allowed to over rule doctors. even the city doctors. I suffered for six months prior to my return with no income or medical coverage, so that I could come back and have medical coverage, money for my mortgage, bills and medicine. After all I have been through and for a person to take away my income means of survival and tell me she does not care. I have been wronged in a major way. by Barbara Hemmerl.ing who made this a personal decision . I know officers that she protected and granted limited duty to them because she likes them. I know that she has a dislike for brain injury officers. Barbara Hemmerling forced another brain injury officer off. when she needed , follow up medical treatment and told the officer she could not return limited duty, but she must be full duty. placing the city and fellow officers at risk.

Mayor Emmanuel, please take the time out and help me, I know that Barbara Hemmerling, is abusing her appointed position to hurt as many medically challenged officers.This action is in violation of the contract. God. brought me through. and I refuse to let man take from me any more, I

could have retired, but now I can not because I was placed on a medical leave with no medical benefits, no income. Please check I need your help. I was raised that a honest days work brings about a honest days pay. But most all I did my job. because I was proud that I worked and earned this position and could help people the citizens. Please check. I have worked all my life. and volunteered as well. I needed to complete my job so I can get my medicine and continue my therapy, and not lose my home. I will appreciate whatever you can do.

Sincerely,

Cc: Superintendent Gary F. McCarthy

Secretary Of State Jesse White

10 February 2012

Superintendent Garry F. McCarthy

Chicago Police Department

3510 South Michigan Avenue

Chicago, IL 60652

Dear Superintendent McCarthy:

I would like to introduce myself, my name is Jeanette Sams, and I am a Police Officer that has suffered three strokes. I prayed and with God was able to return back to the department to complete my time so I could at least receive my pension.

I returned in January of 20ll, completed my re-training, and was detailed to Unit 376, which was not good for me medically. I spoke with patrol, and was told to get a letter recommending my work environment. On February 11, my last day in the academy I fell in the alleyway when parking my car, during the bad snow, I fell flat back striking the back of my head. I don't remember anything, other than going to the hospital. I was examined and released back to work by my doctors.

Then on March 03,2011, Barbara Hemmerling, RN in the Medical section, informed me that due to the letter she felt, that if I could not work in the unit assigned to me, I should no longer be a police officer and consider, a civilian position. Hemmerling, also informed me that she was placing me on leave. I asked Hemmerling, to give me in writing what was wrong with the letter so that my doctors could address it. I have yet to receive anything and my doctors have asked as well, She placed me on leave, forcing me off.

Superintendent McCarthy, I worked too hard, and long and prayed everyday to return to my job. I have completed and passed every test necessary to return to work to have a person send me home with no income, no medical insurance, I have had no way to pay for my needed medication. This tells me that Hemmerling was not at all concern that I could die without my medication or follow up medical care. I have no means of support for the past five months nor has Hemmerling ever given me anything that my doctors could have addressed. My doctors have worked with me for six prior to my return, when I was without income and medical coverage at that time.

I am asking for you to look into this matter, due to the fact that no other department member will respond to my calls. Due to this treatment, I will be short four months and unable to receive my pension.. This situation can cause me to medically suffer a stroke that I just may not be able to recover from. I would appreciate, any information regarding this matter.

Sincerely,

Ms. Jeanette Sams

CONFIDENTIAL

06 March 2012

Mayor Rahm Emmanuel

121 North LaSalle Ave

Chicago, IL 60602

I am writing to you for help. My name is Jeanette Sams, a 3 time stroke survivor and Chicago Police Officer, that is for the next few weeks. I hope that you can help me return to my job as an officer. In January of 2011, I returned back to work, after some very intense therapy, faith in God and very good medical team.

I completed all requirements to return, qualified with my firearm, completed re-training and looked forward to fulfilling my require time to retire from the Chicago Police Department. On the 11 February 2011, I fell in the rear alley of my residence and hit the back of my head, causing a large lump, and some intense headaches and returned to work after two weeks. On 01 March 201, Barbara Hemmerling informed me she found a problem, with a letter that was written by doctor, recommending a good environment which would allow me to work to the best of my ability. I informed Barbara Hemmerling that this letter was strictly for the person who requested that I have one so that my detailed assignment could be changed. I was working in that unit when I suffered my first stroke. This unit is the Police Department non-emergency section, it is very busy, noisy ,loud and can be stressful. I worked in this unit when it relocated from 11th and state in 1996, up to 2005. I am quite knowledgeable about the unit and with that in mind I also know my medical condition very well and knew I was placing myself in danger medically .

All this information I told to Barbara Hemmerling, who stated to me that if I could not work in that unit that she felt I should not be the Police, and that I needed to try and apply for a different position. I do not understand how it is that I can not work in another unit, that have medical officers in them. If there was a problem with letter, why not ask for my Medical doctor for a more acceptable letter. Barbara Hemmerling told me that she needed to check some things out, therefore contact my unit and use personal time until I heard from her. On 03 March 2011, Barbara Hemmerling a RN, called my residence and told me I was on medical leave. I told Barbara Hemmerling that I could not be on leave. I used all my leave time during my recuperation from my strokes. I have tried contacting the Chicago Police Department, and no one contacted.

Mayor Emmanuel, this situation is very wrong, when a RN, is allowed to over rule doctors, even the city doctors. I suffered for six months prior to my return with no income or medical coverage, so that I could come back and have medical coverage, money for my mortgage, bills and medicine. After all I have been through and for a person to take away my income means of survival and tell me she does not care. I have been wronged in a major way, by Barbara Hemmerl.ing who made this a personal decision . I know officers that she protected and granted limited duty to them because she likes them. I know that she has a dislike for brain injury officers. Barbara Hemmerling forced another brain injury officer off, when she needed . follow up medical treatment and told the officer she could not return limited duty, but she must be full duty, placing the city and fellow officers at risk.

Mayor Emmanuel, please take the time out and help me. I know that Barbara Hemmerling, is abusing her appointed position to hurt as many medically challenged officers.This action is in violation of the contract. God, brought me through, and I refuse to let man take from me any more. I

could have retired, but now I can not because I was placed on a medical leave with no medical benefits, no income. Please check I need your help. I was raised that a honest days work brings about a honest days pay. But most all I did my job, because I was proud that I worked and earned this position and could help people the citizens. Please check. I have worked all my life, and volunteered as well. I needed to complete my job so I can get my medicine and continue my therapy, and not lose my home. I will appreciate whatever you can do.

Sincerely,

Cc: Superintendent Gary F. McCarthy

Secretary Of State Jesse White

06 March 2012

Superintendent Garry F. McCarthy

Chicago Police Department

3510 South Michigan Avenue

Chicago. IL 60652

Dear Superintendent McCarthy:

I would like to introduce myself. my name is Jeanette Sams, and I am a Police Officer that has suffered three strokes. I prayed and with God was able to return back to the department to complete my time so I could at least receive my pension. I now know that the contract was violated regarding my rights, which is wrong, and I need your assistance.

I returned in January of 20ll. completed my re-training, and was detailed to Unit 376. which was not good for me medically. I spoke with patrol. and was told to get a letter recommending my work environment. On February 11, my last day in the academy I fell in the alleyway when parking my car. during the bad snow, I fell flat back striking the back of my head. I donâ€™t remember anything, other than going to the hospital. I was examined and released back to work by my doctors.

