**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **JEANETTE SAMS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 13 C 7625** |
| **v.** ) | |
| ) | **Judge Jorge L. Alonso** |
| **CITY OF CHICAGO and BARBARA** ) | |
| **HEMMERLING,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Jeanette Sams, brings this suit asserting claims of disability discrimination against

her employer, the City of Chicago ("the City"), under the Americans with Disabilities Act

("ADA"), 42 U.S.C. §§ 12101 *et seq*., and claims of race discrimination against her employer

under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq*, and against a fellow

employee, Barbara Hemmerling, under 42 U.S.C. §§ 1981 and 1983. Defendants have moved for

summary judgment. For the following reasons, defendants' motion is granted in part and denied

in part.

## BACKGROUND

On defendants' motion for summary judgment, the Court considers the following facts in

the light most favorable to plaintiff, giving her the benefit of all conflicts in the evidence and any

reasonable inferences that may be drawn therefrom. The Court does not "necessarily vouch for

the objective accuracy of all factual statements here, but defendants moved for summary judgment,

which requires [viewing] the evidence in this harsh light." *Fish v. Greatbanc Tr. Co.*, 749 F.3d

671, 674 (7th Cir. 2014).

Plaintiff, who is African American, is an inactive Chicago police officer who has worked for the Chicago Police Department ("CPD") since 1991. (Pl.'s LR 56.1 Resp. ¶ 1, ECF No. 138-1 at 17; Defs.' LR 56.1 Stmt. Ex. B, Pl.'s Dep. at 62:12-13, ECF No. 125-3.)  In 1996, suffering from some health issues, plaintiff began to work in a limited duty position in the CPD's Alternate Response Unit ("ARU"), in which officers take police reports over the phone in response to non-emergency 311 calls.  (Pl.'s Dep. at 67:14-15; Pl.'s LR 56.1 Resp. ¶¶ 12-13.)  While working in the ARU, plaintiff's primary responsibility was sending out victim information notices.  (Pl.'s LR 56.1 Resp. ¶ 14.) In 2005, plaintiff suffered a stroke and took "medical roll" time to recover.  (*Id.* ¶ 15.)  In 2006, while on medical roll, plaintiff suffered a second stroke.  (*Id.*)  Later in 2006, plaintiff ran out of medical roll time, and she was placed on a personal leave of absence to apply for disability pension benefits.  (*Id.*)  Plaintiff received an award of disability benefits, which she exhausted on May 23, 2010, after suffering a third stroke.  (*Id.* ¶ 17; *see* Pl.'s Dep. at 176:12-23.) In May 2010, plaintiff contacted CPD to end her leave and seek reinstatement.  (Pl.'s LR 56.1 Resp. ¶ 19.)  Based on a note from her primary care physician confirming that plaintiff had sufficiently recovered to ambulate without assistance and safely handle a weapon, plaintiff was cleared for light duty and reinstated on January 14, 2011.  (*Id.* ¶¶ 20-21.)  She was initially assigned to the police academy for retraining, and she attended the academy until February 11, 2011, when she was notified that she had been assigned to the Third District and detailed to the ARU.  (*Id.* ¶¶ 22-23.)  A police officer is "assigned" to a "home unit," but might be "detailed" to another unit, where she might work temporarily, sometimes based on medical restrictions.  (*Id.* ¶ 23.)  Plaintiff was to report to the ARU on February 14, 2011.  (*Id.* ¶ 25.)

Plaintiff did not report to the ARU as scheduled because, on February 11, she had injured herself by slipping and falling on ice in the alley behind her home, and she was suffering from

headaches as a result. (*Id.* ¶¶ 25-26.) She called in sick to both the ARU and the Medical Services Section ("MSS"), which is a CPD unit responsible for processing officers' injuries, authorizing medical care, and managing officers' time off for injuries or medical issues. (*Id.* ¶ 27.)

Plaintiff did not want to return to the ARU. (*Id.* ¶ 28.) She remembered that it was very noisy there, with as many as one hundred officers in one large room loudly taking police reports over the phone and conversing with—or, often, screaming at—each other. (*Id.*) She believed that the MSS, by contrast, was a calm office setting where her interactions with others were more likely to be one-on-one, and she believed that the MSS offered an environment that was "conducive" to her continuing recovery from her strokes and in which she could "do a good job" while she was returning to full health and fitness. (Pl.'s Dep. at 104:2-105:15; *see* Pl.'s LR 56.1 Resp. ¶ 28.) Plaintiff telephoned the Chief of Patrol, Eugene Williams, to request that she be reassigned to the MSS. (Pl.'s LR 56.1 Resp. ¶ 29.) According to plaintiff, Williams told her that he "didn't see a problem" with reassigning her to the MSS, but she should obtain paperwork from her physician to justify it, "so that if anyone questioned his reassignment of [plaintiff], then he would have something to justify it." (Pl.'s Dep. at 112:8-113:13.)