Then on March 03.2011. Barbara Hemmerling, RN in the Medical section, informed me that due to the letter she felt, that if I could not work in the unit assigned to me, I should no longer be a police officer and consider. a civilian position. Hemmerling, also informed me that she was placing me on leave. I asked Hemmerling. to give me in writing what was wrong with the letter so that my doctors could address it. I have yet to receive anything and my doctors have asked as well. She placed me on leave, forcing me off.

Superintendent McCarthy. I worked too hard, and long and prayed everyday to return to my job. I have completed and passed every test necessary to return to work to have a person send me home with no income, no medical insurance, I have had no way to pay for my needed medication. This tells me that Hemmerling was not at all concern that I could die without my medication or follow up medical care. I have no means of support for the past five months nor has Hemmerling ever given me anything that my doctors could have addressed. My doctors have worked with me for six prior to my return, when I was without income and medical coverage at that time.

I am asking for you to look into this matter, due to the fact that no other department member will respond to my calls. Due to this treatment, I will be short four months and unable to receive my pension.. This situation can cause me to medically suffer a stroke that I just may not be able to recover from. I would appreciate, any information regarding this matter.

Sincerely.

Ms. Jeanette Sams

refuse to let man take from me any more, I could have retired, but now I can not because I was placed on a medical leave with no paper work to justify reason for no pay and medical coverage. Please check into this matter, I need your help, I was raised that a honest days work brings about a honest days pay. But most all I did my job, because I was proud that I worked and earned this position and could help people the citizens. Please check, I have worked all my life, and volunteered as well. I need my job so I can get my medicine and continue my therapy, and not lose my home I have already lost my vehicle.. I will appreciate whatever you can do.

Sincerely,

Ms. Jeanette Y. Sams.#7523

Cc: Superintendent Gary F. McCarthy

Secretary Of State Jesse White

DATE: 15 March 2011

Jeanette Y. Sams
[redacted]
Chicago, Illinois [redacted]

Leave of Absence information for sworn
Member requesting Leave of Absence
(Non-Military)

Dear Jeanette Y.Sams:

Requesting Your Leave

Your request for a Leave of Absence from the Chicago Police Department has been received in this Division pending final review. You have requested that the Leave become effective as of 03/01/11. You are required to return your star, and shield and Chicago Police Department identification card to the Human Resources Division prior to the effective date of your Leave of Absence request. All other Department property, including but not limited to office keys, car keys, telephones, and other equipment should be turned in to your unit of assignment or detail. Failure to return this equipment may delay approval of your Leave request and will result in disciplinary action. No Leave of Absence request is effective until approved by the Director of the Human Resources Division.

Your name will be removed from the active payroll and all City paid benefits will terminate as of the effective date of your Leave. While on Leave of Absence you are not authorized to exercise any police powers vested in you as a result of your employment with the Chicago Police Department including, but not limited to, carrying a firearm or weapon. All members on leave of absence are subject to the Orders and the Rules and Regulations of the Chicago Police Department.

Returning to Active Duty with the CPD

In order to return to active duty you must initiate reinstatement procedures by reporting to the Human Resources Division Employment Services Section, located on the 2nd floor at Police Headquarters, 3510 S. Michigan and submitting a written request on forms provided by the Human Resources Division. This process should be started well in advance of the anticipated return to duty date because the various stages for reinstatement take time.

In order to return to duty, you must present a valid Firearm Operator's Identification Card, a valid Gun Registration Card and a valid driver's license issued by the State of Illinois. You must also be cleared by the Internal Affairs Division and clear any required background or fingerprint check. In addition, if you have been in a no pay status for 30 days or more, you will be required to undergo a fitness for duty examination and firearms qualification test. Your return to duty may require approval from the Office of Budget and Management, additional time to determine whether you may be reinstated if you have restrictions, or you may have to wait until a vacancy is created before you may be reinstated.

CONFIDENTIAL

We cannot estimate the amount of time required to complete these procedures; therefore, your return to duty on a specific date in the future cannot be guaranteed. You will not be reinstated to the payroll until all requirements are met. If you delay reporting to the Human Resources Division until the expiration of the Leave, or if you fail to have all required documentation available at the time you request reinstatement, your time off the payroll may be extended well beyond the date of your requested return.

It is your responsibility to maintain your Leave status in good standing. You should notify the Employment Services Section immediately if the reasons for which the Leave was granted change. Failure to do so will constitute grounds for termination of employment as provided under the terms of the Leave of Absence agreement. Obtaining a Leave of Absence under false pretenses also constitutes grounds for termination of employment.

It is absolutely necessary that you contact the Chicago Police Department's Human Resources Division's Employment Services Section on or before the expiration date of the Leave of Absence to advise us of your intention to request an extension of your Leave or to return to duty. If you are not able to return to duty at the expiration of the requested Leave you must either request an extension of Leave or resign. Both of these actions require the completion of a Personnel Action Request (PAR) form and/or the City Per-73 form which can be obtained from the Human Resources Division. Forms should be submitted to the Human Resources Division prior to the Leave expiration date. Failure to request an extension for a Leave of Absence in a timely manner may result in denial of the Leave extension and/or separation from City employment.

Questions regarding this notice or other Leave procedures should be directed to the Employment Services Section of the Chicago Police Department's Human Resources Division at (312) 745-5310.

Tracey R. Ladner
Director
Human Resources Division

Sent Certified Mail to home address of record:

7747 S. Paxton Chicago, IL 60649

CONFIDENTIAL



Rahm Emanuel
Mayor

Department of Police • City of Chicago
3510 South Michigan Avenue • Chicago, Illinois 60653

Garry F. McCarthy
Superintendent of Police

16 March 2012

Ms. Jeanette Sams

Re: Your letters to Superintendent McCarthy dated 10 February 2012, 27 February 2012 and 06 March 2012

Dear Ms. Sams:

Your letters to the Superintendent have been forwarded to me for response. First, accept my sincere condolences for the health issues you are currently facing. I commend you on your perseverance in completing rehabilitation and your desire to return to work. I can only imagine your disappointment when, after suffering three strokes, and undergoing grueling rehabilitation exercises, you were unable to continue working. I certainly understand your frustration concerning your current job status.

I have reviewed your medical file and spoken to Ms. Barbara Hemmerling, the Medical Administrator. Our records show that you were hired on 20 January 1991. You exhausted all of your medical days on 13 July 2006. You then were on a leave of absence beginning 14 July 2006 to seek ordinary disability. You returned to work in 2010 but went on the medical again in 2011. By March 2011, you exhausted all of your medical time. In March 2011, your doctor stated that you needed "one on one interactions" and that "working in large settings with multiple officers interacting with clients" caused you "psychological distraction and anxiety."

As a result, you were given the option of going on a leave of absence or requesting a reasonable accommodation under the ADA. You refused to exercise either option

We all hope that your medical condition improves so that you may return to duty at some point.