On February 14, 2011, plaintiff contacted her doctor's office and requested a doctor's note to support her request to work daytime hours in a calm environment where she would be required to interact with only a few employees, such as the MSS. (Pl.'s LR 56.1 Resp. ¶ 31.) Plaintiff's doctor, Dr. Killingsworth, wrote a letter to CPD, thanking CPD for "accommodating Ms. Sams in her return to work after significant debilitating illness" and reporting that she "continues to do well with one on one interactions with clients." (Pl.'s LR 56.1 Resp., Ex. A, Pl.'s Decl. ¶ 28, ECF No. 138-1 at 75; *id.* Ex. 8, February 21, 2011 Killingsworth Letter, ECF No. 138-1 at 89.) "However," Dr. Killingsworth continued, "when placed in large settings with multiple officers interacting with

clients, this results in psychological distraction and anxiety for Ms. Sams." (*Id.*) Dr. Killingsworth requested that plaintiff "be allowed to work in smaller settings providing more one on one interactions, adding that she had "also requested an occupational therapy evaluation requesting therapeutic training for [plaintiff] in this area." (*Id.*) At her deposition, Dr. Killingsworth explained that "after her stroke, [plaintiff] had . . . problems focusing and collecting her thoughts," although, with some "social activity" and "speech therapy, there was significant improvement," which Dr. Killingsworth wanted to support and sustain. (Defs.' LR 56.1 Stmt. Ex. K, Killingsworth Dep. at 125:13-20, ECF No. 134-4 at 33.) In her letter, Dr. Killingsworth also requested from CPD a "work site assignment closer to [plaintiff's] home" to "decrease stressors" and "significant fatigue" related to her commute. (Pl.'s Decl., Ex. 8.)

Dr. Killingsworth examined plaintiff at an appointment on February 22, 2011, and wrote a note clearing plaintiff to return to work on February 28, 2011, "with the restrictions previously recommended [in the February 21, 2011] correspondence." (Pl.'s LR 56.1 Resp. ¶ 38.) Plaintiff provided MSS with both Dr. Killingsworth's February 21, 2011 recommendation letter and her February 22, 2011 return to work note, and the MSS cleared her to return to work on February 28, 2011. (*Id.* ¶ 39.) Dr. Killingsworth testified at her deposition that, if plaintiff had the opportunity to gradually come back into her previous working environment, she would be able to perform her job as well as anyone else, despite her disabilities. (*Id.* ¶ 70.)

On March 1, 2011, Barbara Hemmerling received Dr. Killingsworth's February 21, 2011 recommendation letter and reviewed plaintiff's medical file. (*Id.* ¶ 44.) Hemmerling served as the Medical Administrator of the MSS. (*Id.* ¶ 1.) Her job was to supervise the MSS, particularly its nursing staff, although at times she took responsibility for supervising the clerical staff as well. (Defs.' LR 56.1 Stmt. Ex. D, Hemmerling Dep. at 8:9-10:15, ECF No. 125-7 at 3-4.) Hemmerling

called plaintiff immediately to request that she report to the MSS to meet with her, and plaintiff reported that same day.  (Pl.'s LR 56.1 Resp. ¶ 44.)

According to plaintiff, Hemmerling told plaintiff that she was "over" plaintiff's health issues, she did not want plaintiff working in MSS, she wanted plaintiff to return to the ARU, she would go upstairs to Human Resources to make sure plaintiff was not assigned to MSS, and if plaintiff did not agree to return to the ARU, Hemmerling would complete paperwork declaring that plaintiff was unfit for work.  (*Id.* ¶ 45.)  Plaintiff attempted to explain that she had spoken with the Chief of Patrol and he was assigning her to MSS, but Hemmerling insisted that plaintiff must return to the ARU.  (Pl.'s Dep. at 127:7-13.)  Plaintiff said she would follow up with the chain of command, and Hemmerling said she would speak with Tracey Ladner, CPD's Director of Human Resources, and be in contact with plaintiff.  (*Id.* at 127:15-128:16.)

On March 3, 2011, Hemmerling telephoned plaintiff to tell her that she had placed plaintiff on a personal leave of absence.  (*Id.* at 140:10-141:2.)  Plaintiff responded that she had not requested a personal leave of absence, she did not believe she could properly be placed on a personal leave involuntarily, and she would follow up with the chain of command.  (*Id.* at 141:2-14.)

Also on March 3, 2011, Hemmerling emailed Lieutenant Looney, the commanding officer of MSS, and a sergeant in Human Resources, Barbara West, about her March 1 meeting with plaintiff.  (Pl.'s LR 56.1 Resp. ¶ 58.)  According to Hemmerling, she had tried to explain at the meeting that plaintiff was out of medical roll time and her only options were to (a) report to the ARU; (b) complete ADA accommodation paperwork, if she sought reassignment to a different unit to facilitate her ongoing recovery; or (c) take another leave of absence.  (*Id.* ¶ 45.)  In her email, Hemmerling wrote that plaintiff refused all of those options: she had submitted a note from

her physician that "precludes her from returning to duty," she refused to accept the ADA accommodation form that Hemmerling had tried to give her, and she had refused to sign a personal leave of absence form. (Defs.' LR 56.1 Stmt. Ex. J, Hemmerling Aff. Ex. 16, ECF No. 125-13 at 55.)