Sincerely,

Tracey R. Ladner
Director of Human Resources
Chicago Police Department



Rahm Emanuel
Mayor

Department of Police • City of Chicago

Garry F. McCarthy
Superintendent of Police

16 November 2012

Jeannette Sams

Dear Ms. Sams:

I have been unable to reach you by phone at either 773-731-6948 or 312-213-8315. As you know, your case is currently in litigation. I have attached my letter to you dated 16 March 2012. Because you are currently in litigation against the City, I am unable to comment any further on your case.

I wish you a speedy recovery.

Sincerely,

Tracey R. Ladner
Director of Human Resources
Chicago Police Department

28 November 2012

Ms. Tracey R. Ladner
Director of Human Resources
Chicago Police Department

Dear Ms. Ladner:

This is my letter in response to the message left by you on my cell phone, for me to return your call. Per the conversation where you stated to me that you could not talk to me, after leaving a message to call you. You also stated per the conversation, that you had mailed me a letter and that I should read the letter. I did ask you about the contents of the letter, which you stated you, could not give me any information, just that I should read the letter.

I received a two page letter the first page stating that you tried to call two phone numbers for me and you were unable to reach me and that the enclosed letter attached was sent to me in March 2012. I must state that this is the first time I have ever read this letter. This letter was not received at my residence. Perhaps, had this letter been sent certified I would have received it.

Due to my first time reading this letter, I must correct the contents, and state the facts. The facts are listed as follow:

The fact the record shows that I was hired on 30 January 1991.

The fact In 2006, I was placed on medical leave by the Medical Administrator, notified of this decision when I met with medical section staff, regarding my release from the medical roll. I was informed by staff that my file was gone over to the medical/pension board therefore I could not be released to duty.

The fact I was placed on active duty roll on 14 January 2011, after completion of all requirements needed to return to duty.

The fact is during the serious snow storm of February 2011, I fell in the alleyway of my residence striking the back of my head and due to my previous medical condition, and I was treated and released by the doctors at Metro South Hospital. I was placed on medical roll on the 14 February 2011 and released back to active duty roll on 27 February. Therefore, I was on the medical roll for a total of 14 days.

The fact is according to the binding contractual agreement; sworn personnel have furlough, baby furlough, personal days, and 364 medical days every year.

The fact is the letter used by the Medical Administrator, does not state that I need any of the listed information you have chosen to use to justify placing me on a leave. It is a letter that states recommendations and was a letter requested by the Chief of Patrol to justify my Unit reassignment.

The fact that I informed the Medical Administrator of this, when questioned by her on 01 March 2010, and then told by her that if I did not work in Unit 376, then she felt I should not be working.

The fact is that due to my receiving my paycheck from a civilian in the medical section, the fear that I may have been placed to work there was a situation that Barbara Hemmerling, did not want to happen.

The fact that the misuse of power and position by the medical administrator, violating my rights. The fact is the Medical Administrator has never stated or given me an opportunity to address this issue. The fact is that Barbara Hemmerling refused my phone calls, or my doctor's phone calls to question the reason that she chose to disregard several doctors and their statement that cleared me for work.

The fact is I was on active duty roll when forced on a leave. I called in for three days to Unit 376 to use time as told to do so by Medical Administrator, Barbara Hemmerling, per phone call. The fact is the actions of the Medical Administrator and The Director of Human Resources, is to cause me another stroke, hopefully my death.

The fact is that being a stroke victim, people insults your intelligence; they become condescending, because the assumption is that you're stupid. I am in no way stupid just delayed and fully understanding the actions that The Chicago Police Department has taken against me.

The fact that my family will continue this fight upon my death, and you will be charged for my death.

Thank you.

Ms. Jeanette Y. Sams

41902160

SEQ NO. 11508913

PAY01-057-1180-00-231-0000

**City of Chicago** **Department of Finance**

Check Number 11508913

Check Date 01-MAR-2011

| Employee ID | Employee Name | | Period End | Check Date | Check Amount |
|---|---|---|---|---|---|
| 30860 | JEANETTE Y. SAMS 1 Single 1 | 9161 | 28-FEB-2011 | 01-MAR-2011 | $2,306.11 |

| Description | Rate | Hours | Earnings | YTD |
|---|---|---|---|---|
| Regular Salary | | 72.00 | 3,453.25 | 10,236.75 |
| Time Entry Wages | | | | 444.04 |
| UNIFORM ALLOWANCE | | | | 600.00 |

| Before Tax Deductions | Current | YTD |
|---|---|---|
| HEALTH INS | 44.62 | 87.65 |
| POLIC PENSION | 310.79 | 961.26 |

| After Tax Deductions | Current | YTD |
|---|---|---|
| Federal Tax | 552.59 | 1,892.35 |
| IL State Tax | 150.73 | 499.09 |
| Medicare | 49.42 | 162.30 |
| POLICE INSURANCE | 1.25 | 5.00 |
| TERM LIFE INSURANC | 16.49 | 65.96 |
| UNION DUES | 21.25 | 63.75 |

| Net Amount Distribution | |
|---|---|
| Type | Amount |
| Checking Account | |
| Savings Account | |
| Check Amount | 2,306.11 |
| Total | $2,306.11 |

| Totals | Current | YTD |
|---|---|---|
| Gross | 3,453.25 | 11,280.79 |
| Less Before-Tax Deductions | 355.41 | 1048.91 |
| Taxable Gross | 3097.84 | 10231.88 |
| Less After-Tax Deductions | 791.73 | 2688.45 |
| Net Amount | $2,306.11 | $7,543.43 |

DEF001229

Pl. Dec. Ex. 14

FC

Richard M. Daley
Mayor

Department of Police • City of Chicago
3510 S. Michigan Avenue • Chicago, Illinois 60653

Jody P. Weis
Superintendent of Police

15 JUNE 2009

# EXPIRING LEAVE OF ABSENCE NOTIFICATION

JEANETTE Y. SAMS
[redacted]
CHICAGO, IL [redacted]

DEAR MS. SAMS:

Your Leave of Absence from your position with the Chicago Police Department will expire as of the date shown below. The checklist shows what forms and information are needed in order to make your status current with the Department. Please be sure to sign all forms required and return them to this office in the envelope provided. Be sure to affix proper postage to ensure delivery. If you are planning to return to duty, you must come to the Human Resources Division at 3510 S. Michigan to begin reinstatement procedures.

Date Current Leave Expire 14 JULY 09
Type of Leave:

- [x] Sworn disability pension
- [ ] Civilian medical disability
- [ ] Civilian/Sworn- Personal (State reason on forms)
- [ ] FMLA Expired - Change reason if requesting more time
- [ ] Leave to accept other Non-Career Service City of Chicago position
- [ ] Military Leave of Absence

In order to extend the Leave of Absence, you must submit one or more of the following documentations checked as follows:

- [x] Personnel Action Request (PAR) form
  (**SIGN FRONT AND BACK OF PINK COPY - KEEP GREEN COPY)
- [ ] City of Chicago Department of Personnel Request for Leave of Absence
  (**SIGN BACK OF ALL FOUR COPIES)
- [ ] To/From /Subject report – Explain reason for extension request
- [ ] Official employment verification from your current job
- [ ] Proof of enrollment/attendance in school
- [ ] Medical statement from your doctor

If you have any other questions regarding this notice, please call Annette Steptore of the Human Resources Division at (312) 745-5310.