West forwarded Hemmerling's email to Ladner, who forwarded it to Marvin Shear, the Deputy Chief of the Bureau of Administration, to whom Ladner reported. (Pl.'s LR 56.1 Resp. ¶ 58.) Shear told Hemmerling and Looney to complete paperwork placing plaintiff on a leave of absence. (*Id.*)

In 2012, plaintiff called the MSS and left messages, but her calls were not returned. (Defs.' LR 56.1 Resp. ¶ 20, ECF No. 146.) Plaintiff sent letters and made calls to various CPD and City of Chicago officials to complain about being placed on leave. (*Id.*; Pl.'s LR 56.1 Resp. ¶ 71.) CPD Superintendent Garry McCarthy received three letters from plaintiff, in two of which plaintiff explained that Hemmerling had told her that she was placing plaintiff on leave because she felt that, if plaintiff could not work in the unit to which she was assigned, she should not be a police officer at all. (Defs.' LR 56.1 Stmt. Ex. F, Ladner Aff., Ex. 16, ECF No. 125-9 at 77-79.) McCarthy forwarded these letters to Ladner for response. (Pl.'s LR 56.1 Resp. ¶ 72.)

Ladner, who is African American (Pl.'s LR 56.1 Resp. ¶ 5), wrote plaintiff a letter, dated March 16, 2012, in which she explained plaintiff's status based upon a review of her medical file:

> By March 2011, you exhausted all of your medical time. In March 2011, your doctor stated that you needed "one on one interactions" and that "working in large settings with multiple officers interacting with clients" caused you "psychological distraction and anxiety."
>
> As a result, you were given the option of going on a leave of absence or requesting a reasonable accommodation under the ADA. You refused to exercise either option.

> We hope that your medical condition improves so that you may return to duty at some point.

Plaintiff and Ladner spoke by telephone in March 2012. (Pl.'s Decl. ¶ 45.) According to plaintiff, she told Ladner that Hemmerling had evidently misled her about their March 2011 meeting because, in fact, plaintiff had wanted to return to work ever since then. (*Id.*) Ladner told plaintiff that she could not return to work because of "medical reasons." (*Id.*)

Plaintiff filed a charge of discrimination with the EEOC on March 23, 2012. In August 2012, plaintiff saw for the first time a form showing that plaintiff was on a personal leave of absence, effective March 1, 2011. (Defs.' LR 56.1 Stmt., Ex. E, Looney Dep. Ex. 1, ECF No. 125-8 at 14.) The form is signed by Lt. Looney, and in the space for plaintiff's signature is the handwritten word, "Refused." (*Id.*) Plaintiff also received, for the first time, a copy of a letter dated March 15, 2011, addressed to plaintiff and signed by Ladner, stating that her "request" for personal leave had been approved, although plaintiff had made no such request. (Pl.'s Decl. ¶ 56, Ex. 11.)

Ladner sent plaintiff a final letter in November 2012, in which she stated that she had been trying to reach plaintiff by phone but had been unable to do so, and in any case she could not provide any information about plaintiff's case other than to enclose another copy of her March 16, 2012 letter because plaintiff's "case is currently in litigation." (Pl.'s Decl. Ex. 11.)

Plaintiff is aware of three officers, Patricia Pawlak, Kim Farrett, and Sieko O'Campo, who were assigned to MSS after March 2011 and who were not African American. (Pl.'s LR 56.1 Resp. ¶ 75.) O'Campo identifies as Hispanic, and Pawlak and Farrett are white. (*Id.*) O'Campo and Farrett are not disabled. (Defs.' LR 56.1 Resp. ¶ 31.) Between January 2011 and March 2012, the MSS staff consisted of twenty-one white employees, twenty-two African-American

employees, seven Hispanic employees, and one Asian employee. (Pl.'s LR 56.1 Resp. ¶ 75.) A number of the officers in MSS were assigned there on limited duty due to medical issues. (*Id.*)

**DISCUSSION**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014); *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 499-500 (7th Cir. 2008). "A factual dispute is 'genuine' only if a reasonable jury could find for either party." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (citation and internal quotation marks omitted). Rule 56 imposes the initial burden on the movant to inform the court why a trial is not necessary. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the nonmovant bears the ultimate burden of persuasion on a particular issue, the movant's initial burden may be discharged by pointing out to the court that there is an absence of evidence to support the nonmoving party's case. *Id.* Upon such a showing, the nonmovant must then "make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (internal quotation marks and citation omitted). The nonmovant must go beyond the pleadings to demonstrate that there is evidence upon which a jury could find in her favor. *Id.* at 1168-69 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

**I.  TIMELINESS**

Defendants' timeliness arguments essentially rehash issues defendants already raised in their 2014 motion to dismiss, when this case was before a different judge. The previously-assigned judge held that (a) plaintiff's § 1981 claim is not time-barred because it is governed by the four-

year statute of limitations of 28 U.S.C. § 1658, not the two-year statute of limitations generally applicable to § 1983 claims in Illinois; and (b) plaintiff's Title VII and ADA claims are not time-barred to the extent they are based on the City's March 2012 refusal to reinstate, rather than the March 2011 forced leave, because and to the extent that the 2012 refusal to reinstate is a "discrete act" that is "independently discriminatory." (Nov. 25, 2014 Mem. Op. & Order at 10-13.) Defendants argue that the Court should reconsider these rulings in light of the evidence produced in discovery, but the Court sees no reason to deviate from either ruling.