Emergency and TTY: 9-1-1 • Non Emergency and TTY: (within City limits) 3-1-1 • Non-Emergency and TTY: (outside City limits) (312) 746-6000
E-mail: police@cityofchicago.org • Website: www.cityofchicago.org/police

CONFIDENTIAL

DEF000450

Pl. Dec. Group Ex. 15



Richard M. Daley
Mayor

Department of Police • City of Chicago
3510 S. Michigan Avenue • Chicago, Illinois 60653

Jody P. Weis
Superintendent of Police

26 JUN 2008

# EXPIRING LEAVE OF ABSENCE NOTIFICATION

JEANETTE Y. SAMS
[redacted]
CHICAGO, IL [redacted]

DEAR MS. SAMS:

Your Leave of Absence from your position with the Chicago Police Department will expire as of the date shown below. The checklist shows what forms and information are needed in order to make your status current with the Department. Please be sure to sign all forms required and return them to this office in the envelope provided. Be sure to affix proper postage to ensure delivery. If you are planning to return to duty, you must come to the Employment Section, Personnel Division at 3510 S. Michigan to begin reinstatement procedures.

Date Current Leave Expire: 14 JUL 08

Type of Leave:

- ☑ Sworn disability pension
- ☐ Civilian medical disability
- ☐ Civilian/Sworn- personal (State reason on forms )
- ☐ FMLA Expired - Change reason if requesting more time
- ☐ Leave to accept other Non-Career Service City of Chicago position

In order to extend the Leave of Absence, you must submit one or more of the following documentations checked as follows:

- ☑ Personnel Action Request (PAR) form
  (**SIGN FRONT AND BACK OF PINK COPY -KEEP GREEN COPY)
- ☐ City of Chicago Department of Personnel Request for Leave of Absence
- ☐ To/From /Subject report -- Explain reason for extension request
- ☐ Official employment verification from your current job
- ☐ Proof of enrollment/attendance in school
- ☐ Medical statement from your doctor

If you have any other questions regarding this notice, please call Annette Steptore of Police Personnel or Virginia Garcia, Manager of the Personnel Division, Employment Section at (312) 745-5310.

**Emergency and TTY:** 9-1-1 • **Non Emergency and TTY:** (within City limits) 3-1-1 • **Non-Emergency and TTY:** (outside City limits) (312) 746-6000
**E-mail:** police@cityofchicago.org • **Website:** www.cityofchicago.org/police

CONFIDENTIAL

DEF000452



POLICE
CITY OF CHICAGO

Richard M. Daley
Mayor

Department of Police • City of Chicago
3510 S. Michigan Avenue • Chicago, Illinois 60653

Philip J. Cline
Superintendent of Police

13 June 2007

# EXPIRING LEAVE OF ABSENCE NOTIFICATION

JEANETTE Y. SAMS

CHICAGO, IL

DEAR MS. SAMS:

Your Leave of Absence from your position with the Chicago Police Department will expire as of the date shown below. The checklist shows what forms and information are needed in order to make your status current with the Department. Please be sure to sign all forms required and return them to this office in the envelope provided. Be sure to affix proper postage to ensure delivery. If you are planning to return to duty, you must come to the Employment Section, Personnel Division at 3510 S. Michigan to begin reinstatement procedures.

Date Current Leave Expire 14 JUL 07
Type of Leave:

- ☒ Sworn disability pension
- ☐ Civilian medical disability
- ☐ Civilian/Sworn- personal (State reason on forms )
- ☐ FMLA Expired - Change reason if requesting more time
- ☐ Leave to accept other Non-Career Service City of Chicago position

In order to extend the Leave of Absence, you must submit one or more of the following documentations checked as follows:

- ☒ Personnel Action Request (PAR) form (**SIGN FRONT AND BACK OF PINK COPY -KEEP GREEN COPY)
- ☐ City of Chicago Department of Personnel Request for Leave of Absence (**SIGN BACK OF ALL FOUR COPIES)
- ☐ To/From /Subject report – Explain reason for extension request
- ☐ Official employment verification from your current job
- ☐ Proof of enrollment/attendance in school
- ☐ Medical statement from your doctor

If you have any other questions regarding this notice, please call Annette Steptore of Police Personnel or Virginia Garcia, Manager of the Personnel Division, Employment Section at (312) 745-5310.

Emergency: 9-1-1 • Non-Emergency: (Within City limits) 3-1-1 • Non-Emergency: (Outside City limits) 312-746-6000
TTY: 312-746-9715 • E-mail: police@ci.chi.il.us • Website: www.ci.chi.il.us/CAPS

CONFIDENTIAL

DEF000453

Chicago Police Department

View AA Sheet

Star No. [ ] Emp No.[ ] Name[ ]
Watch [ ] Beat #[ ] Car #[ ]
Unit No [231 ] MEDICAL SECTION Academy Class[ ]
Date From [03-FEB-2011 ] To[03-FEB-2011 ]
Crossing Guards? [ ]

| Unit | Watch | Star# | Emp# | Name | AA Date | Pres. | Abs Cd | Abs Expl | Beat# | Car# | Start Time | Temp. Change of Watch or Add'l Assn Explanation | Modified By | Modified Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 231 | 1 | | | PIETRZAK, STEPHEN T | 03-FEB-2011 | Yes | - | - | 9510B | - | 0800 | - | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 1 | | | JENKINS, ERICA | 03-FEB-2011 | Yes | - | - | DNA | - | 0800 | DETAIL FR 021 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | | | FINERAN, BETH A | 03-FEB-2011 | No | 83 | - | DNA | - | 0800 | DETAIL FR 003 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | | | VALTIERRA, JOHN | 03-FEB-2011 | Yes | - | - | 9515 | - | 0800 | DETAIL FR 009 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | | | BANKSON, MICHELLE G | 03-FEB-2011 | No | 90 | - | DNA | - | 0700 | DETAIL FR 016 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | | | MOYER, CHRISTOPH M | 03-FEB-2011 | No | 81 | - | 9514 | - | 0700 | DETAIL FR 009 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | | | NEARY, DAWN M | 03-FEB-2011 | Yes | - | - | DNA | - | 0700 | DETAIL FR 012 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | | | MORENO, MICHELLE E | 03-FEB-2011 | Yes | - | - | DNA | - | 0700 | DETAIL FR 008 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | | | HESKIN, ROBERT S | 03-FEB-2011 | Yes | - | - | 856 | - | 0700 | DETAIL FR 008 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | | | YAMICH, ELENI | 03-FEB-2011 | Yes | - | - | DNA | - | 0830 | DETAIL FR 005 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | | | RANDLE, REGINALD D | 03-FEB-2011 | Yes | - | - | DNA | - | 0700 | DETAIL FR 014 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | | | BEDOY, RAMONA | 03-FEB-2011 | No | 90 | - | DNA | - | 0700 | DETAIL FR 009 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | | | HOLOWACH, BEVERLY A | 03-FEB-2011 | No | 83 | - | DNA | - | 0700 | - | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | | | WASHINGTON, LELA A | 03-FEB-2011 | Yes | - | - | - | - | 0800 | DETAIL FR 123 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | | | HECKENBACH, MARY E | 03-FEB-2011 | Yes | - | - | DNA | - | 0700 | DETAIL FR 024 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | | | MITCHELL, | 03-FEB- | No | 83 | - | - | - | 0700 | - | LOONEY, | 03-FEB-2011 |