### 1. Section 1981

The Court agrees with the reasoning of the earlier decision in this case and like decisions that the statute of limitations applicable to § 1981 claims that arise post-contract-formation is the four-year statute of 28 U.S.C. § 1658, not the two-year statute generally applicable to § 1983 claims in Illinois. *See Price v. N. Ill. Univ.*, No. 16 CV 9827, 2017 WL 7510924, at *3 (N.D. Ill. Dec. 14, 2017); *McKinney v. Office of the Sheriff of Whitley Cty.*, No. 15 CV 79, 2018 WL 3434710, at *3 (N.D. Ind. July 17, 2018), *Belton v. City of Memphis*, No. W2015-01785, 2016 WL 2754407, at *12-13 (Tenn. Ct. App. May 10, 2016) (surveying cases nationwide and finding "near unanimity among the federal courts" that the four-year limitations period applies to post-contract-formation race discrimination alleged against a state actor under § 1981 via § 1983); *contra Nitch v. Ester*, No. 16 CV 6033, 2017 WL 4650878 (N.D. Ill. Oct. 17, 2017). Defendants provide no reason to depart from this "near unanimity," particularly considering that the cases they cite are inapposite. *See Matthews v. Hughes*, No. 14 CV 7582, 2015 WL 5876567, at *5 (N.D. Ill. Oct. 5, 2015) (stating, in *dicta*, that a two-year limitations period applies, where there was no dispute that the claim was timely even under a two-year statute of limitations); *Rivas v. Levy*, No. 11 CV 02738,

2015 WL 718271, at *4 n. 4 (N.D. Ill. Feb. 18, 2015) (applying the two-year statute of limitations because the alleged misconduct was pre-contract-formation, not post-formation).

### 2. *Title VII and ADA Claims*

In order to evade the time bar on her Title VII and ADA claims, plaintiff must show that the March 2012 refusal to reinstate plaintiff was a discrete, independently discriminatory act. (Mem. Op. & Order at 10 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("Each discrete discriminatory act starts a new clock . . . . The existence of past acts and the employee's prior knowledge of their occurrence . . . does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.") and *Stuart v. Local 727, Int'l Bhd. of Teamsters*, 771 F.3d 1014, 1018 (7th Cir. 2014) ("There is no rule that a plaintiff who has been repeatedly discriminated against by her employer cannot challenge any of the discriminatory acts under Title VII unless she files her EEOC charge within 300 days after the first such act.").) *See Lewis v. City of Chi.*, 560 U.S. 205, 214-15 (2010) ("[A] Title VII plaintiff must show a present violation within the limitations period. . . . For disparate-treatment claims . . . that means the plaintiff must demonstrate deliberate discrimination within the limitations period.") (internal citations and quotation marks omitted). As the Seventh Circuit has explained,

> An employer's refusal to undo a discriminatory decision is not a fresh act of discrimination. . . . [If there are two discrete wrongs, a]n applicant does not have to sue about the first wrong to be entitled to contest a second. . . . But when the first decision is connected to and implies the second—when, in other words, a single discriminatory decision is taken, communicated, and later enforced despite pleas to relent—the time starts with the initial decision.

*Lever v. Nw. Univ.*, 979 F.2d 552, 556 (7th Cir. 1992).

This is not a case in which the "first decision is connected to and implies the second" or "a single discriminatory decision is taken, communicated, and later enforced despite pleas to relent."

10

The facts show that plaintiff's doctor cleared her to return to work in 2011, although she wrote a letter on plaintiff's behalf requesting, or "recommend[ing]," that plaintiff receive certain accommodations. Viewing the evidence in the light most favorable to plaintiff, in 2011, Hemmerling insisted that she would not stand for plaintiff being reassigned to MSS and she improperly placed plaintiff on leave without plaintiff's consent, using the doctor's letter as cover by deliberately misinterpreting it to "preclude[] her from returning to duty." In 2012, plaintiff corresponded with Ladner about reinstatement, and Ladner independently reviewed plaintiff's medical file, including the doctor's letter, from which she quoted in her correspondence with plaintiff. She spoke with plaintiff by phone, and told her that she could not reinstate plaintiff for "medical reasons."