DEF001193

Pl. Dec. Group Ex. 16

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ZELLASTIN | 2011 | | | | | | | | | WILLIAM | 10:57 |
| 231 | 2 | LEE, BONITA A | 03-FEB-2011 | No | - | - | - | - | 0800 | DETAIL TO 127 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | CARROLL, SHARON | 03-FEB-2011 | No | 83 | - | - | - | 0800 | - | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | SMITH, STEPHANIE L | 03-FEB-2011 | No | 82 | - | - | - | 0800 | - | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | HARDY, DENESE | 03-FEB-2011 | Yes | - | - | DNA | - | 0800 | DETAIL FR 025 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | GUEST, EILEEN T | 03-FEB-2011 | Yes | - | - | 920 | N/A | 0800 | - | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | SMITH, KEVIN D | 03-FEB-2011 | Yes | - | - | 9518 | - | 0800 | DETAIL FR 003 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | RICHARDSON, LAVERNE | 03-FEB-2011 | No | 83 | - | - | - | 0800 | - | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | GARZA JR, GENARO | 03-FEB-2011 | Yes | - | - | - | - | 0700 | - | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | BOND, JERMAINE J | 03-FEB-2011 | Yes | - | - | - | - | 0800 | - | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | JONES, SHEREE | 03-FEB-2011 | Yes | - | - | - | - | 0700 | - | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | EWING, MARIE A | 03-FEB-2011 | No | 83 | - | - | - | 0800 | - | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | WERNER, LESLEY A | 03-FEB-2011 | No | 83 | - | - | - | 0700 | - | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | BARBICK, PAULETTE | 03-FEB-2011 | Yes | - | - | - | - | 0800 | DETAIL FR 163 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | HEMMERLING, BARBARA J | 03-FEB-2011 | Yes | - | - | - | - | 0830 | - | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | MILLER, VIRGINIA | 03-FEB-2011 | Yes | - | - | - | - | 0700 | - | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | GRIFFIN, TAMMI L | 03-FEB-2011 | No | - | - | - | - | 0530 | DETAIL TO 620 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | SVALINA, GLADYS T | 03-FEB-2011 | No | 91 | - | DNA | - | 0830 | DETAIL FR 007 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 2 | ARJMAND, SUSAN B | 03-FEB-2011 | Yes | - | - | - | - | 0900 | - | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 21 | LOONEY, WILLIAM R | 03-FEB-2011 | Yes | - | - | 9510 | - | 0800 | - | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 3 | GREGOIRE, PAUL S | 03-FEB-2011 | No | 49 | - | DNA | - | 0700 | DETAIL TO 007 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 3 | BRADFIELD, | 03-FEB- | Yes | - | - | DNA | - | 0730 | DETAIL FR | LOONEY, | 03-FEB-2011 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | MARCIA | 2011 | | | | | | | 171 | WILLIAM | 10:57 |
| 231 | 3 | MOTHES, JEFFREY J | 03-FEB-2011 | Yes | - | - | 9512 | - | 0700 | DETAIL FR 020 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 3 | WOOLEY, CHANETE R | 03-FEB-2011 | No | 91 | - | DNA | - | 0700 | DETAIL FR 021 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 5 | SMITH, RODNEY L | 03-FEB-2011 | Yes | - | - | 9510A | - | 1100 | - | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 5 | CRUZ, MICHAEL A | 03-FEB-2011 | Yes | - | - | 9511 | - | 0700 | DETAIL FR 018 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 5 | GALLAGHER, PATRICIA A | 03-FEB-2011 | Yes | - | - | 9516 | - | 0800 | DETAIL FR 124 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 5 | FOX, THERESA | 03-FEB-2011 | No | 81 | - | 9513 | - | 0700 | DETAIL FR 189 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |
| 231 | 5 | MORAGNE, TIMOTHY W | 03-FEB-2011 | Yes | - | - | 9517 | - | 0800 | DETAIL FR 002 | LOONEY, WILLIAM | 03-FEB-2011 10:57 |

User:PC0M294

Chicago Police Department

View AA Sheet

Star No. [ ] Emp No.[ ] Name[ ]
Watch [ ] Beat #[ ] Car #[ ]
Unit No [231 ] MEDICAL SECTION Academy Class[ ]
Date From [03-MAR-2011 ] To[03-MAR-2011 ]
Crossing Guards? [ ]

| Unit | Watch | Star# | Emp# | Name | AA Date | Pres. | Abs Cd | Abs Expl | Beat# | Car# | Start Time | Temp. Change of Watch or Add'l Assn Explanation | Modified By | Modified Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 231 | 1 | 2278 | 45323 | PIETRZAK, STEPHEN T | 03-MAR-2011 | Yes | - | - | 9510B | - | 0800 | - | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 1 | 14887 | 16604 | JENKINS, ERICA | 03-MAR-2011 | Yes | - | - | DNA | - | 0800 | DETAIL FR 021 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | 6052 | 11453 | FINERAN, BETH A | 03-MAR-2011 | Yes | - | - | DNA | - | 0800 | DETAIL FR 003 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | 7329 | 26764 | VALTIERRA, JOHN | 03-MAR-2011 | Yes | - | - | 9515 | - | 0800 | DETAIL FR 009 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | 8291 | 57083 | BANKSON, MICHELLE G | 03-MAR-2011 | Yes | - | - | DNA | - | 0700 | DETAIL FR 016, CU 3 HRS, 3 MAR 11 1200-1500 HRS | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | 11127 | 39060 | MOYER, CHRISTOPH M | 03-MAR-2011 | Yes | - | - | 9514 | - | 0700 | DETAIL FR 009 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | 12013 | 10997 | NEARY, DAWN M | 03-MAR-2011 | Yes | - | - | DNA | - | 0700 | DETAIL FR 012 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | 13367 | 9414 | MORENO, MICHELLE E | 03-MAR-2011 | Yes | - | - | DNA | - | 0700 | DETAIL FR 008 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | 14344 | 23481 | HESKIN, ROBERT S | 03-MAR-2011 | Yes | - | - | 856 | - | 0800 | DETAIL FR 008 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | 14689 | 97084 | YAMICH, ELENI | 03-MAR-2011 | Yes | - | - | DNA | - | 0830 | DETAIL FR 005 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | 16624 | 26996 | RANDLE, REGINALD D | 03-MAR-2011 | Yes | - | - | DNA | - | 0700 | DETAIL FR 014 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | 18228 | 44779 | BEDOY, RAMONA | 03-MAR-2011 | Yes | - | - | DNA | - | 0700 | DETAIL FR 009 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | 18671 | 24157 | HOLOWACH, BEVERLY A | 03-MAR-2011 | No | 83 | - | DNA | - | 0700 | - | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | - | 799 | WASHINGTON, LELA A | 03-MAR-2011 | Yes | - | - | - | - | 0800 | DETAIL FR 123 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | - | 6651 | HECKENBACH, | 03-MAR- | Yes | - | - | DNA | - | 0700 | DETAIL FR | LOONEY, | 03-MAR-2011 |