From these facts, it appears that Ladner made an independent decision to refuse to reinstate plaintiff in 2012. Her decision was like Hemmerling's in the sense that they both relied on the same letter from plaintiff's doctor, and they both misinterpreted it in the same way, but it does not follow that Ladner's decision was the mere "enforcement" of Hemmerling's, or that Hemmerling's decision "implied" Ladner's. *See Lever*, 979 F.2d at 556. Ladner was Hemmerling's superior in the hierarchy of the CPD, and was perfectly capable of reversing Hemmerling's earlier decision. She independently reviewed the medical file in March 2012 and had an independent phone conversation with plaintiff, but she independently determined not to reinstate plaintiff at that time, although plaintiff says she was ready to return to work on limited duty. That was a discrete, independently discriminatory act that "start[ed] a new clock." *Morgan*, 536 U.S. at 113.

None of the claims that survived defendants' motion to dismiss in 2014 is time-barred.

## II.    RACE DISCRIMINATION

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). On a defendant's motion for summary judgment in an employment discrimination case, "the correct standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the . . . adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The Court must consider the evidence as a whole to determine whether the full evidentiary picture permits a reasonable inference that plaintiff's race caused the City to refuse to reinstate her in 2012. *See Ortiz*, 834 F.3d at 765; *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). Whether the evidence is direct or circumstantial, "the question remains: has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (citing *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013) ("The central question at issue is whether the employer acted on account of the plaintiff's [race or other protected characteristic].")).

In a previous opinion in this case, the court has already explained the principles governing plaintiff's section 1981 claim:

> 42 U.S.C. § 1981 guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts," regardless of race. It proscribes racial discrimination in contractual relationships, including employment. *Smith v. Bray,* 681 F.3d 888, 892 (7th Cir. 2012). There is a private right of action for violations committed by private actors, but another section—section 1983—provides "the exclusive remedy for violations of § 1981 committed by state actors." *Campbell v. Forest Preserve Dist.,* 752 F.3d 665, 671 (7th Cir. 2014). . . . Individuals can be held liable under § 1981, if they "participated in" the adverse employment action against the plaintiff. *Smith v. Bray,* 681 F.3d at 896-97 & n.2.

(Nov. 25, 2014 Mem. Op. & Order at 11-12, ECF No. 56, *reported at* 2014 WL 6685809.) "The same requirements for proving discrimination apply to claims under Title VII, § 1981, and § 1983." *Egonmwan v. Cook Cty. Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir. 2010).

Defendant Hemmerling argues that she is entitled to summary judgment on the § 1981 claim because she did not participate in any wrongdoing and she did not commit any intentional discrimination against plaintiff. Similarly, the City argues that it is entitled to summary judgment on the Title VII claim because plaintiff has not shown enough evidence of intentional race discrimination by Hemmerling or anyone else at CPD to create a genuine issue of material fact.

Viewing the evidence in the light most favorable to plaintiff, it shows that Hemmerling and Ladner may have behaved toward plaintiff in a way that was unfair, and in Hemmerling's case, genuinely hostile. Further, a reasonable factfinder could conclude that they were dishonest about their reasons for the actions they took in putting plaintiff on leave and refusing to reinstate her, to the extent that they relied on the letter from plaintiff's doctor as evidence that she was unable to work, because the letter merely makes requests on plaintiff's behalf, and other evidence in plaintiff's medical file would have revealed to Hemmerling and Ladner that plaintiff had actually been cleared to return to work as of February 28, 2011.

Apart from this, there is no evidence anywhere in the record that Hemmerling and Ladner's actions were based on racial discrimination. There is no evidence, for example, that Hemmerling or Ladner or anyone else who was involved in the 2011 forced leave or the 2012 refusal to reinstate admitted to having any racial animus against plaintiff or other African Americans or made any stray or ambiguous remarks that might be interpreted as evidence of a racial bias. Plaintiff points to the fact that three non-African-American employees came to work in MSS after March 2011 as evidence that similarly situated people were treated differently, but by itself this proves very little. The record reveals virtually nothing about these three employees other than their names and races, which is not sufficient information to determine whether their situations are "similar enough, apart from the employees' races, to provide support for a reasonable inference of discrimination." *Lane*

*v. Riverview Hosp.*, 835 F.3d 691, 697 (7th Cir. 2016).  In particular, the record does not reveal whether Hemmerling or Ladner had any role in the assignment of these employees to MSS.  Additionally, Ladner is African American herself.