DEF001196

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | MARY E | 2011 | | | | | | | 024 | WILLIAM | 12:47 |
| 231 | 2 | - | 16333 | MITCHELL, ZELLASTIN | 03-MAR-2011 | Yes | - | - | - | - | 0700 | - | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | - | 18278 | LEE, BONITA A | 03-MAR-2011 | No | - | - | - | - | 0800 | DETAIL TO 127 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | - | 20692 | CARROLL, SHARON | 03-MAR-2011 | Yes | - | - | - | - | 0800 | - | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | - | 21450 | SMITH, STEPHANIE L | 03-MAR-2011 | Yes | - | - | - | - | 0800 | - | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | - | 22247 | HARDY, DENESE | 03-MAR-2011 | Yes | - | - | DNA | - | 0800 | DETAIL FR 025 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | - | 24729 | GUEST, EILEEN T | 03-MAR-2011 | Yes | - | - | 0101 | - | 0800 | - | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | - | 26197 | SMITH, KEVIN D | 03-MAR-2011 | No | 81 | - | 9518 | - | 0800 | DETAIL FR 003 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | - | 31063 | RICHARDSON, LAVERNE | 03-MAR-2011 | Yes | - | - | - | - | 0800 | - | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | - | 33611 | GARZA JR, GENARO | 03-MAR-2011 | Yes | - | - | - | - | 0700 | - | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | - | 34404 | BOND, JERMAINE J | 03-MAR-2011 | Yes | - | - | - | - | 0800 | - | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | - | 36687 | JONES, SHEREE | 03-MAR-2011 | Yes | - | - | - | - | 0700 | - | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | - | 37316 | EWING, MARIE A | 03-MAR-2011 | Yes | - | - | - | - | 0800 | - | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | - | 40729 | WERNER, LESLEY A | 03-MAR-2011 | No | 83 | - | - | - | 0700 | - | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | - | 41269 | BARBICK, PAULETTE | 03-MAR-2011 | Yes | - | - | - | - | 0800 | DETAIL FR 163 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | - | 54056 | HEMMERLING, BARBARA J | 03-MAR-2011 | Yes | - | - | - | - | 0830 | - | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | - | 54198 | MILLER, VIRGINIA | 03-MAR-2011 | Yes | - | - | - | - | 0700 | - | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | - | 54463 | GRIFFIN, TAMMI L | 03-MAR-2011 | No | - | - | - | - | 0600 | DETAIL TO 620 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | - | 97468 | SVALINA, GLADYS T | 03-MAR-2011 | Yes | - | - | DNA | - | 0830 | DETAIL FR 007 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 2 | - | 108917 | ARJMAND, SUSAN B | 03-MAR-2011 | No | 45 | - | - | - | 0900 | - | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 21 | 14 | 43077 | LOONEY, WILLIAM R | 03-MAR-2011 | Yes | - | - | 9510 | - | 0800 | - | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 3 | 7974 | 25012 | BRADFIELD, | 03-MAR- | Yes | - | - | DNA | - | 0730 | DETAIL FR | LOONEY, | 03-MAR-2011 |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | MARCIA | 2011 | | | | | | | 171 | WILLIAM | 12:47 |
| 231 | 3 | 19715 | 13446 | MOTHES, JEFFREY J | 03-MAR-2011 | No | 81 | - | 9512 | - | 0700 | DETAIL FR 020 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 3 | 20520 | 14283 | WOOLEY, CHANETE R | 03-MAR-2011 | Yes | - | - | DNA | - | 0700 | DETAIL FR 021 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 5 | 2658 | 17735 | SMITH, RODNEY L | 03-MAR-2011 | Yes | - | - | 9510A | - | 0700 | - | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 5 | 5587 | 35630 | CRUZ, MICHAEL A | 03-MAR-2011 | Yes | - | - | 9511 | - | 0700 | DETAIL FR 018 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 5 | 15302 | 50880 | GALLAGHER, PATRICIA A | 03-MAR-2011 | Yes | - | - | 9516 | - | 0800 | DETAIL FR 124 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 5 | 18759 | 45743 | FOX, THERESA | 03-MAR-2011 | Yes | - | - | 9513 | - | 0700 | DETAIL FR 189 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |
| 231 | 5 | 19052 | 45846 | MORAGNE, TIMOTHY W | 03-MAR-2011 | Yes | - | - | 9517 | - | 0800 | DETAIL FR 002 | LOONEY, WILLIAM | 03-MAR-2011 12:47 |

User:PC0M294

Chicago Police Department

View AA Sheet

Star No. [ ] Emp No.[ ] Name[ ]
Watch [ ] Beat #[ ] Car #[ ]
Unit No [231 ] MEDICAL SECTION Academy Class[ ]
Date From [31-MAR-2011 ] To[31-MAR-2011 ]
Crossing Guards? [ ]

| Unit | Watch | Star# | Emp# | Name | AA Date | Pres. | Abs Cd | Abs Expl | Beat# | Car# | Start Time | Temp. Change of Watch or Add'l Assn Explanation | Modified By | Modified Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 231 | 1 | 2278 | 45323 | PIETRZAK, STEPHEN T | 31-MAR-2011 | Yes | - | - | 9510B | - | 0800 | - | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 1 | 14887 | 16604 | JENKINS, ERICA | 31-MAR-2011 | Yes | - | - | DNA | - | 0800 | DETAIL FR 021 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | 6052 | 11453 | FINERAN, BETH A | 31-MAR-2011 | Yes | - | - | DNA | - | 0800 | DETAIL FR 003 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | 7329 | 26764 | VALTIERRA, JOHN | 31-MAR-2011 | Yes | - | - | 9515 | - | 0800 | DETAIL FR 009 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | 8291 | 57083 | BANKSON, MICHELLE G | 31-MAR-2011 | No | 82 | - | DNA | - | 0700 | DETAIL FR 016 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | 11127 | 39060 | MOYER, CHRISTOPH M | 31-MAR-2011 | No | 82 | - | 9514 | - | 0700 | DETAIL FR 009 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | 12013 | 10997 | NEARY, DAWN M | 31-MAR-2011 | No | 49 | OPY | DNA | - | 0700 | DETAIL FR 012 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | 13367 | 9414 | MORENO, MICHELLE E | 31-MAR-2011 | No | 90 | - | DNA | - | 0700 | DETAIL FR 008 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | 14344 | 23481 | HESKIN, ROBERT S | 31-MAR-2011 | Yes | - | - | 856 | - | 0800 | DETAIL FR 008 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | 14689 | 97084 | YAMICH, ELENI | 31-MAR-2011 | Yes | - | - | DNA | - | 0830 | DETAIL FR 005 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | 16624 | 26996 | RANDLE, REGINALD D | 31-MAR-2011 | Yes | - | - | DNA | - | 0700 | DETAIL FR 014 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | 18228 | 44779 | BEDOY, RAMONA | 31-MAR-2011 | No | 90 | - | DNA | - | 0700 | DETAIL FR 009 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | 18671 | 24157 | HOLOWACH, BEVERLY A | 31-MAR-2011 | No | 83 | - | DNA | - | 0700 | - | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | - | 799 | WASHINGTON, LELA A | 31-MAR-2011 | Yes | - | - | - | - | 0800 | DETAIL FR 123 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | - | 6651 | HECKENBACH, MARY E | 31-MAR-2011 | Yes | - | - | DNA | - | 0700 | DETAIL FR 024 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | - | 16333 | MITCHELL, | 31-MAR- | No | 83 | - | - | - | 0700 | - | LOONEY, | 04-APR-2011 |