Plaintiff's claim of race discrimination rests on evidence of pretext and weak—if not meaningless—evidence that people of a different race were treated differently.  In similar circumstances, the Seventh Circuit recently found that summary judgment for the defendant was appropriate:

> It has long been established that an employer's dishonesty in defending or explaining an employment decision can support an inference of illegal discrimination. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993). When an employer's response is factually wrong in a self-serving way on a material fact, the choice between treating it as an honest mistake or a deliberate falsehood is ordinarily a choice for a jury at trial, not for summary judgment. See *Castro* [*v. DeVry University, Inc.*, 786 F.3d 559, 574 (7th Cir. 2015)]; *Testerman v. EDS Technical Products Corp.*, 98 F.3d 297, 303 (7th Cir. 1996). . . .
>
> If there were more substance to the [comparator] comparison here, we would find a jury issue here, as well. But the two inferential steps go too far here. To go from this factual discrepancy to an inference of racial bias, a jury would have to conclude first that the discrepancy was the result of a deliberate decision to mislead . . . and second that the motive of the deliberate decision to mislead was to conceal unlawful race discrimination. Without further circumstantial evidence of unlawful discrimination, a reasonable jury could not take that step. (The issue here is familiar as the pretext element of the *McDonnell Douglas* framework for circumstantial evidence. *See Castro*, 786 F.3d at 574; *McInnis v. Alamo Community College Dist.*, 207 F.3d 276, 283 (5th Cir. 2000). Even under that framework, such evidence of pretext is not enough by itself to prove discrimination; it becomes a factor only after the plaintiff has shown other circumstances corroborating unlawful intent, including evidence that a similarly situated employee outside the plaintiff's protected class was treated better. That additional evidence is missing here.) Even if we assume that [the defendant's human resources director] deliberately misled the EEOC about her role in the [comparator] incident, that would not by itself support the further inference of unlawful intent. And the rest of the support here is just too weak to allow a reasonable inference of discrimination.

*Lane*, 835 F.3d at 697 (internal citations altered).  This case is similar.  Although a reasonable jury could find that Hemmerling and Ladner were dishonest, there is not enough evidence to support a

conclusion that their dishonesty was motivated by an intent to discriminate against plaintiff on the basis of race. Defendants' motion for summary judgment is granted on plaintiff's race discrimination claims.

## III. DISABILITY DISCRIMINATION UNDER THE ADA

Plaintiff claims that the City discriminated against her based on her disability when it failed to reinstate her in 2012. The City argues that the evidence could not support a reasonable jury verdict for plaintiff on this claim.

The ADA provides, as a "general rule," that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. A "qualified individual" is an individual who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds." 42 U.S.C. § 12111(8). "To make out a claim under the ADA, an individual must show: 1) that she is disabled; 2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against her because of her disability or failed to make a reasonable accommodation." *Stevens v. Ill. Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000).

### A. "Disability"

Under the ADA, an individual has a disability if she has:

(A) a physical or mental impairment that substantially limits one or more major life activities . . . ;
(B) a record of such an impairment; or
(C) [is] regarded as having such an impairment.

42 U.S.C. § 12102(1). "Major life activities" include "walking, standing, . . . concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i)(1)(i).

Viewing the evidence in the light most favorable to her, it appears that plaintiff meets all three prongs. There is evidence that, after her strokes, plaintiff was substantially limited in some or all of the examples of "major life activities" listed above. (Pl.'s LR 56.1 Resp. ¶¶ 34, 66-67; Killingsworth Dep. at 125:13-20.) Further, her history of strokes was well known to her employer, so there was a "record" of her "impairment." And even if she were not actually disabled, it appears that some of the City's employees, such as Hemmerling and Ladner, at least "regarded" her as disabled, to the extent that they told plaintiff she could or should not work as a police officer with such serious medical issues.

## B. "Qualified Individual"

The City argues that plaintiff was not a "qualified individual" under the ADA because she could not perform certain essential functions of her position, including (1) ambulating without assistance and (2) effectuating the arrest of an active resister, with or without a reasonable accommodation. (Pl.'s LR 56.1 Resp. ¶ 69.) CPD issued a directive, effective January 1, 2012, requiring even officers on "limited duty" to be able to use a firearm, ambulate independently, arrest an active resister, and drive a motor vehicle. (Hemmerling Aff. Ex. 17.)

> The [ADA] explicitly gives "consideration" to "the employer's judgment as to what functions of a job are essential." [42 U.S.C. § 12111(8).] Furthermore, "if an employer has prepared a written description . . . , this description shall be considered evidence of the essential functions of the job." *Id.*

*Jackson v. City of Chi.*, 414 F.3d 806, 811 (7th Cir. 2005). Equal Employment Opportunity Commission ("EEOC") regulations define "essential functions" as follows:

> (n) Essential functions—
> (1) In general. The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position.
> (2) A job function may be considered essential for any of several reasons, including but not limited to the following:

(i) The function may be essential because the reason the position exists is to perform that function;

(ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

(3) Evidence of whether a particular function is essential includes, but is not limited to:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2.

In *Jackson*, the Seventh Circuit found an earlier, less restrictive version of the CPD "limited duty" directive to define "essential functions" of a police officer's job:

> The "MINIMUM ELIGIBILITY REQUIREMENTS" of the "SWORN LIMITED/CONVALESCENT DUTY PROGRAM" show that even a police officer assigned to "limited/convalescent duty" must be able to "safely carry, handle, and use [her] Department approved, prescribed firearm." A police officer, including one on "limited/convalescent duty," also must be able to "maintain an independent and stable gait." We shall not "second-guess the employer's judgment as to the essential functions" of a position. *Peters v. City of Mauston,* 311 F.3d 835, 845 (7th Cir. 2002).