DEF001199

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | ZELLASTIN | 2011 | | | | | | | | WILLIAM | 09:37 |
| 231 | 2 | - | 18278 | LEE, BONITA A | 31-MAR-2011 | No | - | - | - | - | 0800 | DETAIL TO 127 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | - | 20692 | CARROLL, SHARON | 31-MAR-2011 | Yes | - | - | - | - | 0800 | - | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | - | 21450 | SMITH, STEPHANIE L | 31-MAR-2011 | Yes | - | - | - | - | 0800 | - | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | - | 22247 | HARDY, DENESE | 31-MAR-2011 | Yes | - | - | DNA | - | 0800 | DETAIL FR 025 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | - | 24729 | GUEST, EILEEN T | 31-MAR-2011 | Yes | - | - | 0101 | - | 0800 | - | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | - | 26197 | SMITH, KEVIN D | 31-MAR-2011 | Yes | - | - | 9518 | - | 0800 | DETAIL FR 003 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | - | 31063 | RICHARDSON, LAVERNE | 31-MAR-2011 | Yes | - | - | - | - | 0800 | - | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | - | 33611 | GARZA JR, GENARO | 31-MAR-2011 | Yes | - | - | - | - | 0700 | - | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | - | 34404 | BOND, JERMAINE J | 31-MAR-2011 | Yes | - | - | - | - | 0800 | - | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | - | 36687 | JONES, SHEREE | 31-MAR-2011 | Yes | - | - | - | - | 0700 | - | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | - | 37316 | EWING, MARIE A | 31-MAR-2011 | Yes | - | - | - | - | 0800 | - | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | - | 40729 | WERNER, LESLEY A | 31-MAR-2011 | No | 83 | - | - | - | 0700 | - | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | - | 41269 | BARBICK, PAULETTE | 31-MAR-2011 | Yes | - | - | - | - | 0800 | DETAIL FR 163 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | - | 54056 | HEMMERLING, BARBARA J | 31-MAR-2011 | Yes | - | - | - | - | 0830 | - | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | - | 54198 | MILLER, VIRGINIA | 31-MAR-2011 | Yes | - | - | - | - | 0700 | - | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | - | 54463 | GRIFFIN, TAMMI L | 31-MAR-2011 | No | - | - | - | - | 0600 | DETAIL TO 620 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | - | 97468 | SVALINA, GLADYS T | 31-MAR-2011 | Yes | - | - | DNA | - | 0830 | DETAIL FR 007 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 2 | - | 108917 | ARJMAND, SUSAN B | 31-MAR-2011 | Yes | - | - | - | - | 0900 | - | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 21 | 14 | 43077 | LOONEY, WILLIAM R | 31-MAR-2011 | No | 82 | - | 9510 | - | 0800 | - | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 3 | 7974 | 25012 | BRADFIELD, MARCIA | 31-MAR-2011 | Yes | - | - | DNA | - | 0730 | DETAIL FR 171 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 3 | 19715 | 13446 | MOTHES, | 31-MAR- | Yes | - | - | 9512 | - | 0700 | DETAIL FR | LOONEY, | 04-APR-2011 |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | JEFFREY J | 2011 | | | | | | | 020 | WILLIAM | 09:37 |
| 231 | 3 | 20520 | 14283 | WOOLEY, CHANETE R | 31-MAR-2011 | No | 83 | - | DNA | - | 0700 | DETAIL FR 021 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 5 | 2658 | 17735 | SMITH, RODNEY L | 31-MAR-2011 | Yes | - | - | 9510A | - | 0700 | - | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 5 | 5587 | 35630 | CRUZ, MICHAEL A | 31-MAR-2011 | Yes | - | - | 9511 | - | 0700 | DETAIL FR 018 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 5 | 15302 | 50880 | GALLAGHER, PATRICIA A | 31-MAR-2011 | Yes | - | - | 9516 | - | 0800 | DETAIL FR 124 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 5 | 18759 | 45743 | FOX, THERESA | 31-MAR-2011 | Yes | - | - | 9513 | - | 0700 | DETAIL FR 189 | LOONEY, WILLIAM | 04-APR-2011 09:37 |
| 231 | 5 | 19052 | 45846 | MORAGNE, TIMOTHY W | 31-MAR-2011 | Yes | - | - | 9517 | - | 0800 | DETAIL FR 002 | LOONEY, WILLIAM | 04-APR-2011 09:37 |

User:PC0M294

Chicago Police Department
CLEAR

Print | Logout | Help

Return to Duty

Home » Medical / Timekeeping » Return to Duty

Name: SAMS, JEANETTE Y Emp No.: 30860 Category: SICKNESS

## Employee Information

| | | | | | |
|---|---|---|---|---|---|
| Name | SAMS, JEANETTE Y | Assigned Unit | 003 | Emp No. | 30860 |
| Watch | 3 | Detailed Unit | 376 | Star No. | 7523 |
| Day Off Group | 66 | District of Residence | 004 | Position | POLICE OFFICER |
| Furlough Period | 04A,12B, | | | | |

## Return to Duty

| | |
|---|---|
| First Day of Medical Absence | 14-FEB-2011 |
| Last Day of Medical Absence | 27-FEB-2011 |
| Date Released for Duty | 28-FEB-2011 |
| Created By | JENKINS, ERICA |
| Created Date/Time | 26-FEB-2011 12:25 |

## Release Type

Release Type CONVALESCENT DUTY

## Acknowledgement

Acknowledged? NO

User: PC0U265
Module: 15030 $Revision: 1.77 $

Copyright © 2002. All rights reserved.