414 F.3d at 811. It would seem to follow that the requirements of the 2012 directive, including the requirements that limited duty officers must be able to arrest active resisters and walk independently, similarly represent essential functions of the police officer position.

Since *Jackson*, the Seventh Circuit has warned that "the employer's judgment is an important factor, but it is not controlling." *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 198 (7th Cir. 2011). Courts must also "look to evidence of the employer's actual practices in the workplace." *See id.* (climbing tall ladders was not "essential function" for members of highway

bridge maintenance crew, although it was an essential part of each bridge maintenance project, because it was employer's normal practice to permit certain crew members to leave certain essential tasks to other members of the crew, for lack of proficiency or other reasons).  It is true that plaintiff had worked for years in the ARU, where she had no need to arrest active resisters or even walk without assistance, and at the time of her forced leave, she was seeking to work in the MSS, where the conditions would have been even more favorable to plaintiff.

But it does not follow from the fact that particular job functions are not essential to a particular assignment that they are not essential to the employee's position.  "'[A]n employer may create a position, the nature of which requires an employee to perform a multitude of tasks in a wide range of environments,'" even if he performs some of those tasks only rarely.  *Martin v. Kansas*, 190 F.3d 1120, 1130 (10th Cir. 1999) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1176 (10th Cir. 1999) (concluding that the "essential functions of [plaintiff's] job were those broader functions of a corrections officer position, as opposed to the limited duties of a particular post") *overruled on other grounds by Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 360 (2001).  In *Martin*, the Tenth Circuit relied heavily on *Miller v. Illinois Department of Corrections*, in which the Seventh Circuit explained the principle as follows in a similar context:

> But it seems to us . . . that if an employer has a legitimate reason for specifying multiple duties for a particular job classification, duties the occupant of the position is expected to rotate through, a disabled employee will not be qualified for the position unless he can perform enough of these duties to enable a judgment that he can perform its *essential* duties.
>    **If it is reasonable for a farmer to require each of his farmhands to be able to drive a tractor, clean out the stables, bale the hay, and watch the sheep, a farmhand incapable of performing any of these tasks except the lightest one (watching the sheep) is not able to perform the essential duties of his position.** This is provided that the employer has a valid reason for requiring multiple abilities. In the case of the farmhand, the reason would be that the farm was too small to justify the hiring of specialists in each task. In the case of correctional officers and other paramilitary and military personnel, the reason for having multiply able workers who rotate through the different duty positions is to be able to respond to

unexpected surges in the demand for particular abilities. ***The prison has to be able to call upon its full staff of correctional officers for help in putting down a prison riot***, and therefore each officer must have experience in the positions, such as searching and escorting inmates, that provide the necessary training and experience for responding effectively to a riot, as well as the capability for such response. ***It would not do to have a correctional officer whose only experience and capability were in operating a telephone switchboard or issuing weapons.***

107 F.3d 483, 485 (7th Cir. 1997) (internal citations omitted) (bold emphasis added).

Similarly, in *Dargis v. Sheahan*, 526 F.3d 981, 983 (7th Cir. 2008), the Seventh Circuit held that a correctional officer, recovering from a stroke and restricted to sedentary work with no "inmate contact," *i.e.*, work that did not require him to interact with inmates and carried no risk of physical contact with inmates, could not perform the essential functions of his job. His employer, the Cook County Sheriff's Office, had refused to return him to work because the Sheriff's Office required all correctional officers to be able to "respond to emergencies such as riots or escapes, and . . . rotate through various positions as needed," so it would not accept his restrictions. *Id.* at 984. The officer insisted that there were several assignments within the institution that required no inmate contact, "including the prison's tower, the master control security center, various points of entrance and egress from the prison, the records department, the training academy, the computer room, and the firing range," and, if assigned to one of these places, he could perform the essential functions of the position. *Id.* at 984, 986.

The Seventh Circuit explained that the Sheriff's Office was not required to "'manufacture a job that will enable the disabled worker to work despite his disability.'" *Id.* at 987 (quoting *Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000)). Correctional officers were expected to be able rotate throughout the institution and respond to emergencies, and "[c]arving out a job that included very few of the duties all other correctional officers were expected to perform would have

the effect of creating a new position for an employee who would not be otherwise qualified." *Id.* at 987. The officer was not able to perform the essential functions of his job.

The City has not shown that CPD officers were necessarily required to "rotate through the different duty positions" or that there was any reason why plaintiff could not have stayed in the ARU or the MSS indefinitely. Nevertheless, the Court considers *Dargis*, along with *Jackson*, controlling. Under the 2012 directive, all officers, even those on limited duty, must be able to ambulate independently, arrest active resisters, and handle firearms. Plaintiff does not genuinely dispute that she could not do those things in 2012. (Pl.'s LR 56.1 Resp. ¶ 70; *see* Killingsworth Dep. at 180:17-21.) Although, unlike in *Miller* and *Dargis*, the City has submitted no evidence explaining the directive, its purpose is clear: it ensures that any police officer on duty can directly contribute to the central purpose of CPD, a "paramilitary operation," of "serving and protecting those within its jurisdiction by enforcing the law" and keeping the peace (Pl.'s LR 56.1 ¶ 3), just as a similar policy in *Miller* and *Dargis* ensured that all corrections officers on duty would be able to subdue violent, rioting or escaping inmates in an emergency.