EXHIBIT
B
exhibitsticker.com

**PERSONNEL ACTION REQUEST**
**CHICAGO POLICE DEPARTMENT**

| MEMBER TO BE AFFECTED (LAST NAME - FIRST - M.I.) | STAR / BADGE NO. | TODAY'S DATE | |
|---|---|---|---|
| SAMS, Jeanette Y. | XXX 7523 | XX 01 Mar 11 | |
| EFFECTIVE DATE | JOB TITLE | EMPLOYEE NO. | UNIT ASSIGNED |
| 01 Mar 11 | Police Officer | 30860 | 003/37 |
| | | SOCIAL SECURITY NO. | [redacted] |

**TYPE OF ACTION**

| CHECK TYPE OF ACTION HERE (DO NOT CHECK MORE THAN ONE) | | INFORMATION REQUIRED (ENTER INFORMATION IN "REMARKS SECTION" BELOW) | SIGNATURES REQUIRED |
|---|---|---|---|
| EXCUSED WITHOUT PAY - DISCIPLINARY | | GIVE EFFECTIVE DATE, CIRCUMSTANCES & C.R. NO. | UNIT C.O. |
| EXCUSED WITHOUT PAY - NON-DISCIPLINARY | | GIVE EFFECTIVE DATE & CIRCUMSTANCES. | UNIT C.O. |
| ABSENCE WITHOUT PAY - AWOP | | GIVE EFFECTIVE DATE & CIRCUMSTANCES. STATE WHETHER OR NOT MEMBER NOTIFIED SUPERVISOR. | UNIT C.O. |
| TERMINATION - JOB ABANDONMENT | | GIVE EFFECTIVE DATE: F.O.P. - ACTION TAKEN AFTER 4 CONSECUTIVE WORKDAYS AWOP; AFSCME & UNIT II - ACTION TAKEN AFTER 5 CONSECUTIVE WORKDAYS AWOP | UNIT C.O., AREA CHIEF OR DIVISION C.O. |
| LEAVE, DISABILITY PENSION - SWORN ONLY | XX | ATTACH MEDICAL REPORTS, COMPLETE REVERSE SIDE. | MEMBER, MEDICAL DIRECTOR |
| LEAVE, MILITARY (PAID ENCAMPMT.-14 DAYS MAX.) | | GIVE DATES, ATTACH COPY OF OFFICIAL ORDER, COMPLETE REVERSE SIDE. | MEMBER, UNIT C.O. AREA CHIEF OR DIVISION C.O. |
| LEAVE, MILITARY - WITHOUT PAY | | GIVE DATES, ATTACH COPY OF OFFICIAL ORDERS, COMPLETE REVERSE SIDE. IF OVER 29 DAYS, ALSO ATTACH PER-73 (CITY REQUEST FOR LEAVE) AND PER-78 (EXIT INTERVIEW REPORT). | MEMBER, UNIT C.O. AREA CHIEF OR DIVISION C.O. |
| UNPAID ABSENCE (29 DAYS AND UNDER) - NO INSURANCE BENEFITS | | GIVE REASON & RETURN DATE, COMPLETE AND SIGN REVERSE SIDE. | MEMBER, UNIT C.O. AREA CHIEF OR DIVISION C.O. |
| LEAVE, OTHER (30 DAYS AND OVER) | | GIVE REASON & LENGTH OF LEAVE REQUESTED, COMPLETE REVERSE SIDE, ATTACH PER-73 (CITY REQUEST FOR LEAVE) AND PER-78 (EXIT INTERVIEW REPORT). | MEMBER, UNIT C.O. AREA CHIEF OR DIVISION C.O., DEP. SUPT. B.A.S. |
| LEAVE, EXTENSION OF | | GIVE DATES & REASON, COMPLETE REVERSE SIDE. ATTACH PER-73 (CITY REQUEST FOR LEAVE) | MEMBER |
| MARRIAGE LEAVE | | GIVE DATES REQUESTED FOR LEAVE, DATE OF CEREMONY & SPOUSE'S NAME | MEMBER, UNIT C.O. |
| NAME CHANGE | | GIVE NEW NAME. IF OTHER THAN BY MARRIAGE, ATTACH VERIFICATION / EXPLANATION | MEMBER |
| RETIREMENT | | GIVE EFFECTIVE DATE — ATTACH PER-78 (EXIT INTERVIEW REPORT). AS SOON AS RESIGNATION IS ACTED ON BY THE COMMANDING OFFICER WILL NOTIFY THE INTERNAL AFFAIRS AND THE PAYROLL / FINANCE DIVISION BY PAX TELEPHONE | MEMBER, UNIT C.O. AREA CHIEF OR DIVISION C.O. |
| RESIGNATION | | GIVE EFFECTIVE DATE & REASON | MEMBER, UNIT C.O. AREA CHIEF OR DIVISION C.O. |
| SEPARATION TO ACCEPT OTHER CITY POSITION / TITLE | | GIVE EFFECTIVE DATE, NEW JOB TITLE & NAME OF NEW CITY DEPARTMENT | MEMBER, UNIT C.O. AREA CHIEF OR DIVISION C.O. |
| DEATH IN FAMILY | | GIVE DATES & RELATIONSHIP TO DECEASED | UNIT C.O. |
| TRANSFER REQUEST | | COMPLETE PERSONNEL TRANSFER & ASSIGNMENT SECTION BELOW | MEMBER, UNIT C.O. AREA CHIEF OR DIVISION C.O., DEP. SUPT. |
| RECOGNIZED OPENING BID (FOP) | | COMPLETE PERSONNEL TRANSFER & ASSIGNMENT SECTION BELOW | MEMBER |
| RECOGNIZED VACANCY BID (FOP) | | COMPLETE PERSONNEL TRANSFER & ASSIGNMENT SECTION BELOW | MEMBER |

UFO ENTERED #806

**PERSONNEL TRANSFER & ASSIGNMENT SECTION**

| UNIT OF ASSIGNMENT REQUESTED | HOME ADDRESS | HOME TELEPHONE NO. | SENIORITY DATE | TITLE CODE | GRADE |
|---|---|---|---|---|---|
| DATE ASSIGNED TO PRESENT UNIT | DATE OF BIRTH | ☐ UNIT NOTICE OF RECOGNIZED OPENING NO.: ☐ RECOGNIZED VACANCY LISTING ADMINISTRATIVE MESSAGE FACSIMILE NETWORK NO.: | POSITION REQUESTED | | |
| DATE SUBMITTED | TIME SUBMITTED | COMMANDING OFFICER / WATCH COMMANDER'S SIGNATURE | | STAR NO. | |

**REMARKS SECTION**

Officer Sams exhausted available medical days on 13 Jul 06. The Officer went o an LOA for Disability Benefits effective 14 Jul 06. Member was reinstated to t Payroll on 14 Jan 11. The Officer has no available medical time; therefore the new LOA date is effective 01 Mar 11.

Notifications; IAD By MAIL 03 MAR 11 Finance 03 MAR 11 Joel Brown Unit 03 MAR 11 [illegible]

HUMAN RESOURCE DIVISION 4 MAR 11 16

**SIGNATURES**

SIGNATURE OF MEMBER (IF REQUIRED) Refused

☒ RECOMMEND APPROVAL ☐ DISAPPROVAL — SIGNATURE & TITLE (UNIT C.O.) [signature] 55Y

☐ RECOMMEND APPROVAL ☐ DISAPPROVAL — SIGNATURE

☐ RECOMMEND APPROVAL ☐ DISAPPROVAL — SIGNATURE & TITLE

☐ RECOMMEND APPROVAL ☐ DISAPPROVAL — SIGNATURE & TITLE

FOR PERSONNEL DIVISION / BUREAU OF ADMINISTRATIVE SERVICES USE ONLY

☒ APPROVED ☐ DISAPPROVED — SIGNATURE Kacey R. [illegible]

COMMENTS

I.A.D. CLEARANCE AS OF:

CONFIDENTIAL

EXHIBIT C