The EEOC regulations provide that a job function may be essential "because the reason the position exists is to perform that function." 29 C.F.R. § 1630.2(n)(2)(i). For a police officer, arresting an active resister is essential in precisely that sense, and the ability to ambulate independently and handle a firearm goes hand-in-hand with that function. The Court concludes that the requirements of the 2012 CPD directive were "essential functions" of plaintiff's job as a police officer, and plaintiff could not perform them without a reasonable accommodation.

## C. Reasonable Accommodation

Even if plaintiff was unable to perform the essential functions of her job, she still meets the ADA's definition of "qualified individual" if she was able to return to work with a "reasonable

accommodation" from her employer. A "reasonable accommodation" may include such measures as "job restructuring, . . . modified work schedules, *reassignment to a vacant position*, . . . appropriate adjustment or modification of examinations, training materials or policies, . . . and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9) (emphasis added). "[A]n employer may be required to reassign a disabled employee to a vacant position if the employee no longer can perform the essential functions of the job she holds." *Jackson*, 414 F.3d at 812-13.

When an employer learns that one of its employees is unable to perform essential functions of her job but wishes to remain employed, "the employer must engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996) (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)); *see also Miller*, 107 F.3d at 486-87 ("Even if an employee who as here becomes disabled while employed just says to the employer, 'I want to keep working for you-do you have any suggestions?' the employer has a duty under the [ADA] to ascertain whether he has some job that the employee might be able to fill."). There is no "hard and fast rule" defining the employer's responsibilities vis-à-vis the employee in this flexible, "interactive process" because:

> neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Beck*, 75 F.3d at 1135. Thus, employers must make a good faith effort of reasonable accommodation of an employee's disability. *See Haschmann v. Time Warner Entm't Co.*, 151

F.3d 591, 602 (7th Cir. 1998); *see also id.* at 601 n.12 (holding that district court properly instructed jury that defendant must prevail if evidence showed that defendant made a "good faith effort and consulted with the plaintiff to identify and make a reasonable accommodation" that would not cause an undue hardship).

Ladner claims that she told plaintiff in their March 2012 telephone conversation that if plaintiff was interested in a "non-police position" within CPD, she could fill out CPD's standard reasonable accommodation paperwork. (Pl.'s LR 56.1 Resp. ¶ 73.) According to defendants, plaintiff never filled out reasonable accommodation paperwork, although Ladner reminded her of that option in her March 2012 letter and telephone conversation. (*Id.* ¶ 74.) But plaintiff claims that Ladner never told her anything about reasonable accommodation paperwork, apart from alleging in her March 2012 letter that plaintiff had refused to fill out any such paperwork in 2011, an allegation plaintiff disputes. (*Id.* ¶¶ 73-74; *see id.* ¶ 58.) According to plaintiff, no one at CPD ever asked her to fill out any accommodation paperwork. (*Id.* ¶¶ 73-74.)

Based on the parties' conflicting stories as to what happened during plaintiff's March 2012 communication with Ladner, there is a triable question of fact on the issue of whether CPD made a good faith effort of reasonable accommodation. CPD had the burden of engaging with plaintiff in an interactive process to determine whether a reasonable accommodation was feasible once it learned that plaintiff wanted to be reinstated but could not return to work as a police officer. *See Miller*, 107 F.3d at 486-87. If it finds plaintiff more credible than Ladner and other CPD witnesses, a reasonable jury could conclude that, in March 2012, Ladner told plaintiff that she could not be reinstated for "medical reasons," without telling her that she could apply for non-police employment as a reasonable accommodation, and that no one ever gave plaintiff reasonable accommodation paperwork to fill out. Further, according to plaintiff, she was perfectly capable of

performing clerical or similar work in an office setting, much as she had been doing in the ARU before her first stroke (*see* Pl.'s LR 56.1 Resp. ¶ 14). Under such circumstances, a jury could conclude that CPD was required to do more to explore the possibility of reassigning plaintiff to a non-police position where she could perform clerical or other work that was not physically taxing as a reasonable accommodation of her disability. There is a genuine issue of material fact on plaintiff's disability discrimination claim.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment [121] is granted in part and denied in part. The motion is granted as to plaintiff's race discrimination claims, but denied as to plaintiff's claim that the City of Chicago discriminated against plaintiff on the basis of her disability when it refused to reinstate her in 2012. A status hearing remains set for October 17, 2018 at 9:30 a.m.

**SO ORDERED.**

**ENTERED: September 28, 2018**

**HON. JORGE ALONSO**
**United States District Judge**